LIONEL Z. GLANCY (#134180)
MICHAEL GOLDBERG (#188669)
**GLANCY BINKOW& GOLDBERG LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
E-mail: info@glancylaw.com
lglancy@glancylaw.com
mmgoldberg@glancylaw.com

*Counsel for Lead Plaintiff*

(*Additional Counsel appear on Signature page*)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRAD MAUSS, Individually and on Behalf of All Other Persons Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> NUVASIVE, INC., ALEXIS V. LUKIANOV, KEVIN C. O'BOYLE, and MICHAEL J. LAMBERT, <br><br> Defendants. | Case No.: 13-cv-02005-JM <br><br> **SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |

Lead Plaintiff Brad Mauss ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding NuVasive, Inc. ("NuVasive" or the "Company"), analysts' reports and advisories about the Company, and  information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased NuVasive securities between October 22, 2008 and July 30, 2013, inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 against the Company and certain of its top officials.

2.     NuVasive is a medical device company focused on developing surgical products and procedurally integrated solutions for the spine.   The Company's principal product is a surgical platform called Maximum Access Surgery ("MAS"), which includes a proprietary software-driven nerve detection and avoidance system, Intra-Operative Monitoring ("IOM") support, a unique retractor system, an innovative lateral procedure known as eXtreme Lateral Interbody Fusion ("XLIF"), and a wide variety of specialized implants and biologic products utilized in spinal surgery.

3.     NuVasive operates in an intensely-competitive industry.   As the Company itself has acknowledged, many of its competitors are bigger, better financed, and more-widely known and accepted by surgeons, hospitals, and third-party payers, such as insurance companies.   As a result, to sustain and grow its business, the Company faces constant pressure to innovate, promote and market its products, establish relationships with surgeons and hospitals, and convince spine surgeons to choose its products over those of its competitors.

4.     At the same time, NuVasive is subject to an extensive regulatory framework, which is intended to protect patients and government-funded health care programs, such as Medicare and Medicaid, from fraud and abuse.   Thus, sales and marketing practices and other conduct that may be common in other industries may be unacceptable or illegal when soliciting business that ultimately is paid for

in whole or in part by governmental healthcare programs.  Failure to adhere to these laws and regulations can result in civil and criminal penalties, or even exclusion from participation in governmental health care programs.

5.     Because NuVasive and its customers – mainly hospitals and surgeons – rely primarily on third-party reimbursement for the surgical and monitoring fees that they earn, exclusion from participation in programs, such as Medicare and Medicaid, can be fatal to its business.  As NuVasive explains, "We expect that sales volumes and prices of our products and services will continue to be largely dependent on the availability of reimbursement from third-party payers, including government-funded programs, such as Medicare and Medicaid."  Consequently, if hospitals and physicians cannot recover adequate payments from programs like Medicare and Medicaid – either because NuVasive is ineligible to participate or because there is a disagreement about reimbursement – it is unlikely that they will use NuVasive's products and services.

6.     Despite their recognition that "[h]ealthcare fraud and abuse laws apply to our business," Defendants determined to sustain the Company's revenues and expand its customer base by employing numerous, aggressive and questionably-ethical sales and marketing practices that constitute violations of federal and state laws, including but not limited to, the Anti-Kickback Statute, the False Claims Act, and other applicable healthcare fraud and abuse laws.

7.    First, the Company lured surgeons to utilize NuVasive products and services and encourage other surgeons to do the same by devising so-called educational and training programs and clinical studies, which included, among other things, all-expense paid trips to New York, San Diego, Puerto Rico, and other locations, first-class flights on private jets, tickets to Broadway shows and NFL games, expensive cocktail receptions and dinners, luxury hotel stays, and gift cards.

8.    Defendants also created a network of prominent physicians, known within the Company as "high end rollers," who received rewards and special treatment, such as all-expense paid travel, concierge services, and speaking engagements, based upon the number of patients they referred to the Company and their promotion and publication of peer-reviewed papers touting the benefits of NuVasive products and services.

9.    Certain physicians were also paid exorbitant consulting fees and commissions, often in excess of $1 million per year per doctor, for participating in clinical trials and utilizing NuVasive products in surgeries.

10.    Defendants engaged in this wrongful and illegal conduct, knowing that the resulting increases in sales and revenues would be paid, in part, by governmental healthcare programs, including Medicare and Medicaid.

11.     Second, following losses in revenue in its monitoring business due to changes in rules for billing and coding IOM services, the Company responded by, among other things, (1) having sales representatives place monitoring equipment in operating rooms, when the equipment was redundant and not medically necessary; (2) allowing doctors to remotely monitor several patients simultaneously, and then generating separate invoices for the same time billed; (3) developing marketing materials to instruct customers on coding monitoring services so as to take advantage of loopholes in coding procedures; and (4) improperly coding monitoring services in claims submissions to Medicare and Medicaid.

12.     Third, when coding disputes threatened to impact revenues for NuVasive's XLIF procedure, which was the Company's most lucrative and well-known line of business, the Company waged a very heated battle with third-party payers, insisting that those payers, including Medicare and Medicaid, accept the coding designation assigned by NuVasive.   Ultimately, NuVasive decided to continue to utilize the coding that resulted in the highest reimbursement for the XLIF procedure.

13.     Defendants knew and disclosed in their public filings that the Anti-Kickback Statute "*prohibits the knowing and willful solicitation, offer, payment or receipt of any remuneration, direct or indirect, in cash or in kind, in return*

*for or to induce the referral of patients for items or services covered by Medicare, Medicaid and certain other governmental health programs.*" Yet, despite their awareness of numerous practices in violation of the law, Defendants claimed, "*We believe that our operations materially comply with the anti-kickback statutes…*"

14.    Likewise, Defendants knew that by compromising the independent judgment of physicians, promoting the use of equipment that was not medically necessary, and manipulating and exploiting loopholes in the billing coding system and encouraging customers to do the same, improper claims would be submitted for payment to Medicare and Medicaid in violation of the False Claims Act.

15.    Defendants' thinly-veiled kickback scheme and deceptive billing practices ultimately caught the attention of regulators.  On July 30, 2013, the Company disclosed in its Form 10-Q for its second quarter 2013 that it had "received a federal administrative subpoena from the Office of the Inspector General of the U.S. Department of Health and Human Services (OIG) in connection with an investigation into possible false or otherwise improper claims submitted to Medicare and Medicaid.   The subpoena seeks discovery of documents for the period January 2007 through April 2013."

16.    On this news, NuVasive securities declined $3.28 per share or over 12%, closing at $22.84 per share on July 31, 2013.

17.     Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.    Specifically, Defendants made false and/or misleading statements and/or failed to disclose that, inter alia: (1) the Company utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors to utilize its products and services and to encourage other doctors to do the same in violation of federal and state laws and regulations; (2) the Company employed improper sales and billing practices to sustain revenues related to its monitoring business and XLIF procedure, including by submitting false or otherwise improper claims to Medicare and Medicaid; (3) the Company provided guidance to its customers as to how to code NuVasive products and procedures in order to take advantage of loopholes and maximize reimbursement by third party payers, including Medicare and Medicaid; and (4) the Company's earnings and revenues were earned, in part, as a result of violations of healthcare fraud and abuse laws.    As a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

18.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members have suffered significant losses and damages.

## **JURISDICTION AND VENUE**

19.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

20.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

21.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as the securities of NuVasive were publicly traded in this District.

22.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

23.     Lead Plaintiff, as set forth in the attached certification, purchased NuVasive securities at artificially inflated prices during the Class Period and suffered damages upon the announcement of the alleged corrective disclosure.

24.     Defendant NuVasive is a Delaware corporation with its headquarters located at 7475 Lusk Boulevard, San Diego, CA 92121.

25.     Defendant Alexis V. Lukianov ("Lukianov") at all relevant times has been the Company's Chairman of the Board of Directors and Chief Executive Officer.

26.     Defendant Kevin C. O'Boyle ("O'Boyle") served as the Company's Executive Vice President and Chief Financial Officer through November 2009.

27.     Defendant Michael J. Lambert ("Lambert") has been the Company's Chief Financial Officer since November 9, 2009.

28.     The defendants referenced above in ¶¶ 24 - 28 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background**

29.     NuVasive began as small start-up, venture capital-backed company in 1999.  Led by Chairman and CEO Alex Lukianov, the Company has grown at an extraordinary rate to become the third-largest spinal product and surgical company in the U.S. and the fourth largest in the world, with annual revenues totaling over $620 million in 2012.  According to the Company's website, NuVasive attributes its success, in part, to "Speed of Innovation®, Absolute Responsiveness®,… and a distinct culture of 'A Players,'" who "embrace the culture of teamwork, innovation, and high expectations."

30.     NuVasive offers a comprehensive spine portfolio of over 80 unique products and services.   The Company's principal procedural solution is its Maximum Access Surgery ("MAS"), platform, which includes the XLIF® procedure, a minimally disruptive procedure that allows spine surgeons to have direct access to the intervertebral disc space (the "joint" of the spine) from the side of the body, as opposed to the front or back.

31.     NuVasive has also developed a nerve avoidance monitoring system (NVJJB™ /M5®) designed to help ensure nerve and spinal cord safety by alerting surgeons to possible injury to neural elements during procedures.   Additionally, NuVasive offers a portfolio of biologics products, including FormaGraft and Osteocel Plus, to help the bone healing process.

32.     In October 2011, NuVasive expanded its products and services by acquiring Impulse Monitoring, Inc. ("Impulse Monitoring"), which operates as a wholly-owned subsidiary of NuVasive, for $80 million.   Impulse Monitoring provides Intra-Operative Monitoring ("IOM") services, which allow doctors to detect neural structures and potential neural compromise during surgical procedures.   The IOM model employs two doctors, a neurophysiologist, who oversees the use of monitoring equipment during surgery, and a physician, who monitors and interprets neurological data transmitted from sensors attached to the patient by the neurophysiologist, usually from a remote location outside the

hospital.  Both of these doctors work for Impulse Monitoring either as employees or as independent contractors.

33.    The acquisition of Impulse Monitoring was intended to leverage NuVasive's nerve monitoring platform and facilitate sales of its other products and services, such as the Company's existing nerve monitoring system, NeuroVisionTM, as well as surgical kits, from which the Company derives significant revenue.  At the time of the acquisition, the Company estimated that Impulse Monitoring would contribute approximately $40 million to NuVasive's annual revenue and would grow at a rate of approximately 15% per year.

34.    According to NuVasive's public filings, the Company's sales volumes and revenues are largely dependent on its ability to obtain reimbursement for its products and services, either directly or indirectly, from third-party payers, including governmental healthcare programs, such as Medicare and Medicaid. With respect to its medical devices and biological products, the Company sells directly to doctors and hospitals on a consignment basis.  The hospitals then stock the products for use during surgery.  After a surgery is complete, NuVasive invoices the hospital for the amount of products the surgeon utilizes.   The hospital, in turn, then pays NuVasive and submits claims for reimbursement to third-party payers, including Medicare and Medicaid.  Although NuVasive is not directly involved in preparation of these claims, the Company knows and

understands that if claims for reimbursement are rejected by third party payers, for example, because the procedure is not properly coded or is not considered reasonably priced or necessary, then doctors and hospitals will likely switch to competitors' products and services for which they can receive reimbursement.

35.    In contrast, NuVasive generates two invoices in connection with provision of IOM services.   The first invoice, which NuVasive sends to the hospital, covers the cost of the neurophysiologist and the use of the remote monitoring equipment in the operating room.   The second invoice covers the physician's fees for remotely monitoring the procedure.   NuVasive bills this portion directly to the patient's insurer, including Medicare and Medicaid.   In order to be reimbursed, NuVasive must code IOM services in accordance with the Centers for Medicare and Medicaid Services ("CMS") guidelines and published fee schedules.

## NuVasive Operates In A Highly-Competitive Industry

36.    Despite its apparent success, NuVasive faces intense competition in the medical device industry and is under constant pressure to develop and market its products and services.   As NuVasive acknowledged:

> Our currently marketed products are, and any future products
> we commercialize will be, subject to intense competition.
> Several of our current and potential competitors have
> substantially greater financial, technical and marketing
> resources than we do, and they may succeed in developing

products that would render our products obsolete or
noncompetitive. In addition, these competitors may have
significantly greater operating history and reputations than we
do in their respective fields.

37.     Thus, the key to the Company's commercial success is to "convince
spine surgeons that [NuVasive's] minimally disruptive surgical products are an
attractive alternative to [its] competitors' products for the treatment of spine
disorders."   Otherwise, as NuVasive warns, "[I]f we fail to adequately and
continually promote and market our products to these spine surgeons or if a spine
surgeon adopts a competitor's products into their practice, our sales could
significantly decrease which could significantly impact our profitability and cash
flow."

38.     In response to this enormous competitive pressure, the Company has
dedicated significant resources to build an exclusive sales force, which sells only
NuVasive's products, and to develop training and education programs for
surgeons.  These training and education programs include, but are not limited to,
building state-of-the-art cadaver operating theaters on both the East and West
Coasts and creating and financing medical societies, such as the Society of Lateral
Access Surgery ("SOLAS"), which purportedly studies lateral spine surgery
techniques, including NuVasive's own XLIF procedure.

39.   According to the Company's annual report, in 2012 alone, the Company spent over $372 million on sales, marketing, and administrative expenses ("SMA"), consuming approximately 60% of the Company's total revenues.   The annual report explains that SMA includes, inter alia, "compensation, commission and training costs …; surgeon training costs; shareowner (employee) related expenses for our administrative functions; and third-party professional service fees."

40.   Indeed, since 2008, SMA has comprised in excess of 65% of total revenues for each year, amounting to over a billion dollars in sales and marketing expenses for 2008 through 2012.

41.   The percentage of revenue funneled to SMA is also disproportionately large as compared to NuVasive's competitors.   On average, the competitors identified by NuVasive in its annual report only spent 34% of total revenues on SMA in 2012.

42.   Therefore, the Company has been willing to expend significant resources to fight for market share, meet expectations, and expand the Company's reach and influence among doctors and hospitals.

---

**NuVasive's Business Depends On Its Ability**
**To Participate In Federal Healthcare Programs**

43.     While NuVasive may have been highly motivated to do everything necessary to increase sales and revenues, numerous federal and state laws and regulations, as well as industry ethical guidelines, restrict the Company's ability to adopt certain practices in the sales and marketing of and billing for its products and services.   While some of these sales and marketing practices may be commonly accepted and legal in many types of businesses, the medical device and related industries, like pharmaceuticals, are unique, because certain government programs, such as Medicare and Medicaid, depend on physicians and healthcare professionals to exercise independent judgment in the best interests of the patient. Thus, as explained by the Office of the Inspector General ("OIG"), the purpose of these laws and regulations is "to protect patients and federal healthcare programs from fraud and abuse by curtailing the corrupting influence of money on health care decisions."

44.     Specifically, in 1972, Congress enacted the Federal Anti-Kickback Statute to address concerns regarding conflicts of interest and unfair competition, which lead to abuses of federal health care programs.  The Anti-Kickback Statute provides, in pertinent part:

> "Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
>
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both."

42 U.S.C. § 1320a-7b(b).

45.    In addition to criminal and civil fines and penalties, including up to five years in prison, violation of the Anti-Kickback Statute can also result in exclusion from participating in and receiving reimbursement from state and federal healthcare programs.  For most medical device and pharmaceutical businesses, including NuVasive, exclusion from these programs makes it nearly impossible to compete, as healthcare providers will find alternative products and services for which they can obtain reimbursement from third-party payers, including Medicaid and Medicare.

46.    Furthermore, under the Federal False Claims Act, the government may recover losses due to fraud and abuse by persons seeking payment from the

United States.  See S. Rep. No. 345, 99 Cong., 2d Sess. at 2 (1986), reprinted in 1986 U.S.C.C.A.N 5266.  The False Claims Act makes it unlawful for any person to knowingly present a false or fraudulent claim, record or statement to the government for payment or approval.  See 31 U.S.C. § 3729.  With respect to Medicare and Medicaid, claims may be false if they claim reimbursement for services or costs that either are not reimbursable or were not rendered as claimed.  Medicare and Medicaid coverage is also limited to medical goods and services that are "reasonable and necessary" for the diagnosis and treatment of a patient.  See 42 U.S.C. § 1395y(a)(1)(A).  The amounts reimbursed by Medicare and Medicaid depends on established coding for given procedures, which are determined by the American Medical Association and the Centers for Medicare and Medicaid Services ("CMS").  Improper coding is a basis for liability under the False Claims Act.

47.    Regulatory scrutiny of the medical industry has also increased with the enactment of the Physician Payments Sunshine Act of 2009 and the Patient Protection and Affordable Care Act in 2010.  These laws broaden the scope of the Anti-Kickback Statute and False Claims Act and require companies to report all transfers of value to physicians to the U.S. Department of Health and Human Services on an annual basis beginning March 31, 2013.

48.    The OIG has issued Compliance Program Guidance to encourage companies like NuVasive to monitor and adhere to applicable laws and program requirements.   Among other things, this guidance recommends that companies evaluate whether any remuneration paid to physicians (i) depends on the volume or value of business generated for the company; (ii) reflects fair market value of the services provided; (iii) has the potential to affect costs to any federal healthcare programs; and (iv) creates potential conflicts of interest that diminish, or appear to diminish, objectivity of professional judgment, as these pose a risk of fraud and abuse.   The OIG also cautions that certain consulting and advisory payments, business courtesies and gratuities (e.g., entertainment, travel, gifts), and education and research funding potentially implicate the Anti-Kickback Statute, particularly where these arrangements originate through sales or marketing functions or are connected in some way to marketing or promotion of the company's products and services.

49.    In their public filings, Defendants acknowledge that these laws apply to their business.

**Defendants' Unethical And Illegal Kickbacks In Exchange For Business**

50.    Despite the potentially serious repercussions, Defendants employed numerous sales and marketing practices that were unethical and that exposed the

Company to liability and enforcement under healthcare fraud and abuse laws, including, inter alia, the Anti-Kickback Statute and the False Claims Act.

51.     These sales and marketing practices included, but were not limited to, (1) providing millions of dollars of gifts, such as vacations, private jet travel, Broadway shows, hotel stays, expensive dinners, and tickets to sporting events, to doctors who used NuVasive products and services; (2) utilizing Company-financed clinical trials and medical societies to promote its products and services; (3) rewarding certain prominent physicians for exceeding goals set by the Company for referring patients to clinical trials; (4) developing training and educational programs that also included numerous "perks" for participating doctors; (5) paying surgeons exorbitant consulting fees and commissions for using and promoting the Company's products; and (6) paying large sums of money to doctors who published favorable articles touting the benefits of the Company's products and services in peer-reviewed journals.

52.     Upon information and belief, in the Company's public disclosures, these kickbacks paid to doctors for referrals of business and promotion of NuVasive's products and services were disguised under innocuous descriptions, such as "surgeon training costs; shareowner (employee) related expenses for our administrative functions; and third-party professional service fees."  In actuality,

Defendants spent millions of dollars of revenue to purchase influence and increase sales.

53.     Defendants engaged in this wrongful and illegal conduct, knowing that the resulting increases in sales and revenues would be paid, in part, by governmental healthcare programs, including Medicare and Medicaid, which was accepted by physicians using NuVasive's products and services.

54.     Defendants' fraudulent and abusive sales and marketing practices have been confirmed by numerous former employees.  For example, Confidential Witness 1 ("CW1"), is a former employee who worked directly for Defendant Lukianov from December 2009 through September 2012.  CW1 had access to the Company's sales and marketing-related programs and expenses, including expense reports submitted by Defendant Lukianov.  During CW1's tenure, CW1 became aware of millions of dollars of gifts given to doctors who used NuVasive products in surgeries.  These gifts included flights on private jets from such cities as San Diego and New York to Florida, where doctors met with Defendant Lukianov, and then travelled on to Puerto Rico for all-expense paid vacations. The Company also paid for expensive dinners and other entertainment, including suites and tickets to professional sporting events.

55.     According to CW1, there were about 20 doctors receiving this special treatment, and "they used the entire line of [NuVasive] spinal products.  They

didn't use any other of our competitors." CW1 also indicated that "doctors [who] were Lukianov's favorites … received more gifts than others."

56.     In addition, CW1 learned that Defendant Lukianov's excessive business and personal expenses were all being paid by the Company. "Millions of dollars were spent on private airfare when I was there. Personal dinners with his wife were sent through the company. There was a giant wine storage cabinet that houses I can't even tell you how many bottles of $150 bottle wines. There was excess. Definitely."

57.     CW1 also said that the Company purchased an Audi A8 and Lincoln Navigator used almost exclusively by Defendant Lukianov. Defendant Lukianov also had a corporate driver at his disposal, who Defendant Lukianov mainly employed for personal use, including transporting his wife and children. The driver was paid by the Company and earned well over $100,000 per year.

58.     In early 2010, CW1 began informing Defendant Lambert that Defendant Lukianov was billing large personal expenses through the Company as business expenses. On several occasions, CW1 brought Defendant Lukianov's expense reports to Defendant Lambert's office and specifically identified improper and excessive expenses. Disappointingly, CW1 stated that "[Defendant Lambert] approved the expenses anyway. Always."

59.     Similarly, Confidential Witness 2 ("CW2"), a former project administrator who worked in the marketing department from August 2008 through October 2013, and Confidential Witness 3 ("CW3"), a former clinical research coordinator from June 2012 to February 2013, described a training program called the Marquis Visit Program ("MVP").  According to a Company brochure, MVP is a "hands-on cadaveric experience in NuVasive's state-of-the-art MAS Operating Room.  The lab experience is facilitated by the engineers and product managers who are integral to the product development process.  Each visit includes an introduction to NuVasive via a corporate overview, clinical and product discussions, and interaction with senior management"

60.     In addition, the Company brochure promises that "NuVasive has a dedicated team that manages all Surgeon Marquis Visits on virtually a '24/7' basis to accommodate surgeons' schedules from across the United States. … [T]he MVP team will handle all logistics and associated costs for surgeons, including travel, lodging and hospitality."

61.     CW3, who dealt directly with clinical research sites and doctors participating in the research, also said that certain prominent physicians, who exceeded goals set by the Company for referring patients to clinical trials, were referred to internally as "high end rollers."  The high end rollers received special treatment, and they were flown around the country to conventions and events,

where they demonstrated and spoke about NuVasive's products and services.  The high end rollers also were flown in weekly to conduct demonstrations in the Marquis Visit Program.  According to CW3, when the high end rollers were attending events at the Company's headquarters, there would be a catered affair with large quantities of champagne and wine.  As CW3 emphasized, "The CEO did not skimp on champagne and wine."

62.    The Company also developed educational programs and medical societies to market and promote its products and generate business.  For instance, the Company formed the Society of Lateral Access Surgery ("SOLAS"), which, according to SOLAS's website, is intended "to foster research, education and advocacy around the lateral approach."   Significantly, several high level positions within SOLAS are occupied by doctors who are also high end rollers, including Dr. Luiz Pimenta, SOLAS president, and Dr. William Smith, SOLAS vice president, and many of these doctors also participate in Medicare and Medicaid programs.  These blatant conflicts of interest suggest that the SOLAS existed merely as another cover to finance Defendants' improper and illegal sales and marketing activities.

63.    Moreover, according to Confidential Witness 4 ("CW4"), a former coordinator in the surgeon education department from January 2011 to May 2013, who worked in NuVasive's Paramus, New Jersey office coordinating surgeon

travel and accommodations for the Company's training programs, sales representatives determined which doctors to invite to educational programs based on how much business the doctor could refer to the Company.  CW4 explained that sales representatives would talk to hospitals where surgeons practiced and interview doctors about the size of their practice, the number of procedures they performed, and their level of interest in using NuVasive's products.  Similarly, according to Confidential Witness 8 ("CW8"), a former area business manager and XLIF market development manager, who worked for NuVasive from December 2009 to March 2012, sales people had to convince the Company that a surgeon was worth the time and money the Company would spend to send to educational programs, such as the MVP, and that the surgeon would "convert" to using NuVasive's procedures and products after attending.

64.    Furthermore, doctors who published favorable articles about the benefits of Nuvasive's products and services also received payments and other remuneration.  CW3 said that when Dr. J. Allan Goodrisch and Dr. J. Volvan, two of the Company's high end rollers, published a textbook on XLIF, the Company ordered wine bottles etched with the cover of the book with matching wine glasses to give as gifts.  CW3 said the gifts cost about $1,700 to $2,000 for 10 bottles. Likewise, Confidential Witness 5 ("CW5"), a former product manager in Intraoperative Monitoring, who reported to the Senior Director of Marketing from

June 2010 through February 2011, said that in what "seemed like a complete conflict of interest," the same doctors who were paid hundreds of thousands of dollars in consulting fees also authored peer-reviewed papers, which the Company used to "grease the wheels" for clearing hurdles with the FDA and persuading other doctors to use NuVasive products.

65.    The accounts of these former NuVasive employees were substantiated by Confidential Witness 6 ("CW6"), a former accounting manager from June 2010 to April 2012 who conducted weekly audits of employee reimbursement requests for travel and entertainment, as well as payments to doctors for consulting fees and commissions.  CW6 described an extensive and excessive kickback system, where Company executives "pampered [doctors] with a lot of things.  Wining and dining them and paying for their flights. … [O]bviously, [the doctors] were going to be favoring the company."

66.    According to CW6, these kickbacks included private jet rental for surgeon trips, totaling between $80,000 and $200,000 per month.  CW6 said that generally, Defendant Lukianov and other top-level executives, including Jason Hannon and Patrick Miles, traveled with the doctors and then submitted to the Company all expenses from the trips, including all of the doctors' expenses.  On trips to New York City, the surgeons and executives usually went to Broadway shows and/or NFL games.  CW6 said that a bill for a group of 3 to 4 doctors was

usually $800 to $1000.  On other occasions, executives took doctors out just for drinking, spending "thousands and thousands of dollars."

67.   CW6 was also aware of two ski trips, where executives invited surgeons to attend and then paid for all expenses, including ski lift tickets.

68.   CW6 met once a week with the Company's Controller, Patricia Bitar, to discuss the results of the expense audits.  CW6 said she regularly flagged expenses considered inappropriate, but the Controller never took any action.

69.   CW6 said that at the beginning of 2011, the Board of Directors requested a "look-back" audit of travel and entertainment expenses through October 2010.   The Company's compliance team, led by Stuart White, the Director of Healthcare and Corporate Compliance and Internal Audit and SOX, was in charge of the audit.  The Board's audit ultimately identified a number of inappropriate expenses and violations of policies, procedures, and guidelines. According to a report prepared by NuVasive's Audit Committee, the "potential risks" included, *inter alia*: (1) non-business expenses approved by and reimbursed to senior members of management; (2) expense reports that did not comply with NuVasive's Corporate Travel Policy; (3) expense reports that did not comply with the requirements set forth in the Patient Protection and Affordable Care Act; and (4) meals and entertainment expenses that violated NuVasive's Comprehensive Healthcare Compliance Program policies.

70.     Nevertheless, CW6 indicated that rather than improving and correcting expense reporting problems, steps were taken to continue to conceal these fraudulent practices.  At the direction of the Controller and Jason Hannon, the Company's General Counsel, CW6 was instructed to categorize excessive and inappropriate expenses related to travel and entertainment of physicians under different non-descript projects, with names such as "Wolverine."  According to CW6, Project Wolverine was run by Jason Hannon, Executive Vice President and General Counsel.  Other projects with similar non-descript "code names" to disguise excessive expenses were run by other executives.

71.     In addition, senior executives developed a system to circumvent expense reporting by approving each other's expense reports.  Thus, after the Board's audit, Defendant Lambert approved Defendant Lukianov's expenses; Defendant Lukianov approved Jason Hannon's expenses; and Peter Valentine and other senior executives approved each other's expenses.

72.     CW6 also confirmed that certain doctors were paid consulting fees and commissions, usually in the range of $250,000 to $280,000 per quarter, which in some cases, totaled over $1 million or more annually for each doctor.

73.     These sales and marketing practices were intended to, and did in fact, induce doctors to utilize and promote NuVasive products and services in exchange for financial and other personal benefits, which were awarded based on the

volume of business generated for the Company.  Many of these products and services were also eligible for reimbursement through government-funded healthcare programs, including Medicare and Medicaid, which were accepted by many physicians, including certain "high end rollers," and Defendants knew that any resulting increases in sales and revenues would be paid, in part, by governmental healthcare programs, including Medicare and Medicaid.

74.    Not only are such arrangements fraught with conflicts of interest that compromise doctors' objective clinical judgment, but they violate numerous healthcare fraud and abuse laws, including the Anti-Kickback Statute and the False Claims Act, thereby exposing the Company to civil and criminal investigations and penalties, as well as loss of its eligibility to participate in federal healthcare programs.

75.    At various times, the payments and other remuneration received by doctors were reported to other senior executives within the Company, who knew or should have known about the strict regulatory environment in which the Company operated and the importance of maintaining compliance with applicable laws and regulations.  CW1 and CW6 separately informed Defendant Lambert that inappropriate expenses were being billed to the Company.  Beginning in early 2010, CW1 met with Defendant Lambert on several occasions to discuss improper expenses.  CW1 noted that "[Defendant Lambert] approved the expenses anyway.

Always."  CW1 also reported these expenses to NuVasive's legal, finance, and human resource departments.  Ultimately, CW1 left the Company, because CW1 "could not stomach it anymore."

76.    CW6 began raising concerns about improper expenses in late 2010. CW6 sent reports to Brian Adashek, Manager of Compliance, as well as Stuart White, who was responsible for conducting the audit requested by the Board in 2011.   After raising concerns with the Controller, General Counsel, and compliance group, CW6 also spoke directly with Defendant Lambert about these issues.  CW6 was told by Defendant Lambert that he would "allow [the expenses] to go through, but next time, he wouldn't allow it."  However, CW6 "didn't see any change in the company" at any time.

77.    By failing to implement adequate internal controls to monitor the Company's compliance with applicable laws and by refusing to take steps to stop inappropriate and illegal kickbacks to doctors even when presented with evidence by numerous employees in a position to identify the wrongful conduct, Defendants exposed the Company to increased regulatory risk, which contributed, in part, to the OIG's subpoena and investigation related to improper claims submitted to Medicare and Medicaid.

**Defendants' Scheme To Prop Up Revenues From The Company's
Monitoring Business**

78.     At the time of its acquisition, Impulse Monitoring was heralded as a
complementary business, which would generate approximately $40 million in
additional revenue per year, as well as facilitate sales of other NuVasive products
and services, especially NeuroVisionTM, which was designed for use during the
XLIF procedure.

79.     Impulse Monitoring's revenues are derived from services provided
by neurophysiologists, who attend surgical procedures, attach sensors and
equipment to the patient, and make sure the equipment is transmitting
information, and physicians, who are responsible for monitoring the patient's
condition during surgery from a remote location.  Both the neurophysiologist and
the physician work for Impulse Monitoring, either as employees or independent
contractors.

80.     Most of Impulse Monitoring's revenue is derived from services
provided by physicians, who bill at a higher rate than neurophysiologists and who
historically, could monitor multiple patients at the same time.  In fact, according
to Confidential Witness 9 ("CW9"), who worked as a manager of integrative
operative solutions for NuVasive from 2006 through August 2013 and who
oversaw the integration of Impulse Monitoring after its acquisition in 2011, nearly

80% of Impulse Monitoring's revenues come from services provided by physicians as compared to neurophysiologists.

81.     Besides expanding its product offerings, the acquisition of Impulse Monitoring exposed NuVasive to additional regulatory scrutiny, because unlike other aspects of the Company's business, Impulse Monitoring directly bills third party payers and governmental healthcare programs, including Medicare and Medicaid, for monitoring services rendered by its doctors.  As the Company explained in its annual report in 2012, this "brings with it additional risks associated with proper billing practice regulations, HIPAA compliance, corporate practice of medicine laws, and new collections risk associated with third party payers."

82.     In January 2013, on the heels of NuVasive's high hopes for growth in its IOM services, CMS promulgated new guidelines stating that companies could no longer bill Medicare and Medicaid for a physician remotely monitoring multiple patients.  The change in CMS guidelines threatened to significantly impact Impulse Monitoring's revenues.  According to CW9, this new restriction cut into the revenue stream for Medicare and Medicaid patients by an estimated 50 to 80%.

83.     Prior to this rule change, Confidential Witness 7 ("CW7"), who worked as a neurophysiologist for Impulse Monitoring from 2011 to 2012,

explained that it was "common knowledge" among employees that a single physician would monitor multiple patients remotely at the same time. CW7 had access to schedules showing which physicians were assigned to various patients during surgeries, and CW7 said it was "standard practice" for physicians to monitor up to six patients simultaneously. The ability to generate multiple invoices for the same block of time at the higher rates charged by physicians was key to Impulse Monitoring's profitability.

84.     In its 2012 Annual Report, NuVasive disclosed that there was "downward pressure on reimbursement for the IOM services provided by Impulse Monitoring." Specifically, the Company explained that new coding rules "may lead to reduced reimbursement by private payers for the professional remote oversight component of [IOM] service. Medicare patients will be subject to additional coding changes imposed by CMS which may restrict access to care and limit Impulse Monitoring's ability to cover, bill and collect for cases performed."

85.     Nevertheless, NuVasive pressured Impulse Monitoring to keep revenues up after the rule change. CW9 explained, "Everyone was nervous about this. NuVasive was worried it had paid $80 million for a company that might not be profitable anymore. The magnifying glass was on Impulse as far as its profitability. [NuVasive executives] said, 'These are the goals we set for [Wall Street] and we're going to try to hit that.'"

86.     Unable to employ its standard multiple-billing business model, NuVasive had to find other ways to make up the shortfall.  NuVasive began to pressure neurophysiologists to assist with sales efforts during surgeries and had sales representatives place monitoring equipment in operating rooms, which was redundant and not medically necessary.  The Company also developed marketing materials to instruct customers on coding monitoring services so as to take advantage of loopholes in coding procedures and maximize reimbursement. These practices resulted in the improper submission of claims to insurance providers such as Medicare and Medicaid.

87.     For example, Confidential Witness 10 ("CW10"), a former director at Impulse Monitoring from 2006 through July 2013, explained that after the coding rule changes took effect, the Company asked neurophysiologists who sat in on surgeries to "be more in line with how sales people wanted them to do things" and encouraged neurophysiologists to "get … more involved in working with sales people."  This practice contravened OIG guidance, which warned that medical and marketing and sales functions should be kept separate to avoid compromising clinical judgment and to ensure that services provided were reasonable and medically necessary.

88.     The increasing overlap between medical and marketing functions also resulted in installation of monitoring equipment that was redundant and that

required the use of more expensive surgical kits, which were a high profit center for the Company.  Confidential Witness 12 ("CW12") and Confidential Witness 13 ("CW13"), former neurophysiologists for Impulse Monitoring working in separate locations, both complained that sales representatives began to install NuVasive's M5 monitoring system, in addition to the Impulse Monitoring's Cascade system, even though both systems monitor the same neurophysiological activities.  CW12 said, "It sounded like they wanted us to do both.  No one on my team was excited about that.  Either you do one [monitoring system] or the other. Why you would need both, I don't know."

89.    CW13 also described numerous incidents, which "seemed really inappropriate," where sales representatives would try to tell neurophysiologists what to do and what equipment to use, often claiming that the surgeon preferred NuVasive's products.  CW13 stated, "[The sales rep] would try to talk to us and try to tell us what to do … he'd say, 'Oh, the surgeon wants this and this.'  He would try to recommend things.  He had no idea of what we were doing.  He had no understanding of monitoring."

90.    In one instance, a sales representative opened an expensive surgical kit, and then told the neurophysiologist to wheel it into the operating room so it appeared to be used, so that the sales representative would not have to "eat the cost of it."  In another case, CW13 said that one of the surgeons seemed to choose

NuVasive's M5 monitoring system "as a favor to the rep, even if it was not medically necessary." CW13 explained, "It seemed like the surgeon was trying to help the rep out by ordering us to use the M5 system even if everything could be done with just the Cascade. It almost seemed like the surgeon was trying to throw the guy a bone. It was very strange."

91. With respect to coding and billing, Defendants added remote monitoring capabilities to M5 equipment as an additional selling feature, in the hopes of increasing sales and market share. Although the M5 had been designed to allow doctors in the operating room to monitor readings themselves, the remote monitoring feature was promoted as a way for doctors to use another physician, usually a partner at the doctors' practices, to monitor the same readings from another location and then separately bill for these services.

92. According to CW5, the Company believed that by showing doctors how to make additional money when using the M5 – essentially, "using a loophole in insurance coding to double bill," doctors would be more likely to choose the product. In one instance, CW5 said that one of the Company's top consultants was set up with remote monitoring with the M5. While he performed surgery, his wife, who was also a partner in his medical practice, would monitor the M5 readings remotely, thus enabling both doctors to bill for monitoring the same readings during the same surgery.

93.   In addition, CW5 said that she helped develop marketing material that the Company's sales people used to inform doctors as to how to bill Medicare and Medicaid for remote monitoring using the M5: "Part of what we did was create guides to help surgeons bill Medicare and other insurance companies down to the exact codes that they used to bill, which really shouldn't have been our business … I don't know if it was illegal, but it was billing twice for the same surgery."

94.   These "reimbursement guides" instructed doctors in basic coding pitfalls, such as making sure that the physician billing for remote monitoring had a different specialty than the operating surgeon.  The purpose of these guides was to maximize reimbursement for IOM services so that doctors would continue to use the M5 and other NuVasive products and equipment after the changes in Medicare and Medicaid billing codes took effect.  According to CW5, these reimbursement guides were distributed to sales people at the Company's national sales meetings, including a meeting in San Diego in 2011.  Sales people were told to talk to doctors about how to bill for remote monitoring as part of their sales efforts.

95.   In addition, Confidential Witness 11 ("CW11"), a former billing clerk with Impulse Monitoring from February 2011 to January 2013, described deficiencies in Impulse Monitoring's internal billing system.  Specifically, CW11 said that billing employees, who worked on submitting invoices to Medicare and

Medicaid, were able to manually override billing codes generated by the Company's computer system.  There were also several employee complaints that CW11's direct supervisor, instructed employees to change billing codes and that invoices were submitted to Medicare and Medicaid with the wrong billing code on them.

96.   By compromising the independent clinical judgment of neurophysiologists, failing to separate medical and marketing functions, installing equipment and features that required the use of more expensive surgical kits and that were not medically necessary, and instructing doctors to take advantage of loopholes in Medicare and Medicaid coding and reimbursement, Defendants, directly and indirectly, caused improper claims to be submitted to Medicare and Medicaid in violation of the False Claims Act.

97.   Executives within the Company were aware that these practices were taking place.  CW5 said that she and her direct supervisor, a senior director of marketing, worked with Patrick Miles, President of Global Products and Services on marketing efforts related to monitoring equipment and services, including development of the reimbursement guides.  In addition, CW5 stated that her direct supervisor worked with Defendant Lukianov, who "was aware of what we were doing" to promote the Company's IOM services.

98.   Defendants' conduct has exposed the Company to increased regulatory risk, which contributed, in part, to the OIG's subpoena and investigation related to improper claims submitted to Medicare and Medicaid.

**The Company's Coding And Reimbursement Problems Related To XLIF**

99.   According to former employees, NuVasive also encountered difficulties related to coding and reimbursement in connection with the XLIF procedure, which was the Company's most lucrative and well-known innovation in spinal surgery techniques.

100.   Typically, when performing spinal fusion surgery, doctors must access the spine using either an anterior or posterior approach.  However, utilizing the Company's MAS platform and nerve monitoring system, a surgeon performing the XLIF procedure is able to access the spine from the side of the patient's body, which the Company claims is less invasive and efficacious than either anterior or posterior methods.

101.   Because XLIF is neither a front nor a back procedure, it did not fit neatly into existing billing codes for reimbursement.  Nevertheless, NuVasive was aware that if the hospital coded XLIF as an "anterior-posterior" procedure, which is considered more complicated and difficult and therefore more expensive, the Company could bill the hospital at a higher rate than if XLIF was coded as either

"anterior" or "posterior" alone, and the hospital, in turn, could demand higher reimbursement from third party payers, including Medicare and Medicaid.

102.   As Confidential Witness 14 ("CW14"), a former sales director for NuVasive from January 2005 to May 2010 explained, if a hospital was known to code XLIF as "anterior-posterior," the Company charged the hospital approximately $30,000, knowing that third party payers would accept a higher price based on the perceived difficulty of the procedure as reflected by the code. But if the hospital coded XLIF as either "anterior" or "posterior," then, based on what third party payers considered a reasonable price for such a procedure, the Company could only bill approximately $20,000.   CW14 estimated that convincing hospitals and third party payers that XLIF should be coded as "anterior-posterior" potentially impacted the Company's revenues by tens of millions of dollars each year.

103.   According to Confidential Witness 15 ("CW15"), a former Vice President of research and development from June 2009 through January 2013, NuVasive developed a reputation for aggressively pushing back if there was a disagreement about how NuVasive products and procedures should be coded.  For example, CW15 explained that during 2010, NuVasive fought with insurance companies concerning the proper coding for the XLIF procedure.  Ultimately the

---

dispute was resolved, with NuVasive adopting the coding for XLIF that it demanded, which also allowed the Company to charge more for the procedure.

104.   By taking an aggressive stance and forcing its own interpretation of billing codes on third party payers, Defendants exposed the Company to increased regulatory risk, which contributed, in part, to the OIG's subpoena and investigation related to improper claims submitted to Medicare and Medicaid.

## MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

### Quarterly Report for 3Q 2008

105.   On October 22, 2008, the Company issued a press release announcing its financial results for the quarter ended September 30, 2008.  For the quarter, the Company reported a net loss of $23.1 million, or ($0.64) diluted earnings per share ("EPS") and revenue of $66.9 million, compared to a net loss of $2.3 million or ($0.07) diluted EPS and revenue of $38.5 million for the same period a year ago.

106.   On November 7, 2008, the Company filed a quarterly report for the period ended September 30, 2008 on a Form 10-Q with the SEC ("3Q 2008 10-Q"), which was signed by Defendants Lukianov and O'Boyle, and reiterated the Company's previously reported financial results and financial position.  The Form 10-Q contained signed certifications by Defendants Lukianov and O'Boyle,

stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

107.   These reports of financial results were false and misleading and/or omitted material information, because, as confirmed by CW2, CW9, and CW14, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices that contravened regulatory guidance, violated healthcare fraud and abuse laws, and exposed the Company to increased regulatory risk.

108.   In addition, the 3Q 2008 10-Q indicated that for the three months ended September 30, 2008, the Company spent approximately $54.5 million on sales, marketing, and administrative expenses, comprising 81.5% of total revenues for that period.   According to the 3Q 2008 10-Q, sales, marketing and administrative expenses included, *inter alia*, "commission and training costs for personnel engaged in sales, marketing and customer support functions, distributor commissions, surgeon training costs, shareowner (employee) related expenses for our administrative functions, third party professional service fees, amortization of acquired intangible assets, and facilities and insurance expenses."

109.   The Company's statements concerning sales, marketing, and administrative expenses were false and misleading and omitted material

information, because as confirmed by, among others, CW2, the Company's expenditures for sales and marketing included, *inter alia*, millions of dollars of gifts and payments to doctors in exchange for use and promotion of NuVasive products and services in violation of healthcare fraud and abuse laws. Defendants also failed to disclose that these improper and illegal expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme.

**2008 Annual Report**

110. On February 25, 2009, the Company issued a press release announcing its financial results for the quarter and year ended December 31, 2008. For the quarter, the Company reported net income of $3.7 million, or $0.10 diluted EPS and revenue of $74.6 million, compared to a net loss of $1.1 million or ($0.03) diluted EPS and revenue of $46.9 million for the same period a year ago. For the year, the Company reported net loss of $27.5 million, or ($0.77) diluted EPS and revenue of $250.1 million, compared to net loss of $11.3 million, or ($0.32) diluted EPS and revenue of $154.3 million for the same period a year ago.

111. On March 2, 2009, the Company filed an annual report for the period ended December 31, 2008 on Form 10-K with the SEC (the "2008 Annual Report"), which was signed by Defendants Lukianov and Lambert, and stated,

inter alia, the Company's financial results and financial position, as well as its compliance with regulatory requirements, including, but not limited to, the Anti-Kickback Statute and False Claims Act. In addition, the Form 10-K contained signed certifications by Defendants Lukianov and O'Boyle, stating that the information contained in the Form 10-K was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

112. These reports of financial results were false and misleading and/or omitted material information, because as confirmed by CW2, CW9, and CW14, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices that contravened regulatory guidance, violated healthcare fraud and abuse laws, and exposed the Company to increased regulatory risk.

113. With respect to training and education programs and expenses, the 2008 Annual Report stated:

> NuVasive devotes significant resources to training and educating surgeons regarding the safety and reproducibility of our surgical techniques and our complimentary instruments and implants. We maintain a state-of-the-art cadaver operating theatre and training facility at our corporate headquarters to help promote adoption of our products. Currently, we are training approximately 400 to 500 surgeons annually in the XLIF® technique and our other Maximum Access Surgery, or MAS platform, products including: NeuroVision, MaXcess and SpheRx DBR.

---

114.  Defendants' statement that the Company "devotes significant resources to training and education," as well as related statements describing purported training programs, were materially false and misleading and omitted material information, because Defendants failed to disclose that Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business.   As confirmed by numerous former employees, including CW2, doctors attending training programs received free travel, lodging, and entertainment, including lavish dinners and other perks.

115.  The 2008 Annual Report also stated: "NuVasive has also helped to establish SOLAS ™ , the Society of Lateral Access Surgery, a group of spine surgeons dedicated to the development and expanded application of lateral spine surgery techniques that offer significant patient benefits and improved clinical outcome through peer-to-peer communication, clinical education efforts, and research."

116.  This statement is similarly false and misleading and omits material information, because Defendants failed to disclose that the Company used these medical societies as a platform to promote its products and services.  Specifically, several confidential witnesses, including CW3, identified certain prominent physicians, known internally as "high end rollers," who received consulting fees

and other remuneration and gifts in exchange for using NuVasive products and referring patients to clinical trials.  These same "high end rollers" occupy high level positions within certain medical societies financed by NuVasive.  These practices contravened regulatory guidance and policies and exposed the Company to increased risk of regulatory scrutiny and prosecution for violations of healthcare fraud and abuse laws.

117.  The 2008 Annual Report further stated, "In addition, we believe recommendations and support of our products by influential surgeons are essential for market acceptance and adoption. If we do not receive support from such surgeons or have favorable long-term data, surgeons and hospitals may not use our products."

118.  The 2008 Annual Report also indicated that 75% of total revenue in 2008 was spent on sales, marketing and administrative expenses, including but not limited to, "compensation, commission and training costs for personnel engaged in sales, marketing and customer support functions; distributor commissions; surgeon training costs; shareowner (employee) related expenses for our administrative functions; third party professional service fees; amortization of acquired intangible assets; and facilities and insurance expenses."

119.  The statements concerning purported training and education programs and sales and marketing expenses were false and misleading and

omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW2, CW9, and CW14: (1) Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2) Defendants utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; and (3) improper and illegal sales and marketing expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme.

120.   With respect to the Company's compliance with healthcare fraud and abuse laws, the 2008 Annual Report stated acknowledged:

> Healthcare fraud and abuse laws apply to our business if a customer submits a claim for an item or service that is reimbursed under Medicare, Medicaid or most other federally-funded health care programs … If a governmental authority were to conclude that we are not in compliance with applicable laws and regulations, we and our officers and employees could be subject to severe criminal and civil penalties including, for example, exclusion from participation as a supplier of product to beneficiaries covered by Medicare or Medicaid.

121.   The Company explained that the regulatory environment had become more intense, as several states "mandate[d] implementation of commercial compliance programs, along with the tracking and reporting of gifts, compensation, and other remuneration to physicians."  In addition, the U.S. DOJ "has increased its scrutiny of interactions between healthcare companies and healthcare providers which has led to an unprecedented level of investigations and settlements in the healthcare industry."

122.   The following statements were false and misleading and/or omitted material information, because they failed to disclose that Defendants knew or recklessly disregarded the fact that the Company's sales and marketing practices exposed the Company to increased regulatory scrutiny and prosecution for violations of applicable healthcare fraud and abuse laws.   As confirmed by numerous former employees, including CW2, CW9, and CW14: (1) Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2) Defendants utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; (3) Defendants employed

improper sales and billing practices to sustain revenues, with knowledge that its customers ultimately would submit claims for reimbursement to governmental healthcare programs, including Medicare and Medicaid; and (4) Defendants provided guidance to its customers as to how to code NuVasive products and procedures in order to take advantage of loopholes and maximize reimbursement by third party payers, including Medicare and Medicaid.  As a result, there was no reasonable basis to believe that NuVasive was in compliance with healthcare fraud and abuse laws and would not be subject to regulatory scrutiny.

**Quarterly Report for 1Q 2009**

123.   On April 22, 2009, the Company issued a press release announcing its financial results for the quarter ended March 31, 2009.  For the quarter, the Company reported a net loss of $4.3 million, or ($0.12) diluted EPS and revenue of $80 million, compared to a net loss of $7.7 million or ($0.22) diluted EPS and revenue of $51.2 million for the same period a year ago.

124.   On May 8, 2009, the Company filed a quarterly report for the period ended March 31, 2009 on a Form 10-Q with the SEC ("1Q 2009 10-Q") signed by Defendants Lukianov and O'Boyle, where it reiterated the Company's previously reported financial results and financial position.  In addition, the Form 10-Q contained signed certifications by Defendants Lukianov and O'Boyle stating that the financial information contained in the Form 10-Q was accurate, and that they

disclosed any material changes to the Company's internal control over financial reporting.

125.   These reports of financial results were false and misleading and/or omitted material information, because as confirmed by CW2, CW9, and CW14, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices that contravened regulatory guidance, violated healthcare fraud and abuse laws, and exposed the Company to increased regulatory risk.

126.   In addition, the 1Q 2009 10-Q indicated that for the three months ended March 31, 2009, the Company spent approximately $58.5 million on sales, marketing, and administrative expenses, comprising 73.1% of total revenues for that period.  According to the 1Q 2009 10-Q, sales, marketing and administrative expenses included, *inter alia*, "commission and training costs for personnel engaged in sales, marketing and customer support functions, distributor commissions, surgeon training costs, shareowner (employee) related expenses for our administrative functions, third party professional service fees, amortization of acquired intangible assets, and facilities and insurance expenses."

127. The Company's statements concerning sales, marketing, and administrative expenses were false and misleading and omitted material information, because as confirmed by, among others, CW2, CW9, and CW14, the

Company's expenditures for sales and marketing included, *inter alia*, millions of dollars of gifts and payments to doctors in exchange for use and promotion of NuVasive products and services in violation of healthcare fraud and abuse laws. Defendants also failed to disclose that these improper and illegal expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme.

**April 22, 2009 Investor Conference Call**

128.   On April 22, 2009, Defendants held a conference call with analysts to discuss the Company's financial results for the first quarterly period ended March 31, 2009.  During that conference call, Defendant Lukianov stated:

> On the compliance front, we expect the government and medical societies to adopt stricter policy related to disclosure of surgeon relationships, which will provide increasing details on remuneration. We will continue to acquire innovative product ideas and intellectual property from surgeons, and we will continue to work closely with surgeons to proctor and teach our innovative techniques, all within the bounds that have been determined by the government and industry groups.

129.   Defendant Lukianov's statements concerning the Company's compliance with applicable policies, regulations, and healthcare fraud and abuse laws were false and misleading and omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW2, CW9, and CW14: (1) Defendants' education and training

programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2) Defendants utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; (3) Defendants employed improper sales and billing practices to sustain revenues, with knowledge that its customers ultimately would submit claims for reimbursement to governmental healthcare programs, including Medicare and Medicaid; and (4) Defendants provided guidance to its customers as to how to code NuVasive products and procedures in order to take advantage of loopholes and maximize reimbursement by third party payers, including Medicare and Medicaid.  As a result, there was no reasonable basis to believe that NuVasive was in compliance with healthcare fraud and abuse laws and would not be subject to regulatory scrutiny.

130.  When asked to address concerns about potential reimbursement changes and competitive pressures, Defendant Lukianov claimed: "Our reimbursement prospects have not changed. There is nothing being done differently by surgeons. We are following the exact same coding process that we've been following since 2006 as was established by NAS. So absolutely

nothing has changed. And frankly, it's just – it's baloney and there's absolutely no truth to it."

131.   Defendant Lukianov's statements concerning reimbursement for NuVasive products and services were false and misleading and omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW9 and CW14, Defendants provided guidance to its customers as to how to code NuVasive products and procedures in order to take advantage of loopholes and maximize reimbursement by third party payers, including Medicare and Medicaid.  According to CW14, convincing hospitals and third party payers to utilize particular coding for procedures such as XLIF potentially impacted the Company's revenues by tens of millions of dollars each year.

**Quarterly Report for 2Q 2009**

132.   On July 23, 2009, the Company issued a press release announcing its financial results for the quarter ended June 30, 2009.  For the quarter, the Company reported net income of $2.8 million, or $0.07 diluted EPS and revenue of $88.5 million, compared to a net loss of $495,000 or ($0.01) diluted EPS and revenue of $57.4 million for the same period a year ago.

133.   On August 6, 2009, the Company filed a quarterly report for the period ended June 30, 2009 on a Form 10-Q with the SEC ("2Q 2009 10-Q")

signed by Defendants Lukianov and O'Boyle, where it reiterated the Company's previously reported financial results and financial position. In addition, the Form 10-Q contained signed certifications by Defendants Lukianov and O'Boyle stating that the financial information contained in the Form 10-Q was accurate, and that they disclosed any material changes to the Company's internal control over financial reporting.

134. These reports of financial results were false and misleading and/or omitted material information, because as confirmed by CW2, CW9, CW14, and CW15, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices that contravened regulatory guidance, violated healthcare fraud and abuse laws, and exposed the Company to increased regulatory risk.

135. In addition, the 2Q 2009 10-Q indicated that for the three months ended June 30, 2009, the Company spent approximately $58.1 million on sales, marketing, and administrative expenses, comprising 65.7% of total revenues for that period. According to the 2Q 2009 10-Q, sales, marketing and administrative expenses included, *inter alia*, "commission and training costs for personnel engaged in sales, marketing and customer support functions, distributor commissions, surgeon training costs, shareowner (employee) related expenses for

our administrative functions, third party professional service fees, amortization of acquired intangible assets, and facilities and insurance expenses."

136.   The Company's statements concerning sales, marketing, and administrative expenses were false and misleading and omitted material information, because as confirmed by, among others, CW2, the Company's expenditures for sales and marketing included, *inter alia*, millions of dollars of gifts and payments to doctors in exchange for use and promotion of NuVasive products and services in violation of healthcare fraud and abuse laws.  Defendants also failed to disclose that these improper and illegal expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme.

**Quarterly Report for 3Q 2009**

137.   On October 20, 2009, the Company issued a press release announcing its financial results for the quarter ended September 30, 2009.  For the quarter, the Company reported net income of $5.1 million, or $0.13 diluted EPS and revenue of $94.9 million, compared to net loss of $23.1 million, or ($0.64) diluted EPS and revenue of $66.9 million for the same period a year ago.

138.   On November 6, 2009, the Company filed a quarterly report for the period ended September 30, 2009 on a Form 10-Q with the SEC ("3Q 2009 10-Q") signed by Defendants Lukianov and O'Boyle and where it reiterated the

Company's previously reported financial results and financial position.   In addition, the Form 10-Q contained signed certifications by Defendants Lukianov and O'Boyle stating that the financial information contained in the Form 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

139.   These reports of financial results were false and misleading and/or omitted material information, because as confirmed by CW2, CW9, CW14, and CW15, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices that contravened regulatory guidance, violated healthcare fraud and abuse laws, and exposed the Company to increased regulatory risk.

140.   In addition, the 3Q 2009 10-Q indicated that for the three months ended September 30, 2009, the Company spent approximately $59.8 million on sales, marketing, and administrative expenses, comprising 63% of total revenues for that period.   According to the 3Q 2009 10-Q, sales, marketing and administrative expenses included, *inter alia*, "commission and training costs for personnel engaged in sales, marketing and customer support functions, distributor commissions, surgeon training costs, shareowner (employee) related expenses for our administrative functions, third party professional service fees, amortization of acquired intangible assets, and facilities and insurance expenses."

141. The Company's statements concerning sales, marketing, and administrative expenses were false and misleading and omitted material information, because as confirmed by, among others, CW2, the Company's expenditures for sales and marketing included, *inter alia*, millions of dollars of gifts and payments to doctors in exchange for use and promotion of NuVasive products and services in violation of healthcare fraud and abuse laws. Defendants also failed to disclose that these improper and illegal expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme.

## 2009 Annual Report

142. On February 25, 2010, the Company issued a press release announcing its financial results for the quarter and year ended December 31, 2009. For the quarter, the Company reported net income of $2.3 million, or $0.06 diluted EPS and revenue of $106.9 million, compared to net income of $3.7 million or $0.10 diluted EPS and revenue of $74.6 million for the same period a year ago. For the year, the Company reported net income of $5.8 million, or $0.15 diluted EPS and revenue of $370.3 million, compared to a net loss of $27.5 million, or ($0.77) diluted EPS and revenue of $250.9 million for the same period a year ago.

143.   On February 26, 2010, the Company filed an annual report for the period ended December 31, 2009 on Form 10-K with the SEC (the "2009 Annual Report"), which was signed by Defendants Lukianov and Lambert, and reiterated the Company's financial results and financial position, as well as its compliance with regulatory requirements, including, but not limited to, the Anti-Kickback Statute and False Claims Act.   In addition, the Form 10-K contained signed certifications by Defendants Lukianov and Lambert, stating that the information contained in the Form 10-K was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

144.   These reports of financial results were false and misleading and/or omitted material information, because as confirmed by CW2, CW9, CW14, and CW15, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices that contravened regulatory guidance, violated healthcare fraud and abuse laws, and exposed the Company to increased regulatory risk.

145.   With respect to training and education programs and expenses, the 2009 Annual Report stated:

> NuVasive devotes significant resources to training and educating surgeons regarding the safety and reproducibility of our surgical techniques and our complimentary instruments and implants. We maintain a state-of-the-art cadaver operating theatre and training facility at our corporate headquarters to

> help promote adoption of our products. Currently, we are training approximately 400 to 500 surgeons annually in the XLIF technique and our other MAS platform products including: NeuroVision, MaXcess and specialized implants.

146.   Defendants' statement that the Company "devotes significant resources to training and education," as well as related statements describing purported training programs, were materially false and misleading and omitted material information, because Defendants failed to disclose that Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business.   As confirmed by numerous former employees, including CW2, doctors attending training programs received free travel, lodging, and entertainment, including lavish dinners and other perks. These practices contravened regulatory guidance and policies and exposed the Company to increased risk of regulatory scrutiny and prosecution for violations of healthcare fraud and abuse laws.

147.   The 2009 Annual Report also stated:

> NuVasive has also helped to establish SOLAS ®, the Society of Lateral Access Surgery, a group of spine surgeons dedicated to the development and expanded application of lateral spine surgery techniques that offer significant patient benefits and improved clinical outcome through peer-to-peer communication, clinical education efforts, and research. The number of surgeons trained annually includes first-time surgeons new to our

MAS product platform as well as surgeons previously trained on our MAS product platform who are attending advanced training programs.

148. These statements were false and misleading and omitted material information, because Defendants failed to disclose that the Company used medical societies like SOLAS as a platform to promote its products and services. Specifically, several confidential witnesses, including CW3, identified certain prominent physicians, known internally as "high end rollers," who received consulting fees and other remuneration and gifts in exchange for using NuVasive products and referring patients to clinical trials. These same "high end rollers" were installed in high level positions within certain medical societies financed by NuVasive. These practices contravened regulatory guidance and policies and exposed the Company to increased risk of regulatory scrutiny and prosecution for violations of healthcare fraud and abuse laws.

149. The 2009 Annual Report also indicated that 69% of total revenue in 2009 was spent on sales, marketing and administrative expenses, including but not limited to, "compensation, commission and training costs for personnel engaged in sales, marketing and customer support functions; distributor commissions; depreciation expense for loaned instrument sets used in surgeries; shipping costs; surgeon training costs; shareowner (employee) related expenses for our administrative functions; and third-party professional service fees."

150.   The statements concerning purported training and education programs and sales and marketing expenses were false and misleading and omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW2, CW9, CW14, and CW15: (1) Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2) Defendants utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; (3) Defendants' sales and marketing practices, such as encouraging neurophysiologists to facilitate sales and billing for medically redundant and unnecessary equipment in operating rooms, contravened regulatory guidance and exposed the Company to increased regulatory risk; and (4) improper and illegal sales and marketing expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme.

151.   With respect to coding and reimbursement, the 2009 Annual Report stated:

Reimbursement is contingent on established coding for a given procedure, coverage of the codes by the third-party payers, and adequate payment for the resources used.

In July of 2006 NASS established the proper physician coding for the XLIF procedure by declaring it to be encompassed in existing codes that describe an anterolateral approach to the spine. This position was confirmed in a formal statement in January 2010. Hospital coding is established by the Centers for Medicare and Medicaid Services (CMS). XLIF is not currently included in the nomenclature for hospital codes but has been proposed as an additional descriptor of existing codes. CMS' proposal is slated for review and ratification in 2010. All physician and hospital coding is subject to change which could impact reimbursement and physician practice behavior.

*     *     *

NuVasive will continue to provide the appropriate resources to patients, physicians, hospitals, and insurers in order to ensure the best in patient care and clarity regarding XLIF reimbursement and work to remove the non-coverage policies.

152. Defendants' statements regarding coding and reimbursement were false and misleading and omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW9, CW14, and CW15: (1) Defendants employed improper sales and billing practices to sustain revenues, with knowledge that its customers ultimately would submit claims for reimbursement to governmental healthcare programs, including Medicare and Medicaid; and (2) Defendants provided guidance to its customers as to how to code NuVasive products and procedures in order to take advantage of

loopholes and maximize reimbursement by third party payers, including Medicare and Medicaid.

153.   The Company also indicated:

> Healthcare fraud and abuse laws apply to our business when a customer submits a claim for an item or service that is reimbursed under Medicare, Medicaid or most other federally-funded health care programs … If a governmental authority were to conclude that we are not in compliance with applicable laws and regulations, we and our officers and employees could be subject to severe criminal and civil penalties including, for example, exclusion from participation as a supplier of product to beneficiaries covered by Medicare or Medicaid.

154.   The Company explained that the regulatory environment had become more intense, as several states "mandate[d] implementation of commercial compliance programs, along with the tracking and reporting of gifts, compensation, and other remuneration to physicians."  In addition, the U.S. DOJ "has increased its scrutiny of interactions between healthcare companies and healthcare providers which has led to an unprecedented level of investigations and settlements in the healthcare industry."

155.   The following statements were false and misleading and/or omitted material information, because they failed to disclose that Defendants knew or recklessly disregarded the fact that the Company's sales, marketing, and billing practices exposed the Company to increased regulatory scrutiny and prosecution

for violations of applicable healthcare fraud and abuse laws.  As confirmed by numerous former employees, including CW2, CW9, CW14, and CW15: (1) Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2) Defendants utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; (3) Defendants employed improper sales and billing practices to sustain revenues, with knowledge that its customers ultimately would submit claims for reimbursement to governmental healthcare programs, including Medicare and Medicaid; and (4) Defendants provided guidance to its customers as to how to code NuVasive products and procedures in order to take advantage of loopholes and maximize reimbursement by third party payers, including Medicare and Medicaid.  As a result, there was no reasonable basis to believe that NuVasive was in compliance with healthcare fraud and abuse laws and would not be subject to regulatory scrutiny.

**Quarterly Report for 1Q 2010**

156.   On April 20, 2010, the Company issued a press release announcing its financial results for the quarter ended March 31, 2010.  For the quarter, the Company reported net income of $1.1 million, or $0.03 diluted EPS and revenue of $109.1 million, compared to net loss of $4.3 million or ($0.12) diluted EPS and revenue of $80 million for the same period a year ago.

157.   On May 10, 2010, the Company filed a quarterly report for the first quarterly period ended March 31, 2010 on Form 10-Q with the SEC ("1Q 2010 10-Q"), which was signed by Defendants Lukianov and Lambert, and reiterated the Company's financial results and financial position, as well as the Company's expenses related to training and education and issues with third-party payers.  In addition, the Form 10-Q contained signed certifications by Defendants Lukianov and Lambert, stating that the information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

158.   These reports of financial results were false and misleading and/or omitted material information, because as confirmed by CW1, CW2, CW8, CW9, CW14, and CW15, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices that

contravened regulatory guidance, violated healthcare fraud and abuse laws, and exposed the Company to increased regulatory risk.

159.   With respect to training and education expenses, NuVasive stated: "We dedicate significant resources to our sales and marketing efforts, including training spine surgeons on our unique technology and products."

160.   The Company also disclosed that for the period ending March 31, 2010, 68.4% of total revenues were spent on sales, marketing and administrative expenses, including, among other things, "compensation, commission and training costs for personnel engaged in sales, marketing and customer support functions; distributor commissions; depreciation expense for loaned instrument sets used in surgeries; shipping costs; surgeon training costs; shareowner (employee) related expenses for our administrative functions; and third-party professional service fees."

161.   Defendants' statements concerning purported education and training programs and sales and marketing expenses were false and misleading and omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW1, CW2, CW8, and CW9: (1) Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2)

Defendants utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; (3) Defendants' sales and marketing practices, such as encouraging neurophysiologists to facilitate sales and billing for medically redundant and unnecessary equipment in operating rooms, contravened regulatory guidance and exposed the Company to increased regulatory risk; and (4) improper and illegal expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme.

162.   With respect to coding and reimbursement for the XLIF procedure, the Company stated: "Certain insurance providers have stated a policy of not providing reimbursement for the XLIF procedure. NuVasive cannot offer definitive time frames nor final outcomes regarding reversal of the non-coverage policies, as the process is dictated by third-party insurance providers. To date, these policies have not materially impacted our operating results."

163.   Defendants' statements concerning coding and reimbursement were false and misleading and omitted material information, because as confirmed by CW14 and CW15, Defendants failed to disclose that: (1) Defendants employed improper sales and billing practices to sustain revenues, with knowledge that its

customers ultimately would submit claims for reimbursement to governmental healthcare programs, including Medicare and Medicaid; and (2) Defendants provided guidance to its customers as to how to code NuVasive products and procedures in order to take advantage of loopholes and maximize reimbursement by third party payers, including Medicare and Medicaid.

**Quarterly Report for 2Q 2010**

164. On July 27, 2010, the Company issued a press release announcing its financial results for the quarter ended June 30, 2010. For the quarter, the Company reported net income of $6.7 million, or $0.17 diluted EPS and revenue of $119.6 million, compared to net income of $2.8 million, or $0.07 diluted EPS and revenue of $88.5 million for the same period a year ago.

165. On August 6, 2010, the Company filed a quarterly report for the second quarterly period ended June 30, 2010 on Form 10-Q with the SEC ("2Q 2010 10-Q"), which was signed by Defendants Lukianov and Lambert, and reiterated the Company's financial results and financial position, as well as the Company's expenses related to training and education and issues with third-party payers. In addition, the Form 10-Q contained signed certifications by Defendants Lukianov and Lambert, stating that the information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

166. These reports of financial results were false and misleading and/or omitted material information, because as confirmed by numerous confidential witnesses, including CW1, CW2, CW5, CW6, CW8, CW9, CW13, CW14, and CW15, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices that contravened regulatory guidance, violated healthcare fraud and abuse laws, and exposed the Company to increased regulatory risk.

167. With respect to training and education expenses, NuVasive stated: "We dedicate significant resources to our sales and marketing efforts, including training spine surgeons on our unique technology and products."

168. The Company also disclosed that for the period ending June 30, 2010, 65% of total revenues were spent on sales, marketing and administrative expenses, including, among other things, "compensation, commission and training costs for personnel engaged in sales, marketing and customer support functions; distributor commissions; depreciation expense for loaned instrument sets used in surgeries; shipping costs; surgeon training costs; shareowner (employee) related expenses for our administrative functions; and third-party professional service fees."

169. Defendants' statements concerning purported education and training programs and sales and marketing expenses were false and misleading and

omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW1, CW2, CW6, CW8, CW9, and CW13: (1) Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2) Defendants utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; (3) Defendants' sales and marketing practices, such as encouraging neurophysiologists to facilitate sales and billing for medically redundant and unnecessary equipment in operating rooms, contravened regulatory guidance and exposed the Company to increased regulatory risk; and (4) improper and illegal expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme.

170.   With respect to coding and reimbursement for the XLIF procedure, the Company stated: "Certain insurance providers have stated a policy of not providing reimbursement for the XLIF procedure. NuVasive cannot offer definitive time frames nor final outcomes regarding reversal of the non-coverage

policies, as the process is dictated by third-party insurance providers. To date, we have not experienced lack of payment for our procedures."

171.   Defendants' statements concerning coding and reimbursement were false and misleading and omitted material information, because as confirmed by CW5, CW14, and CW15, Defendants failed to disclose that: (1) Defendants employed improper sales and billing practices to sustain revenues, with knowledge that its customers ultimately would submit claims for reimbursement to governmental healthcare programs, including Medicare and Medicaid; and (2) Defendants provided guidance to its customers as to how to code NuVasive products and procedures in order to take advantage of loopholes and maximize reimbursement by third party payers, including Medicare and Medicaid.

**July 27, 2010 Investor Conference Call**

172.   On July 27, 2010, Defendants held a conference call with analysts to discuss the Company's financial results for the second quarterly period ended June 30, 2010.   During that conference call, Defendant Lukianov was asked to address issues concerning the Company's compliance practices.   Defendant Lukianov stated:

> I have addressed this many times before and we are extremely compliant and have ensured that we have everything in order. As I've also talked about, if you take a look at the percentage that goes out in royalty and on all consulting cost and so on and so forth, the number is very low. It's in the order of about 3%.

So we're very comfortable with where we are. We're very comfortable with how we've handled everything related to that area for years, and we've spent a lot of money ensuring that we've learned from those around us and watched what they've had to do with regard to compliance and that we have the same, if not better, systems.

173.  Defendant Lukianov's statements regarding the Company's compliance with healthcare fraud and abuse laws were false and misleading and omitted material information, because Defendant Lukianov failed to disclose that, *inter alia*: (1) as confirmed by CW1 and CW6, millions of dollars of gifts, including free travel, dinners, and other entertainment were provided to doctors who used NuVasive products and services; (2) according to CW1, "doctors [who] were Lukianov's favorites … received more gifts than others"; (3) as confirmed by CW2, certain "high end rollers" received special privileges as part of the "MVP" training program; (4) as confirmed by CW5, doctors were paid hundreds of thousands of dollars in "consulting fees" for authoring peer-reviewed papers promoting NuVasive's products; and (5) as confirmed by CW6, improper expenses were categorized under non-descript project names, such as "Wolverine," in order to conceal Defendants' fraudulent gifts and payments in violation of applicable healthcare fraud and abuse laws.  Furthermore, CW1 and CW6 confirmed that expenses for gifts to doctors appeared on Defendant Lukianov's Company expense reports.  In addition to these improper expenses, as

confirmed by CW5, Defendant Lukianov was also aware that the Company prepared so-called "reimbursement guides" in order to coach doctors and hospitals on coding procedures that would exploit loopholes and increase reimbursement from third-party payers, including Medicare and Medicaid. Therefore, at the time of this statement, Defendant Lukianov had no reasonable basis to state that "we are extremely compliant and have ensured that we have everything in order" and that, with regard to compliance, "we have the same, if not better, systems" as compared to others in the industry.

**Quarterly Report for 3Q 2010**

174. On October 28, 2010, the Company issued a press release announcing its financial results for the quarter ended September 30, 2010. For the quarter, the Company reported net income of $8.5 million, or $0.21 diluted EPS and revenue of $120.3 million, compared to net income of $5.1 million, or $0.13 diluted EPS and revenue of $94.9 million for the same period a year ago.

175. On November 5, 2010, the Company filed a quarterly report for the third quarterly period ended September 30, 2010 on Form 10-Q with the SEC ("3Q 2010 10-Q"), which was signed by Defendants Lukianov and Lambert, and reiterated the Company's financial results and financial position, as well as the Company's expenses related to training and education and issues with third-party payers. In addition, the Form 10-Q contained signed certifications by Defendants

Lukianov and Lambert, stating that the information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

176.   These reports of financial results were false and misleading and/or omitted material information, because as confirmed by CW1, CW2, CW5, CW6, CW8, CW9, CW13, CW14, and CW15, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices that contravened regulatory guidance, violated healthcare fraud and abuse laws, and exposed the Company to increased regulatory risk.

177.   With respect to training and education expenses, NuVasive stated: "We dedicate significant resources to our sales and marketing efforts, including training spine surgeons on our unique technology and products."

178.   The Company also disclosed that for the period ending September 30, 2010, 64.6% of total revenues were spent on sales, marketing and administrative expenses, including, among other things, "compensation, commission and training costs for personnel engaged in sales, marketing and customer support functions; distributor commissions; depreciation expense for loaned instrument sets used in surgeries; shipping costs; surgeon training costs; shareowner (employee) related expenses for our administrative functions; and third-party professional service fees."

179.   Defendants' statements concerning purported education and training programs and sales and marketing expenses were false and misleading and omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW1, CW2, CW6, CW9, CW10, and CW13: (1) Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2) Defendants utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; (3) Defendants' sales and marketing practices, such as encouraging neurophysiologists to facilitate sales and billing for medically redundant and unnecessary equipment in operating rooms, contravened regulatory guidance and exposed the Company to increased regulatory risk; and (4) improper and illegal expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme.

180.   With respect to coding and reimbursement for the XLIF procedure, the Company stated: "Certain insurance providers have stated a policy of not providing reimbursement for the XLIF procedure. NuVasive cannot offer

definitive time frames nor final outcomes regarding reversal of the non-coverage policies, as the process is dictated by third-party insurance providers. To date, we have not experienced lack of payment for our procedures based on these policies."

181.   Defendants' statements concerning coding and reimbursement were false and misleading and omitted material information, because as confirmed by CW5, CW14, and CW15, Defendants failed to disclose that: (1) Defendants employed improper sales and billing practices to sustain revenues, with knowledge that its customers ultimately would submit claims for reimbursement to governmental healthcare programs, including Medicare and Medicaid; and (2) Defendants provided guidance to its customers as to how to code NuVasive products and procedures in order to take advantage of loopholes and maximize reimbursement by third party payers, including Medicare and Medicaid.

**2010 Annual Report**

182.   On February 23, 2011, the Company issued a press release announcing its financial results for the quarter and year ended December 31, 2010. For the quarter, the Company reported net income of $61.9 million, or $1.39 diluted EPS and revenue of $129.3 million, compared to net income of $2.3 million, or $0.06 diluted EPS and revenue of $106.9 million for the same period a year ago.  For the year, the Company reported net income of $78.3 million, or $1.85 diluted EPS and revenue of $478.3 million, compared to net income of $5.8

million, or $0.15 diluted EPS and revenue of $370.3 million for the same period a year ago.

183.   On February 25, 2011, the Company filed an annual report for the period ended December 31, 2010 on Form 10-K with the SEC (the "2010 Annual Report"), which was signed by Defendants Lukianov and Lambert, and reiterated the Company's financial results and financial position, as well as its compliance with regulatory requirements, including, but not limited to, the Anti-Kickback Statute and False Claims Act.   In addition, the Form 10-K contained signed certifications by Defendants Lukianov and Lambert, stating that the information contained in the Form 10-K was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

184.   These reports of financial results were false and misleading and/or omitted material information, because, as confirmed by, among others, CW1, CW2, CW5, CW6, CW8, CW9, CW13, CW14, and CW15, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices that contravened regulatory guidance, violated healthcare fraud and abuse laws, and exposed the Company to increased regulatory risk.

185.   With respect to education and training programs and expenses, the 2010 Annual Report stated:

> NuVasive devotes significant resources to training and educating surgeons regarding the safety and reproducibility of our surgical techniques and our complimentary instruments and implants. We maintain state-of-the-art cadaver operating rooms and training facilities at our corporate headquarters and our facility in Paramus, New Jersey to help promote adoption of our products. Currently, we are training over 500 surgeons annually in the XLIF technique and our other MAS platform products including: our proprietary nerve monitoring systems, MaXcess, Biologics, and specialized implants.

186.   Defendants' statement that the Company "devotes significant resources to training and education," as well as related statements describing purported training programs, were materially false and misleading and omitted material information, because Defendants failed to disclose that Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business.   As confirmed by numerous former employees, including CW1, CW2, and CW6, doctors attending training programs received free travel, lodging, and entertainment, including lavish dinners and other perks.   These practices contravened regulatory guidance and policies and exposed the Company to increased risk of regulatory scrutiny and prosecution for violations of healthcare fraud and abuse laws.

187.   The 2010 Annual Report also stated:

> NuVasive has also helped to establish SOLAS ®, the Society of Lateral Access Surgery, a group of spine

surgeons dedicated to the development and expanded application of lateral spine surgery techniques that offer significant patient benefits and improved clinical outcomes through peer-to-peer communication, clinical education efforts, and ongoing research. The number of surgeons trained annually includes first-time surgeons new to our MAS product platform as well as surgeons previously trained on our MAS product platform who are attending advanced training programs.

188.  These statements were false and misleading and omitted material information, because as confirmed by CW2, Defendants failed to disclose that the Company used medical societies like SOLAS as a platform to promote its products and services.   Specifically, several confidential witnesses, including CW3, identified certain prominent physicians, known internally as "high end rollers," who received consulting fees and other remuneration and gifts in exchange for using NuVasive products and referring patients to clinical trials. These same "high end rollers" were installed in high level positions within certain medical societies financed by NuVasive.   These practices contravened regulatory guidance and policies and exposed the Company to increased risk of regulatory scrutiny and prosecution for violations of healthcare fraud and abuse laws.

189.  The 2010 Annual Report further indicated that 65% of total revenue in 2010 was spent on sales, marketing and administrative expenses, including but not limited to, "compensation, commission and training costs for personnel engaged in sales, marketing and customer support functions; distributor

commissions; depreciation expense for loaned instrument sets used in surgeries; shipping costs; surgeon training costs; shareowner (employee) related expenses for our administrative functions; and third-party professional service fees."

190.   Defendants' statements concerning purported education and training programs and sales and marketing expenses were false and misleading and omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW1, CW2, CW6, CW8, CW9, and CW13: (1) Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2) Defendants utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; (3) Defendants' sales and marketing practices, such as encouraging neurophysiologists to facilitate sales and billing for medically redundant and unnecessary equipment in operating rooms, contravened regulatory guidance and exposed the Company to increased regulatory risk; and (4) improper and illegal expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme.

191.  In terms of compliance with applicable laws and regulations, the

Company stated:

> Our relationship with health care professionals, such as physicians, hospitals and those that may market our products (e.g., distributors, etc.), are subject to scrutiny under various state and federal laws rules, and regulation (e.g., anti-kickback statute, self-referral/Stark laws, false claims, etc.).

> *       *       *

> **We believe that our operations materially comply with the anti-kickback statutes**; however, because these provisions are interpreted broadly by regulatory authorities, we cannot be assured that law enforcement officials or others will not challenge our operations under these statutes.

> *       *       *

> For years, **NuVasive has maintained a compliance program structured to meet the requirements of the federal sentencing guidelines for an effective compliance program and the model compliance programs promulgated by HHS** over the years and includes, but is not limited to, a Code of Ethical Business Conduct, designation of a compliance officer, a confidential disclosure method (a "hotline"), and conducting periodic audits to ensure compliance.

192.  The following statements regarding compliance were false and

misleading and/or omitted material information, because they failed to disclose

that Defendants knew or recklessly disregarded the fact that the Company's sales

and marketing practices exposed the Company to increased regulatory scrutiny

and prosecution for violations of applicable healthcare fraud and abuse laws.  In

particular, Defendants failed to disclose that, *inter alia*:  (1) as confirmed by CW1

and CW6, millions of dollars of gifts, including free travel, dinners, and other entertainment were provided to doctors who used NuVasive products and services; (2) according to CW1, "doctors [who] were Lukianov's favorites … received more gifts than others"; (3) as confirmed by CW2, certain "high end rollers" received special privileges as part of the "MVP" training program; (4) as confirmed by CW5, doctors were paid hundreds of thousands of dollars in "consulting fees" for authoring peer-reviewed papers promoting NuVasive's products; (5) as confirmed by CW6, improper expenses were categorized under non-descript project names, such as "Wolverine," in order to conceal Defendants' fraudulent gifts and payments in violation of applicable healthcare fraud and abuse laws; and (6) as confirmed by CW13, the Company's sales practices included encouraging neurophysiologists to facilitate sales and billing for medically redundant and unnecessary equipment installed in operating rooms. Furthermore, CW1 and CW6 confirmed that expenses for gifts to doctors appeared on Company expense reports, including reports submitted by Defendant Lukianov.   In addition to these improper expenses, CW5 confirmed that Defendants were also aware that the Company prepared so-called "reimbursement guides" in order to coach doctors and hospitals on coding procedures that would exploit loopholes and increase reimbursement from third-party payers, including Medicare and Medicaid.  As a result, there was no reasonable basis to believe that

NuVasive maintained an effective compliance program, was in compliance with healthcare fraud and abuse laws, and would not be subject to regulatory scrutiny.

193.    With respect to coding and reimbursement for NuVasive procedures, the 2010 Annual Report stated:

> At various times over the past two years, certain insurance providers have adopted policies of not providing reimbursement for the XLIF procedure. We have worked with our surgeon customers and NASS who, in turn, have worked with these insurance providers to supply the information, explanation and clinical data they require to categorize the XLIF procedure as a procedure entitled to reimbursement under their policies. … **_We will continue to provide the appropriate resources to patients, surgeons, hospitals, and insurers in order to ensure optimum patient care and clarity regarding XLIF reimbursement and work to remove any and all non-coverage policies_**.

194.    Defendants' statements concerning coding and reimbursement were false and misleading and omitted material information, because as confirmed by CW5, CW14, and CW15, Defendants failed to disclose that: (1) Defendants employed improper sales and billing practices to sustain revenues, with knowledge that its customers ultimately would submit claims for reimbursement to governmental healthcare programs, including Medicare and Medicaid; and (2) Defendants provided guidance to its customers as to how to code NuVasive products and procedures in order to take advantage of loopholes and maximize reimbursement by third party payers, including Medicare and Medicaid. According to CW14, convincing hospitals and third party payers to use certain

billing codes that allowed for increased reimbursement of NuVasive procedures impacted the Company's revenues by tens of millions of dollars each year.

**Quarterly Report for 1Q 2011**

195.    On May 4, 2011, the Company issued a press release announcing its financial results for the quarter ended March 31, 2011.   For the quarter, the Company reported net income of $2.4 million, or $0.06 diluted EPS and revenue of $124.5 million, compared to net income of $1.1 million, or $0.03 diluted EPS and revenue of $109.1 million for the same period a year ago.

196.    On May 6, 2011, the Company filed a quarterly report for the first quarterly period ended March 31, 2011 on Form 10-Q with the SEC ("1Q 2011 10-Q"), which was signed by Defendants Lukianov and Lambert, and reiterated the Company's financial results and financial position, as well as the Company's expenses related to training and education and issues with third-party payers.  In addition, the Form 10-Q contained signed certifications by Defendants Lukianov and Lambert, stating that the information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

197.    These reports of financial results were false and misleading and/or omitted material information, because as confirmed by numerous confidential witnesses, including CW1, CW2, CW4, CW5, CW6, CW7, CW8, CW9, CW11,

CW13, and CW15, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices that contravened regulatory guidance, violated healthcare fraud and abuse laws, and exposed the Company to increased regulatory risk.

198.   With respect to training and education expenses, NuVasive stated: "We dedicate significant resources toward training spine surgeons on our unique technology and products."

199.   The Company also disclosed that for the period ending March 31, 2011, 68% of total revenues were spent on sales, marketing and administrative expenses, including, among other things, "compensation, commission and training costs for personnel engaged in sales, marketing and customer support functions; distributor commissions; depreciation expense for surgical instrument sets; shipping costs; surgeon training costs; shareowner (employee) related expenses for our administrative functions; and third-party professional service fees."

200.   Defendants' statements concerning purported education and training programs and sales and marketing expenses were false and misleading and omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW1, CW2, CW4, CW6, CW7, CW8, CW9, and CW13: (1) Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal

gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2) Defendants utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; (3) Defendants' sales and marketing practices, such as encouraging neurophysiologists to facilitate sales and billing for medically redundant and unnecessary equipment in operating rooms, contravened regulatory guidance and exposed the Company to increased regulatory risk; and (4) improper and illegal expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme.

201.   With respect to coding and reimbursement for the XLIF procedure, the Company stated:

> In the past certain insurance providers have adopted policies of not providing reimbursement for the XLIF procedure. We have worked with our surgeon customers and certain surgical societies who, in turn, have worked with these insurance providers to supply the information required to categorize the XLIF procedure as a procedure entitled to reimbursement under their policies … To date, we have not experienced significant lack of payment for our procedures based on these policies.

202.   Defendants' statements concerning coding and reimbursement were false and misleading and omitted material information, because as confirmed by

CW5 and CW15, Defendants failed to disclose that: (1) Defendants employed improper sales and billing practices to sustain revenues, with knowledge that its customers ultimately would submit claims for reimbursement to governmental healthcare programs, including Medicare and Medicaid; and (2) Defendants provided guidance to its customers as to how to code NuVasive products and procedures in order to take advantage of loopholes and maximize reimbursement by third party payers, including Medicare and Medicaid.  According to CW14, convincing hospitals and third party payers to use certain billing codes that allowed for increased reimbursement of NuVasive procedures impacted the Company's revenues by tens of millions of dollars each year.

**Quarterly Report for 2Q 2011**

203.   On July 25, 2011, the Company issued a press release announcing its financial results for the quarter ended June 30, 2011.  For the quarter, the Company reported net income of $5.4 million, or $0.13 diluted EPS and revenue of $133 million, compared to net income of $6.7 million, or $0.17 diluted EPS and revenue of $119.6 million for the same period a year ago.

204.   August 5, 2011, the Company filed a quarterly report for the second quarterly period ended June 30, 2011 on Form 10-Q with the SEC ("2Q 2011 10-Q"), which was signed by Defendants Lukianov and Lambert, and reiterated the Company's financial results and financial position, as well as the Company's

expenses related to training and education and issues with third-party payers.  In addition, the Form 10-Q contained signed certifications by Defendants Lukianov and Lambert, stating that the information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

205.   These reports of financial results were false and misleading and/or omitted material information, because as confirmed by numerous confidential witnesses, including CW1, CW2, CW4, CW6, CW7, CW8, CW9, CW11, CW13, and CW15, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices that contravened regulatory guidance, violated healthcare fraud and abuse laws, and exposed the Company to increased regulatory risk.

206.   With respect to training and education expenses, NuVasive stated: "We dedicate significant resources toward training spine surgeons on our unique technology and products."

207.   The Company also disclosed that for the period ending June 30, 2011, 63% of total revenues were spent on sales, marketing and administrative expenses, including, among other things, "compensation, commission and training costs for personnel engaged in sales, marketing and customer support functions; distributor commissions; depreciation expense for surgical instrument sets;

shipping costs; surgeon training costs; shareowner (employee) related expenses for our administrative functions; and third-party professional service fees."

208.   Defendants' statements concerning purported education and training programs and sales and marketing expenses were false and misleading and omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW1, CW2, CW4, CW6, CW7, CW8, CW9, and CW13: (1) Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2) Defendants utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; (3) Defendants' sales and marketing practices, such as encouraging neurophysiologists to facilitate sales and billing for medically redundant and unnecessary equipment in operating rooms, contravened regulatory guidance and exposed the Company to increased regulatory risk; and (4) improper and illegal expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme.

209.   With respect to coding and reimbursement for the XLIF procedure, the Company stated:

> In the past certain insurance providers have adopted policies of not providing reimbursement for the XLIF procedure. We have worked with our surgeon customers and certain surgical societies who, in turn, have worked with these insurance providers to supply the information required to categorize the XLIF procedure as a procedure entitled to reimbursement under their policies … To date, we have not experienced significant lack of payment for our procedures based on these policies.

210.   Defendants' statements concerning coding and reimbursement were false and misleading and omitted material information, because as confirmed by CW11 and CW15, Defendants failed to disclose that: (1) Defendants employed improper sales and billing practices to sustain revenues, with knowledge that its customers ultimately would submit claims for reimbursement to governmental healthcare programs, including Medicare and Medicaid; and (2) Defendants provided guidance to its customers as to how to code NuVasive products and procedures in order to take advantage of loopholes and maximize reimbursement by third party payers, including Medicare and Medicaid.

**Quarterly Report for 3Q 2011**

211.   On October 27, 2011, the Company issued a press release announcing its financial results for the quarter ended September 30, 2011. For the quarter, the Company reported a net loss of $67.6 million, or ($1.69) diluted EPS

and revenue of $132.9 million, compared to net income of $8.5 million, or $0.21 diluted EPS and revenue of $120.3 million for the same period a year ago.

212.   On November 4, 2011, the Company filed a quarterly report for the third quarterly period ended September 30, 2011 on Form 10-Q with the SEC ("3Q 2011 10-Q"), which was signed by Defendants Lukianov and Lambert, and reiterated the Company's financial results and financial position, as well as the Company's expenses related to training and education and issues with third-party payers.  In addition, the Form 10-Q contained signed certifications by Defendants Lukianov and Lambert, stating that the information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

213.   These reports of financial results were false and misleading and/or omitted material information, because as confirmed by numerous confidential witnesses, including CW1, CW2, CW4, CW6, CW7, CW8, CW9, CW10, CW11, CW12, CW13, and CW15, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales and marketing practices that contravened regulatory guidance, violated healthcare fraud and abuse laws, and exposed the Company to increased regulatory risk.

214. With respect to training and education expenses, NuVasive stated: "We dedicate significant resources toward training spine surgeons on our unique technology and products."

215. The Company also disclosed that for the period ending September 30, 2011, 64% of total revenues were spent on sales, marketing and administrative expenses, including, among other things, "compensation, commission and training costs for personnel engaged in sales, marketing and customer support functions; distributor commissions; depreciation expense for surgical instrument sets; shipping costs; surgeon training costs; shareowner (employee) related expenses for our administrative functions; and third-party professional service fees"

216. Defendants' statements concerning purported education and training programs and sales and marketing expenses were false and misleading and omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW1, CW2, CW4, CW6, CW8, CW9, CW10, CW12, and CW13: (1) Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2) Defendants utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians

referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; (3) Defendants' sales and marketing practices, such as encouraging neurophysiologists to facilitate sales and billing for medically redundant and unnecessary equipment in operating rooms, contravened regulatory guidance and exposed the Company to increased regulatory risk; and (4) improper and illegal expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme.

217.   With respect to coding and reimbursement for the XLIF procedure, the Company stated:

> In the past certain insurance providers have adopted policies of not providing reimbursement for the XLIF procedure. We have worked with our surgeon customers and certain surgical societies who, in turn, have worked with these insurance providers to supply the information required to categorize the XLIF procedure as a procedure entitled to reimbursement under their policies … To date, we have not experienced significant lack of payment for our procedures based on these policies.

218.   Defendants' statements concerning coding and reimbursement were false and misleading and omitted material information, because as confirmed by CW11, CW12, and CW15, Defendants failed to disclose that: (1) Defendants employed improper sales and billing practices to sustain revenues, with knowledge that its customers ultimately would submit claims for reimbursement

to governmental healthcare programs, including Medicare and Medicaid; and (2) Defendants provided guidance to its customers as to how to code NuVasive products and procedures in order to take advantage of loopholes and maximize reimbursement by third party payers, including Medicare and Medicaid.

**2011 Annual Report**

219. On February 22, 2012, the Company issued a press release announcing its financial results for the quarter and year ended December 31, 2011. For the quarter, the Company reported a net loss of $10 million, or ($0.24) diluted EPS and revenue of $150.2 million, compared to net income of $61.9 million, or $1.39 diluted EPS and revenue of $129.3 million for the same period a year ago. For the year, the Company reported a net loss of $69.8 million, or ($1.73) diluted EPS and revenue of $540.5 million, compared to net income of $78.3 million, or $1.85 diluted EPS and revenue of $478.2 million for the same period a year ago.

220. On February 27, 2012, the Company filed an annual report for the period ended December 31, 2011 on Form 10-K with the SEC (the "2011 Annual Report"), which was signed by Defendants Lukianov and Lambert, and reiterated the Company's financial results and financial position, as well as its compliance with regulatory requirements, including, but not limited to, the Anti-Kickback Statute and False Claims Act. In addition, the Form 10-K contained signed certifications by Defendants Lukianov and Lambert, stating that the information

contained in the Form 10-K was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

221.   These reports of financial results were false and misleading and/or omitted material information, because as confirmed by numerous confidential witnesses, including CW1, CW2, CW4, CW5, CW6, CW7, CW8, CW9, CW10, CW11, CW12, CW13, and CW15, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices that contravened regulatory guidance, violated healthcare fraud and abuse laws, and exposed the Company to increased regulatory risk.

222.   With respect to education and training programs and expenses, the 2011 Annual Report stated:

> We devote significant resources to training and educating surgeons regarding the safety and reproducibility of our surgical techniques and our complimentary instruments and implants. We maintain state-of-the-art cadaver operating rooms and training facilities to help promote adoption of our products at our corporate headquarters in San Diego, California and our facility in Paramus, New Jersey. We continue to train surgeons in the XLIF technique and our other MAS platform products including: our proprietary nerve monitoring systems, MaXcess, biologics, and specialized implants. The number of surgeons trained annually includes first-time surgeons new to our MAS product platform as well as surgeons previously trained on our MAS product platform who are attending advanced training programs.

223.   Defendants' statement that the Company "devotes significant resources to training and education," as well as related statements describing purported training programs, were materially false and misleading and omitted material information, because Defendants failed to disclose that Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business.   As confirmed by numerous former employees, including CW1, CW2, CW4, and CW6, doctors attending training programs received free travel, lodging, and entertainment, including lavish dinners and other perks.   These practices contravened regulatory guidance and policies and exposed the Company to increased risk of regulatory scrutiny and prosecution for violations of healthcare fraud and abuse laws.

224.   The 2011 Annual Report also stated: "As its sole financial supporter, we have also helped to establish SOLAS, a group of spine surgeons dedicated to the development and expanded application of lateral spine surgery techniques that offer significant patient benefits and improved clinical outcomes through peer-to-peer communication, clinical education efforts, and ongoing research."

225.   These statements were false and misleading and omitted material information, because Defendants failed to disclose that the Company used medical societies like SOLAS as a platform to promote its products and services.

Specifically, several confidential witnesses, including CW3, identified certain prominent physicians, known internally as "high end rollers," who received consulting fees and other remuneration and gifts in exchange for using NuVasive products and referring patients to clinical trials. These same "high end rollers" were installed in high level positions within certain medical societies financed by NuVasive. These practices contravened regulatory guidance and policies and exposed the Company to increased risk of regulatory scrutiny and prosecution for violations of healthcare fraud and abuse laws.

226. The 2011 Annual Report further indicated that 64% of total revenue in 2011 was spent on sales, marketing and administrative expenses, including but not limited to, "compensation, commission and training costs for personnel engaged in sales, marketing and customer support functions; distributor commissions; depreciation expense for surgical instrument sets; shipping costs; surgeon training costs; shareowner (employee) related expenses for our administrative functions; and third-party professional service fees."

227. Defendants' statements concerning purported education and training programs and sales and marketing expenses were false and misleading and omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW1, CW2, CW4, CW6, CW8, CW9, CW10, CW12, and CW13: (1) Defendants' education and training

programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2) Defendants utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; (3) Defendants' sales and marketing practices, such as encouraging neurophysiologists to facilitate sales and billing for medically redundant and unnecessary equipment in operating rooms, contravened regulatory guidance and exposed the Company to increased regulatory risk; and (4) improper and illegal expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme.

228. In terms of compliance with applicable laws, the Company stated:

> We are subject to the federal anti-kickback statute, which, among other things, prohibits the knowing and willful solicitation, offer, payment or receipt of any remuneration direct or indirect, in cash or in kind, in return for or to induce the referral of patients for items or services covered by Medicare, Medicaid and certain other governmental health programs. … **_We believe that our operations materially comply with the anti-kickback statutes_**; however, because these provisions are interpreted broadly by regulatory authorities, we cannot be assured that law enforcement officials or others will not challenge our operations under these statutes

\*     \*     \*

> *For years, we have maintained a compliance program structured to meet the requirements of the federal sentencing guidelines for an effective compliance program and the model compliance programs promulgated by HHS* over the years and includes, but is not limited to, a Code of Ethical Business Conduct, designation of a compliance officer, compliance committee, policies and procedures, a confidential disclosure method (a hotline), and conducting periodic audits to ensure compliance.

229. The following statements regarding compliance were false and misleading and/or omitted material information, because they failed to disclose that Defendants knew or recklessly disregarded the fact that the Company's sales and marketing practices exposed the Company to increased regulatory scrutiny and prosecution for violations of applicable healthcare fraud and abuse laws.  In particular, Defendants failed to disclose that, *inter alia*:  (1) as confirmed by CW1 and CW6, millions of dollars of gifts, including free travel, dinners, and other entertainment were provided to doctors who used NuVasive products and services; (2) according to CW1, "doctors [who] were Lukianov's favorites … received more gifts than others"; (3) as confirmed by CW2, certain "high end rollers" received special privileges as part of the "MVP" training program; (4) as confirmed by CW5, doctors were paid hundreds of thousands of dollars in "consulting fees" for authoring peer-reviewed papers promoting NuVasive's products; (5) as confirmed by CW6, improper expenses were categorized under

non-descript project names, such as "Wolverine," in order to conceal Defendants' fraudulent gifts and payments in violation of applicable healthcare fraud and abuse laws; and (6) as confirmed by CW10, CW12, and CW13, the Company's sales practices included encouraging neurophysiologists to facilitate sales and billing for medically redundant and unnecessary equipment installed in operating rooms..  Furthermore, CW1 and CW6 confirmed that expenses for gifts to doctors appeared on Company expense reports, including reports submitted by Defendant Lukianov.  In 2011, an audit of travel and entertainment expenses requested by the Board of Directors and completed by the Company's compliance team identified numerous inappropriate expenses by senior executives, including Defendant Lukianov.    According to CW6, this improper expense reporting continued unabated even after the audit was completed.    In addition to these improper expenses, Defendants were also aware that the Company prepared so-called "reimbursement guides" in order to coach doctors and hospitals on coding procedures that would exploit loopholes and increase reimbursement from third-party payers, including Medicare and Medicaid.   As a result, there was no reasonable basis to believe that NuVasive maintained an effective compliance program, was in compliance with healthcare fraud and abuse laws, and would not be subject to regulatory scrutiny.

230.   With respect to coding and reimbursement, the 2011 Annual Report stated:

> Reimbursement is contingent on established coding for a given procedure, coverage of the codes by the third-party payers, and adequate payment for the resources used.
>
> In July of 2006 NASS established the proper physician coding for the XLIF procedure by declaring it to be encompassed in existing codes that describe an anterolateral approach to the spine. This position was confirmed in a formal statement by NASS in January 2010. Hospital coding is established by the Centers for Medicare and Medicaid Services, or CMS. XLIF is included in the nomenclature for hospital codes as an additional descriptor under existing codes. All physician and hospital coding is subject to change which could impact reimbursement and physician practice behavior.
>
> \*       \*       \*
>
> At various times over the past two years, certain insurance providers have adopted policies of not providing reimbursement for the XLIF procedure. We have worked with our surgeon customers and NASS who, in turn, have worked with these insurance providers to supply the information, explanation and clinical data they require to categorize the XLIF procedure as a procedure entitled to reimbursement under their policies … We will continue to provide the appropriate resources to patients, surgeons, hospitals, and insurers in order to ensure optimum patient care and clarity regarding XLIF reimbursement and work to remove any and all non-coverage policies.

231.   Defendants' statements concerning coding and reimbursement were false and misleading and omitted material information, because as confirmed by CW11 and CW15, Defendants failed to disclose that: (1) Defendants employed improper sales and billing practices to sustain revenues, with knowledge that its

customers ultimately would submit claims for reimbursement to governmental healthcare programs, including Medicare and Medicaid; and (2) Defendants provided guidance to its customers as to how to code NuVasive products and procedures in order to take advantage of loopholes and maximize reimbursement by third party payers, including Medicare and Medicaid.

**Quarterly Report for 1Q 2012**

232.   On April 30, 2012, the Company issued a press release announcing its financial results for the quarter ended March 31, 2012.  For the quarter, the Company reported net income of $673,000, or $0.02 diluted EPS and revenue of $151.7 million, compared to net income of $2.4 million, or $0.06 diluted EPS and revenue of $124.5 million for the same period a year ago.

233.   On May 1, 2012, the Company filed a quarterly report for the first quarterly period ended March 31, 2012 on Form 10-Q with the SEC ("1Q 2012 10-Q"), which was signed by Defendants Lukianov and Lambert, and reiterated the Company's financial results and financial position, as well as the Company's expenses related to training and education and issues with third-party payers.  In addition, the Form 10-Q contained signed certifications by Defendants Lukianov and Lambert, stating that the information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

234.   These reports of financial results were false and misleading and/or omitted material information, because as confirmed by numerous confidential witnesses, including CW1, CW2, CW4, CW6, CW7, CW8, CW9, CW10, CW11, CW12, CW13, and CW15, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices that contravened regulatory guidance, violated healthcare fraud and abuse laws, and exposed the Company to increased regulatory risk.

235.   With respect to training and education expenses, NuVasive stated: "We devote significant resources to offering surgeons the highest caliber training programs and venues to drive adoption of our unique technology and broad portfolio."

236.   The Company also disclosed that for the period ending March 31, 2012, 62% of total revenues were spent on sales, marketing and administrative expenses, including, among other things, "compensation, commission, travel and training costs for personnel engaged in sales, marketing and customer support functions; distributor commissions; depreciation expense for surgical instrument sets; shipping costs; surgeon training costs; shareowner (employee) related expenses for our administrative functions; and third-party professional service fees."

237.   Defendants' statements concerning purported education and training programs and sales and marketing expenses were false and misleading and omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW1, CW2, CW4, CW6, CW8, CW9, CW10, CW12, and CW13: (1) Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2) Defendants utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; (3) Defendants' sales and marketing practices, such as encouraging neurophysiologists to facilitate sales and billing for medically redundant and unnecessary equipment in operating rooms, contravened regulatory guidance and exposed the Company to increased regulatory risk; and (4) improper and illegal expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme.

**Quarterly Report for 2Q 2012**

238.   On July 25, 2012, the Company issued a press release announcing its financial results for the quarter ended June 30, 2012.   For the quarter, the Company reported net income of $2.9 million, or $0.06 diluted EPS and revenue of $154.4 million, compared to net income of $5.4 million, or $0.13 diluted EPS and revenue of $133 million for the same period a year ago.

239.   On July 26, 2012, the Company filed a quarterly report for the third quarterly period ended June 30, 2012 on Form 10-Q with the SEC ("2Q 2012 10-Q"), which was signed by Defendants Lukianov and Lambert, and reiterated the Company's financial results and financial position, as well as the Company's expenses related to training and education and issues with third-party payers.   In addition, the Form 10-Q contained signed certifications by Defendants Lukianov and Lambert, stating that the information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

240.   These reports of financial results were false and misleading and/or omitted material information, because as confirmed by numerous confidential witnesses, including CW1, CW2, CW4, CW6, CW7, CW9, CW10, CW11, CW12, CW13, and CW15, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales and marketing practices that

contravened regulatory guidance, violated healthcare fraud and abuse laws, and exposed the Company to increased regulatory risk.

241. With respect to training and education expenses, NuVasive stated: "We devote significant resources to offering surgeons the highest caliber training programs and venues to drive adoption of our unique technology and broad portfolio."

242. The Company also disclosed that for the period ending June 30, 2012, 60% of total revenues were spent on sales, marketing and administrative expenses, including, among other things, "compensation, commission, travel and training costs for personnel engaged in sales, marketing and customer support functions; distributor commissions; depreciation expense for surgical instrument sets; shipping costs; surgeon training costs; shareowner (employee) related expenses for our administrative functions; and third-party professional service fees."

243. Defendants' statements concerning purported education and training programs and sales and marketing expenses were false and misleading and omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW1, CW2, CW4, CW6, CW9, CW10, CW12, and CW13: (1) Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper

and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2) Defendants utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; (3) Defendants' sales and marketing practices, such as encouraging neurophysiologists to facilitate sales and billing for medically redundant and unnecessary equipment in operating rooms, contravened regulatory guidance and exposed the Company to increased regulatory risk; and (4) improper and illegal expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme.

**Quarterly Report for 3Q 2012**

244.   On October 24, 2012, the Company issued a press release announcing its financial results for the quarter ended September 30, 2012.  For the quarter, the Company reported net income of $2.4 million, or $0.05 diluted EPS and revenue of $148.4 million, compared to a net loss of $67.6 million, or ($1.69) diluted EPS and revenue of $132.9 million for the same period a year ago.

245.   On October 25, 2012, the Company filed a quarterly report for the third quarterly period ended September 30, 2012 on Form 10-Q with the SEC

("3Q 2012 10-Q"), which was signed by Defendants Lukianov and Lambert, and reiterated the Company's financial results and financial position, as well as the Company's expenses related to training and education and issues with third-party payers.  In addition, the Form 10-Q contained signed certifications by Defendants Lukianov and Lambert, stating that the information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

246.   These reports of financial results were false and misleading and/or omitted material information, because as confirmed by numerous confidential witnesses, including CW1, CW2, CW3, CW4, CW7, CW9, CW10, CW11, CW12, CW13, and CW15, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices that contravened regulatory guidance, violated healthcare fraud and abuse laws, and exposed the Company to increased regulatory risk.

247.   With respect to training and education expenses, NuVasive stated: "We devote significant resources to offering surgeons the highest caliber training programs and venues to drive adoption of our unique technology and broad portfolio."

248.   The Company also disclosed that for the period ending September 30, 2012, 59% of total revenues were spent on sales, marketing and administrative

expenses, including, among other things, "compensation, commission, travel and training costs for personnel engaged in sales, marketing and customer support functions; distributor commissions; depreciation expense for surgical instrument sets; shipping costs; surgeon training costs; shareowner (employee) related expenses for our administrative functions; and third-party professional service fees."

249.   Defendants' statements concerning purported education and training programs and sales and marketing expenses were false and misleading and omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW1, CW2, CW3, CW4, CW9, CW10, CW12, and CW13: (1) Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2) Defendants utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; (3) Defendants' sales and marketing practices, such as encouraging neurophysiologists to facilitate sales and billing for medically redundant and unnecessary equipment in operating rooms,

contravened regulatory guidance and exposed the Company to increased regulatory risk; and (4) improper and illegal expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme.

## 2012 Annual Report

250. On February 26, 2013, the Company issued a press release announcing its financial results for the quarter and year ended December 31, 2012. For the quarter, the Company reported a net loss of $2.7 million, or ($0.06) diluted EPS and revenue of $165.8 million, compared to a net loss of $10 million, or ($0.24) diluted EPS and revenue of $150.2 million for the same period a year ago. For the year, the Company reported net income of $3.1 million, or $0.07 diluted EPS and revenue of $620.3 million, compared to a net loss of $69.8 million, or ($1.73) diluted EPS and revenue of $540.5 million for the same period a year ago.

251. On February 27, 2013, the Company filed an annual report for the period ended December 31, 2012 on Form 10-K with the SEC (the "2012 Annual Report"), which was signed by Defendants Lukianov and Lambert, and reiterated the Company's financial results and financial position, as well as its compliance with regulatory requirements, including, but not limited to, the Anti-Kickback Statute and False Claims Act. In addition, the Form 10-K contained signed certifications by Defendants Lukianov and Lambert, stating that the information

contained in the Form 10-K was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

252.   These reports of financial results were false and misleading and/or omitted material information, because as confirmed by numerous confidential witnesses, including CW1, CW2, CW3, CW4, CW6, CW7, CW8, CW9, CW10, CW11, CW12, CW13, and CW15, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices that contravened regulatory guidance, violated healthcare fraud and abuse laws, and exposed the Company to increased regulatory risk.

253.   With respect to education and training programs and expenses, the 2012 Annual Report represented the following:

> We devote significant resources to training and educating surgeons regarding the safety and reproducibility of our MAS surgical techniques and our complementary instruments and implants. We maintain state-of-the-art cadaver operating rooms and training facilities to help educate surgeons regarding our products at our corporate headquarters in San Diego, California and our facility in Paramus, New Jersey. We continue to train surgeons in the XLIF technique and our other MAS platform products including: our proprietary nerve monitoring systems, MaXcess, biologics, and specialized implants. The number of surgeons trained annually includes first-time surgeons new to our MAS product platform as well as surgeons previously trained on our MAS product platform who are attending advanced training programs. The SOLAS Surgeon Education Committee helps direct the continued evolution of our XLIF-related training classes and materials.

254.   The 2012 Annual Report also indicated that 60% of total revenue in 2012 was spent on sales, marketing and administrative expenses, including but not limited to, "compensation, commission and training costs for shareowners engaged in sales, marketing and customer support functions; distributor commissions; depreciation expense for surgical instrument sets; shipping costs; surgeon training costs; shareowner (employee) related expenses for our administrative functions; and third-party professional service fees."

255.  Defendants' statement that the Company "devotes significant resources to training and education," as well as related statements describing purported training programs, were materially false and misleading and omitted material information, because Defendants failed to disclose that Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business.   As confirmed by numerous former employees, including CW1, CW2, CW3, CW4, and CW6, doctors attending training programs received free travel, lodging, and entertainment, including lavish dinners and other perks.  Furthermore, Defendants failed to disclose that the Company used medical societies like SOLAS as a platform to promote its products and services.  Specifically, several confidential witnesses, including CW3, identified certain prominent physicians, known internally as "high end

rollers," who received consulting fees and other remuneration and gifts in exchange for using NuVasive products and referring patients to clinical trials. These same "high end rollers" were installed in high level positions within certain medical societies financed by NuVasive. These practices contravened regulatory guidance and policies and exposed the Company to increased risk of regulatory scrutiny and prosecution for violations of healthcare fraud and abuse laws.

256. Regarding compliance with applicable laws, the Company stated:

> We are subject to the federal anti-kickback statute which, among other things, prohibits the knowing and willful solicitation, offer, payment or receipt of any remuneration, direct or indirect, in cash or in kind, in return for or to induce the referral of patients for items or services covered by Medicare, Medicaid and certain other governmental health programs. … **We believe that our operations materially comply with the anti-kickback statutes**; however, because these provisions are interpreted broadly by regulatory authorities, we cannot be assured that law enforcement officials or others will not challenge our operations under these statutes

> *   *   *

> **For years, we have maintained a compliance program structured to meet the requirements of the federal sentencing guidelines for an effective compliance program and the model compliance programs promulgated by HHS** over the years and includes, but is not limited to, a Code of Ethical Business Conduct, designation of a compliance officer, compliance committee, policies and procedures, a confidential disclosure method (a hotline), and conducting periodic audits to ensure compliance.

257. The following statements regarding compliance were false and misleading and/or omitted material information, because they failed to disclose that Defendants knew or recklessly disregarded the fact that the Company's sales and marketing practices exposed the Company to increased regulatory scrutiny and prosecution for violations of applicable healthcare fraud and abuse laws.  In particular, Defendants failed to disclose that, *inter alia*:  (1) as confirmed by CW1 and CW6, millions of dollars of gifts, including free travel, dinners, and other entertainment were provided to doctors who used NuVasive products and services; (2) according to CW1, "doctors [who] were Lukianov's favorites … received more gifts than others"; (3) as confirmed by CW2, certain "high end rollers" received special privileges as part of the "MVP" training program; (4) as confirmed by CW5, doctors were paid hundreds of thousands of dollars in "consulting fees" for authoring peer-reviewed papers promoting NuVasive's products; (5) as confirmed by CW6, improper expenses were categorized under non-descript project names, such as "Wolverine," in order to conceal Defendants' fraudulent gifts and payments in violation of applicable healthcare fraud and abuse laws; and (6) as confirmed by CW10 and CW13, the Company's sales practices included encouraging neurophysiologists to facilitate sales and billing for medically redundant and unnecessary equipment installed in operating rooms. Furthermore, CW1 and CW6 confirmed that expenses for gifts to doctors

appeared on Company expense reports, including reports submitted by Defendant Lukianov.  In 2011, an audit of travel and entertainment expenses requested by the Board of Directors and completed by the Company's compliance team identified numerous inappropriate expenses by senior executives, including Defendant Lukianov.  According to CW6, this improper expense report continued unabated even after the audit was completed.  In addition to these improper expenses, Defendants were also aware that the Company prepared so-called "reimbursement guides" in order to coach doctors and hospitals on coding procedures that would exploit loopholes and increase reimbursement from third-party payers, including Medicare and Medicaid.  As a result, there was no reasonable basis to believe that NuVasive maintained an effective compliance program, was in compliance with healthcare fraud and abuse laws, and would not be subject to regulatory scrutiny.

258.   With respect to coding and reimbursement, the 2012 Annual Report stated:

> Reimbursement is contingent on established coding for a given procedure, coverage of the codes by the third-party payers, and adequate payment for the resources used.
>
> In July of 2006, NASS established the proper physician coding for the XLIF procedure by declaring it to be encompassed in existing codes that describe an anterolateral approach to the spine. This position was confirmed in a formal statement by NASS in January 2010. Hospital coding is established by CMS. XLIF is included in the nomenclature for hospital codes as an additional descriptor under long standing codes. All physician

and hospital coding is subject to change which could impact reimbursement and physician practice behavior.

259. With respect to the Company's monitoring business, the 2012 Annual Report explained: "In addition, there is a downward pressure on reimbursement for the IOM services provided by Impulse Monitoring. Significant coding changes for IOM services take effect in 2013. New Current Procedural Terminology (CPT) codes were introduced that may lead to reduced reimbursement by private payers for the professional remote oversight component of the service. Medicare patients will be subject to additional coding changes imposed by CMS which may restrict access to care and limit Impulse Monitoring's ability to cover, bill and collect for cases performed."

260. Defendants' statements concerning coding and reimbursement were false and misleading and omitted material information, because Defendants failed to disclose that Defendants employed improper sales and billing practices to sustain revenues, with knowledge that its customers ultimately would submit claims for reimbursement to governmental healthcare programs, including Medicare and Medicaid. These included, but were not limited to: (1) "double-billing" physician's time by allowing the same physician to monitor multiple patients simultaneously (as confirmed by CW7); (2) pressuring neurophysiologists to assist with sales efforts during surgeries (as confirmed by CW10, CW12, and

CW13); (3) installing redundant equipment in operating rooms (as confirmed by CW12 and CW13; and (4) providing guidance to its customers as to how to code NuVasive products and procedures in order to take advantage of loopholes and maximize reimbursement by third party payers, including Medicare and Medicaid (as confirmed by CW5).

**Quarterly Report for 1Q 2013**

261.   On April 30, 2013, the Company issued a press release announcing its financial results for the quarter ended March 31, 2013.  For the quarter, the Company reported net income of $851,000, or $0.02 diluted EPS and revenue of $159.5 million, compared to net income of $673,000, or $0.02 diluted EPS and revenue of $151.7 million for the same period a year ago.

262.   On May 1, 2013, the Company filed a quarterly report for the first quarterly period ended March 31, 2013 on Form 10-Q with the SEC ("1Q 2013 10-Q"), which was signed by Defendants Lukianov and Lambert, and reiterated the Company's financial results and financial position, as well as the Company's expenses related to training and education and issues with third-party payers.  In addition, the Form 10-Q contained signed certifications by Defendants Lukianov and Lambert, stating that the information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

263.   These reports of financial results were false and misleading and/or omitted material information, because as confirmed by numerous confidential witnesses, including CW2, CW3, CW4, CW9, CW10, and CW13, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices that contravened regulatory guidance, violated healthcare fraud and abuse laws, and exposed the Company to increased regulatory risk.

264.   With respect to training and education expenses, NuVasive stated: "The Company dedicates significant resources toward training spine surgeons on its unique technology and products."

265.   The Company also disclosed that for the period ending March 31, 2013, 63% of total revenues were spent on sales, marketing and administrative expenses, including, among other things, "compensation, commission and training costs for shareowners engaged in sales, marketing and customer support functions; distributor commissions; depreciation expense for surgical instrument sets; shipping costs; surgeon training costs; shareowner (employee) related expenses for our administrative functions; and third-party professional service fees."

266.   Defendants' statements concerning purported education and training programs and sales and marketing expenses were false and misleading and omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW2, CW3, CW4, CW9, CW10, and CW13: (1) Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2) Defendants utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; (3) Defendants' sales and marketing practices, such as encouraging neurophysiologists to facilitate sales and billing for medically redundant and unnecessary equipment in operating rooms, contravened regulatory guidance and exposed the Company to increased regulatory risk; and (4) improper and illegal expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme.

267.   With respect to coding and reimbursement for the XLIF procedure, the Company stated:

At various times in the past, certain insurance providers have adopted policies of not providing reimbursement for the XLIF procedure or some of its components. We have worked with our surgeon customers and the North American Spine Society (NASS) who, in turn, have worked with these insurance providers to supply the information, explanation and clinical data they require to categorize the XLIF procedure as a procedure entitled to reimbursement under their policies. At present, the majority of insurance companies provide reimbursement for XLIF procedures. However, certain carriers, large and small, may have policies significantly limiting coverage of XLIF, Instrumented Lumbar Interlaminar Fusion (ILIF), Osteocel Plus, the PCM ® Cervical Disc System, or other procedures or products we sell. We cannot offer definitive time frames or final outcomes regarding reversal of the coverage-limiting policies, as the process is dictated by the third-party insurance providers. To date, we have not experienced significant lack of payment for our procedures based on these policies.

268.   Furthermore, with respect to coding and reimbursement for IOM services, the Company stated:

[T]here is a downward pressure on reimbursement for the IOM services such as those provided by Impulse Monitoring. Significant coding changes for IOM services took effect in 2013. New Current Procedural Terminology (CPT) codes were introduced that may lead to reduced reimbursement by private payers for the professional remote oversight component of the service. Medicare patients will be subject to additional coding changes imposed by CMS which may restrict access to care and limit Impulse Monitoring's ability to cover, bill and collect for cases performed.

269.   Defendants' statements concerning coding and reimbursement were false and misleading and omitted material information, because Defendants failed

to disclose that Defendants employed improper sales and billing practices to sustain revenues, with knowledge that its customers ultimately would submit claims for reimbursement to governmental healthcare programs, including Medicare and Medicaid.  These included, but were not limited to: (1) "double-billing" physician's time by allowing the same physician to monitor multiple patients simultaneously (as confirmed by CW7); (2) pressuring neurophysiologists to assist with sales efforts during surgeries (as confirmed by CW10, CW12, and CW13); (3) installing redundant equipment in operating rooms (as confirmed by CW12 and CW13; and (4) providing guidance to its customers as to how to code NuVasive products and procedures in order to take advantage of loopholes and maximize reimbursement by third party payers, including Medicare and Medicaid (as confirmed by CW5).

## **THE TRUTH BEGINS TO EMERGE**

270.  The Company's aggressive marketing and billing practices and purported "educational" programs, which served as a thinly-disguised kickback system to reward doctors for using NuVasive's products, inevitably attracted the attention of regulators.  Thus, on July 30, 2013, the Company filed a Form 10-Q with the SEC, where it disclosed the following in relevant part:

> During the three months ended June 30, 2013, the Company received a federal administrative subpoena from the Office of the Inspector General of the U.S. Department of Health and

Human Services (OIG) in connection with an investigation into possible false or otherwise improper claims submitted to Medicare and Medicaid. The subpoena seeks discovery of documents for the period January 2007 through April 2013. The Company is working with the OIG to understand the scope of the subpoena and its request for documents, but do not expect to have greater clarity regarding the request for several months. The Company intends to fully cooperate with the OIG's request. At June 30 2013, the Company is unable to determine the potential financial impact, if any, that will result from this investigation.

271.   On the same day, during an investor conference call, Defendant Lukinov stated, "The OIG subpoena is a very broad document request. It was very focused on interbody CoRoent and biologics Osteocel and Formagraft, but very, very broad beyond those as well. And again, it's a request for information. It's not litigation. And this will be going on for a few months, I'm sure, as we sort it out with OIG in terms of the specific information that they would like to see."

272.   On this news, NuVasive's securities declined $3.28 per share or over 12%, to close at $22.84 per share on July 31, 2013.

273.   According to the Company's most recent Form 10-Q, filed July 30, 2014, the OIG's investigation remains ongoing.  The Company has reported that "[l]egal expenses increased $0.2 and $1.1 million in the three and six months ended June 30, 2014, respectively, compared to the same periods in 2013.  These increases are primarily related to costs incurred in response to the OIG subpoena received during the three months ended June 30, 2013…"

## ADDITIONAL SCIENTER ALLEGATIONS

274.    The Company repeatedly stated that its business was "largely dependent on the availability of reimbursement from third-party payers, such as governmental programs, for example Medicare and Medicaid…"  The Company further acknowledged that "[o]ur relationship with health care professionals … are subject to scrutiny  under various state and federal laws, rules and regulation," and "violations of these laws may be punishable by criminal or civil sanctions, including substantial fines, imprisonment, and exclusion from participation in governmental healthcare programs."

275.    Because compliance with healthcare fraud and abuse laws was critical to the Company's business, Defendants cannot credibly claim that they were unaware of the illegal and improper payment of kickbacks in violation of the Anti-Kickback Statute.    Likewise, Defendants cannot claim that they were unaware of aggressive coding and billing practices, which resulted in submission of improper claims to Medicare and Medicaid in violation of the False Claims Act and other applicable laws and regulations.

276.    In addition, the Company spent billions of dollars in sales, marketing, and administrative expenses throughout the Class Period, which included amounts expended for, among other things, surgeon training, commissions, and third party professional fees.  In every year since 2008, sales, marketing, and administrative

expenses consumed in excess of 60% of the Company's total revenues, a disproportionate percentage as compared to any of the Company's competitors. The amounts were so great and impacted profits to such an extent that the Defendants knew or should have known that these expenses encompassed inappropriate and improper expenses that contravened regulatory guidance, violated healthcare fraud and abuse laws, and substantially increased regulatory risk.

277.   The Individual Defendants, as directors and/or officers of NuVasive during the Class Period, are liable as direct participants in all of the wrongs complained of herein. Through their positions of control and authority, these Defendants were in a position to, and did, control all of the Company's false and misleading statements and omissions, including the contents of SEC filings and press releases, as set forth herein.

278.   With respect to Defendant O'Boyle, in addition to his experience, high level position and access to information, Defendant O'Boyle signed the Company's SEC filings and accompanying SOX certifications through November 6, 2009, certifying that the information contained therein was accurate.

279.   During Defendant O'Boyle's tenure, several confidential witnesses confirm that the Company engaged in improper sales, marketing, and billing practices.  For example, CW2 described the training program, known as MVP,

which provided all expense-paid travel to physicians invited to attend.  Similarly, CW14 and CW15 confirmed that NuVasive took a very aggressive posture with third-party payers regarding coding and reimbursement for the XLIF procedure.  According to CW14, the manner in which the Company coded the XLIF procedure impacted the Company's revenues by millions of dollars each year.  As CFO, Defendant O'Boyle would have been aware of the extent to which NuVasive's sales, marketing, and billing practices affected the Company's revenues.

280.  With respect to Defendant Lukianov, in addition to his experience, high level position, access to information, and the fact that he signed all of the Company's SEC filings throughout the Class Period, numerous confidential witnesses confirm that he directly participated in the fraud alleged herein.

281.  CW1 worked directly for Defendant Lukianov from December 2009 to September 2012.  During her tenure, CW1 became aware of millions of dollars in gifts and perks given to physicians in exchange for using NuVasive products.  CW1 discovered that "some of the doctors were Lukianov's favorites," and "those doctors received more gifts than the others."

282.  Similarly, CW6 had access to and regularly audited Company expense reports for senior executives, including Defendant Lukianov, from June 2010 to April 2012.  According to CW6, Defendant Lukianov's expense reports

indicated that, among other things, he traveled with doctors on the Company's private jet, commissioned special gifts for prominent physicians, entertained physicians with tickets to Broadway shows and professional sporting events, and attended all-expense, Company-paid luxury vacations with physicians to such places as Puerto Rico and ski-resort destinations.  CW6 said that these excessive expenses, as well as others, were flagged during a special audit requested by the Board of Directors in 2011.  However, CW6 indicated that even after the audit was complete, Defendant Lukianov continued his practice of billing the Company for physician gifts and entertainment.

283.  CW3, who worked for the Company from June 2012 to February 2013, confirmed that Lukianov attended events at the Company's headquarters with certain "high end rollers," who received special privileges for referring patients to clinical trials.   These events included catered affairs with large quantities of champagne and wine.  CW3 noted, "The CEO did not skimp on champagne and wine."   CW3 also recalled that Drs. Goodrisch and Volcan received specially-ordered wine bottles as gifts after publishing a text book on XLIF.

284.  Likewise, CW4 and CW8 explained the practice of recruiting doctors to attend training programs based upon the doctors' ability to refer business to the Company.

285.   CW5, who worked for NuVasive from June 2010 to February 2011, confirmed that Defendant Lukianov was involved in the development of reimbursement guides distributed to sales representatives, which instructed doctors and hospitals on coding expenses for monitoring services in order to maximize reimbursement.   CW5 said that her direct supervisor worked with Defendant Lukianov, who "was aware of what we were doing in that space" to promote and market the Company's monitoring services.

286.   With respect to Defendant Lambert, in addition to his experience, certification of the Company's SEC filings, high level position and access to information, numerous confidential witnesses confirm that he was told by several employees about excessive expenses and gifts paid to doctors, as well as Defendant Lukianov's personal expenses billed to the Company.   CW1 indicated that she told Defendant Lambert that Defendant Lukianov was running inappropriate expenses through the Company.   CW1 said, "[Defendant Lambert] approved the expenses anyway.  Always."

287.   After raising concerns with the Company's Controller, Compliance Manger, and General Counsel, but seeing no changes in the reporting of travel and entertainment expenses, CW6 also spoke directly with Defendant Lambert.  In or about 2011, CW6 went to Defendant Lambert's office to discuss the inappropriate

items reported in the audit requested by the Board of Directors.   Defendant Lambert said, "Thank you for letting me know … I'll take care of it."

288.   CW6 said that after the Board's audit, Defendant Lukianov's were submitted to and continued to be approved by Defendant Lambert.   CW6 also said that following the Board's audit, she was instructed by the Controller and the Company's General Counsel to file questionable expenses under code names like "Wolverine."   Based upon their positions in the Company and direct involvement, Defendants Lukianov and Lambert knew or should have known of this accounting change to conceal the Company's improper and illegal sales and marketing scheme.

289.   Furthermore, the Board's audit of expenses in 2011 provided notice to Defendants Lukianov and Lambert that the Company lacked sufficient internal controls to detect and prevent wrongful and illegal sales and marketing and billing practices in violation of healthcare fraud and abuse laws.   As CW6 explained, rather than correcting any compliance issues, Defendants Lukianov and Lambert developed a system whereby a small group of senior executives, including Defendants Lukianov and Lambert, as well as the Company's General Counsel, Jason Hannon and senior executive Peter Valentine, approved each other's expenses.   No further steps were taken to ensure the Company's compliance with healthcare fraud and abuse laws.

290.   Defendants Lukianov and Lambert were also aware of and/or recklessly disregarded compliance issues related to its monitoring business.  CW9 and CW10 confirmed that following changes to coding rules, there was increased pressure from management to sustain profitability.  CW10, CW12, and CW13 all describe instances where neurophysiologists were encouraged to facilitate sales and install medically redundant or unnecessary equipment.   Similarly, CW11 explained defects in the Company's billing system, which allowed employees to manually override billing codes.  CW11 noted that several employees complained that invoices were improperly coded and submitted for reimbursement to Medicare and Medicaid.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

291.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired NuVasive securities during the Class Period (the "Class"); and were damaged thereby. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

292.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, NuVasive securities were

actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by NuVasive or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

293.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

294.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

295.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of NuVasive;

- whether the Individual Defendants caused NuVasive to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of NuVasive securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

296.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

297. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- NuVasive securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold NuVasive securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

298.   Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

**(Against All Defendants For Violations of
Section 10(b) and Rule 10b-5 Promulgated Thereunder)**

299.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

300.   This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

301.   During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein;

(ii) artificially inflate and maintain the market price of NuVasive securities; and (iii) cause Plaintiff and other members of the Class to purchase NuVasive securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

302. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for NuVasive securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about NuVasive's finances and business prospects. By virtue of their positions at NuVasive, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.

Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

303.   Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of NuVasive, the Individual Defendants had knowledge of the details of NuVasive internal affairs.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of NuVasive. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to NuVasive's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of NuVasive securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning NuVasive's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased NuVasive securities at artificially inflated prices and relied upon the price of the securities, the integrity

of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

304.   During the Class Period, NuVasive securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of NuVasive securities at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiff and the Class, the true value of NuVasive securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of NuVasive securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.  By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

305.   As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class

Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations Of Section 20(a) Of The Exchange Act Against The Individual Defendants)

306.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

307.   During the Class Period, the Individual Defendants participated in the operation and management of NuVasive, and conducted and participated, directly and indirectly, in the conduct of NuVasive's business affairs. Because of their senior positions, they knew the adverse non-public information about NuVasive's misstatement of income and expenses and false financial statements.

308.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to NuVasive's financial condition and results of operations, and to correct promptly any public statements issued by NuVasive which had become materially false or misleading.

309.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which NuVasive disseminated in

the marketplace during the Class Period concerning NuVasive's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause NuVasive to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of NuVasive within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of NuVasive securities.

310.   Each of the Individual Defendants, therefore, acted as a controlling person of NuVasive. By reason of their senior management positions and/or being directors of NuVasive, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, NuVasive to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of NuVasive and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

311.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by NuVasive.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury.

Dated:  September 8, 2014

**POMERANTZ  LLP**

By: */s/ Jeremy A. Lieberman*
Jeremy A. Lieberman (admitted *pro hac vice)*
Michele Carino
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: 212-661-1100
Facsimile: 212-661-8665
Email: jalieberman@pomlaw.com
          mcarino@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: 312-377-1181
Facsimile: 312-377-1184
Email: pdahlstrom@pomlaw.com

**GLANCY BINKOW & GOLDBERG LLP**
Lionel Z. Glancy
Michael Goldberg
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: 310-201-9150
Facsimile: 310-201-9160
Email: info@glancylaw.com
      lglancy@glancylaw.com
      mmgoldberg@glancylaw.com

*Counsel for Lead Plaintiff*