# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRAD MAUSS, individually and on behalf of all other persons similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUVAVSIVE, INC.; ALEXIS V. LUKIANOV; KEVIN C. O'BOYLE; and MICHAEL J. LAMBERT,<br><br>Defendants. | CASE NO. 13-cv-2005 JM (JLB)<br><br>ORDER DISMISSING PLAINTIFF'S SECOND AMENDED COMPLAINT WITH LEAVE TO AMEND |

Before the court is Defendants' motion to dismiss Plaintiff's second amended complaint for failure to state a claim. (Doc. No. 31.) Plaintiff filed an opposition, (Doc. No. 35), and Defendants replied, (Doc. No. 36). Having considered the filings, the court finds this matter suitable for resolution on the papers without oral argument pursuant to Civil Local Rule 7.1.d.1. For the reasons set forth below, the court dismisses the second amended complaint with leave to amend.

## BACKGROUND

**A.   Procedural History**

This case is a putative class action on behalf of those who purchased NuVasive securities between October 22, 2008, and July 30, 2013. Danny Popov filed the initial complaint in this case on August 28, 2013. (Doc. No. 1.) On October 28, 2013, Brad Mauss filed a motion to be appointed lead plaintiff

pursuant to § 21(D)(a)(3)(B) of the Securities Exchange Act, as amended by the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(a)(3)(B). (Doc. No. 6.)  The court granted the motion on December 27, 2013.  (Doc. No. 15.)

Plaintiff filed a first amended complaint ("FAC") on February 13, 2014, (Doc. No. 22), which the court dismissed for failure to state a claim, (Doc. No. 29). The FAC did not meet the heightened requirements for pleading falsity and scienter in a securities-fraud case, as it did not link the challenged statements to the asserted reasons for their falsity, and it did not identify which Defendants made the statements.  (Id. at 9–15.)

**B.     The Second Amended Complaint**

Plaintiff filed the instant second amended complaint ("SAC") on September 8, 2014.  (Doc. No. 30.)  The SAC asserts two causes of action: (1) securities fraud, in violation of Section 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission ("SEC") Rule 10b-5, against all Defendants; and (2) control-person liability, pursuant to Section 20(a) of the Securities Exchange Act, against Defendants Lukianov, O'Boyle, and Lambert.  (Id. ¶¶ 299–311.)  Lukianov is NuVasive's Chief Executive Officer and Chairman of the Board of Directors.  (Id. ¶ 25.)  O'Boyle was NuVasive's Executive Vice President and Chief Financial Officer through November 2009.  (Id. ¶ 26.)  Lambert has been NuVasive's Chief Financial Officer since November 9, 2009.  (Id. ¶ 27.)

The thrust of the complaint is that Defendants engaged in questionable sales and marketing practices, which they misrepresented or failed to disclose in public filings and statements between October 22, 2008, and July 30, 2013, when NuVasive announced that it had been subpoenaed in an investigation concerning possible improper claims submitted to Medicare and Medicaid. Plaintiff supports these claims with the alleged statements of various confidential witnesses who attest to their knowledge of the company's conduct and the individual Defendants' roles in it.  (Id. ¶¶ 50–104.)

The complaint provides the following general account, which the court takes as true to the extent that the allegations are well pleaded: NuVasive develops and markets products relating to the surgical treatment of spine disorders. (Id. ¶ 2.) To sustain and grow its business, NuVasive faces constant pressure to innovate, promote and market its products, establish relationships with surgeons and hospitals, and convince spine surgeons to choose its products over those of its competitors. (Id. ¶ 3.) As a medical-device company, NuVasive is subject to an extensive regulatory framework that is intended to protect patients and government-funded health-care programs, such as Medicare and Medicaid, from fraud and abuse. (Id. ¶ 4.) Thus, sales and marketing practices and other conduct that is commonplace in other industries may be unacceptable or illegal when soliciting business that is ultimately paid for, in whole or in part, by government healthcare programs. (Id.) Failure to adhere to these laws and regulations can result in civil and criminal penalties or exclusion from participation in government healthcare programs. (Id.)

Because NuVasive and its customers—mainly hospitals and surgeons—rely primarily on third-party reimbursement for surgical and monitoring fees, exclusion from participation in programs such as Medicare and Medicaid can be fatal to the company's business. (Id. ¶ 5.) If hospitals and physicians cannot recover adequate payments from programs like Medicare and Medicaid—either because NuVasive is ineligible to participate or because there is a disagreement about reimbursement—it is unlikely that they will use NuVasive's products and services. (Id.)

Despite Defendants' recognition that "[h]ealthcare fraud and abuse laws apply to our business," Defendants determined to sustain NuVasive's revenues and expand its customer base by employing numerous aggressive and questionable sales and marketing practices that constitute violations of federal and state laws, including the Anti-Kickback Statute, the False Claims Act, and other healthcare-fraud and abuse laws. (Id. ¶ 6.)

1    Plaintiff alleges that Defendants engaged in three specific practices that
2 violated these laws.  First, NuVasive lured surgeons to use its products and
3 services and to encourage other surgeons to do the same by devising so-called
4 educational and training programs and clinical studies, which included, among
5 other things, all-expense paid trips to New York, San Diego, Puerto Rico, and
6 other locations, first-class flights on private jets, tickets to Broadway shows
7 and NFL games, expensive cocktail receptions and dinners, luxury-hotel stays,
8 and gift cards.  (Id. ¶ 7.)  Further, Defendants created a network of prominent
9 physicians, known within the company as "high end rollers," who received
10 rewards and special treatment, such as all-expense-paid travel, concierge services,
11 and speaking engagements, based upon the number of patients they referred to
12 NuVasive and their promotion and publication of peer-reviewed papers touting
13 the benefits of NuVasive products and services.  (Id. ¶ 8.)  Certain physicians
14 were also paid exorbitant consulting fees and commissions, often in excess
15 of $1 million per year per doctor, for participating in clinical trials and using
16 NuVasive products in surgeries.  (Id. ¶ 9.)  Plaintiff alleges that Defendants
17 engaged in these practices knowing that the resulting increases in sales and
18 revenues would be paid, in part, by government healthcare programs, including
19 Medicare and Medicaid.  (Id. ¶ 10.)
20    Second, following losses in revenue in its monitoring business due to
21 changes in rules for billing and coding its intra-operative monitoring services,
22 NuVasive responded by having sales representatives place monitoring equipment
23 in operating rooms when the equipment was redundant and not medically necessary;
24 by allowing doctors to remotely monitor several patients simultaneously and then
25 generating separate invoices for the same time billed; by developing marketing
26 materials to instruct customers on coding monitoring services so as to take
27 advantage of loopholes in coding procedures; and by improperly coding
28 monitoring services in claims submissions to Medicare and Medicaid.  (Id. ¶ 11.)

Third, when coding disputes threatened to impact revenues for NuVasive's Extreme Lateral Interbody Fusion ("XLIF") procedure, which was NuVasive's most lucrative and well-known line of business, the company waged a heated battle with third-party payers, insisting that those payers, including Medicare and Medicaid, accept the coding designation assigned by NuVasive. (Id. ¶ 12.) Ultimately, NuVasive decided to continue to use the coding that resulted in the highest reimbursement for the XLIF procedure. (Id.)

In various public filings, press releases, and investor calls beginning on October 22, 2008 (the beginning of the proposed class period), Defendants stated that figures representing the company's financial condition were accurate and that the company was in compliance with regulatory requirements, including the Anti-Kickback Statute and the False Claims Act. (Id. ¶¶ 13, 105–269.) According to Plaintiff, those statements were false or misleading because they failed to disclose that

> (1) the Company utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors to utilize its products and services and to encourage other doctors to do the same in violation of federal and state laws and regulations; (2) the Company employed improper sales and billing practices to sustain revenues related to its monitoring business and XLIF procedure, including by submitting false or otherwise improper claims to Medicare and Medicaid; (3) the Company provided guidance to its customers as to how to code NuVasive products and procedures in order to take advantage of loopholes and maximize reimbursement by third party payers, including Medicare and Medicaid; and (4) the company's earnings and revenues were earned, in part, as a result of violations of healthcare fraud and abuse laws.

(Id. ¶ 17.)

Plaintiff asserts that the truth began to emerge on July 30, 2013 (the end of the proposed class period), when NuVasive disclosed in its Form 10-Q for its second quarter 2013 that it had received a subpoena regarding an investigation into possible false or improper claims submitted to Medicare and Medicaid. (Id. ¶ 15.) The statement read:

> During the three months ended June 30, 2013, the Company received a federal administrative subpoena from the Office of the Inspector General of the U.S. Department of Health and Human Services (OIG) in connection with an investigation into possible false or otherwise improper claims submitted to Medicare and Medicaid. The subpoena seeks discovery of documents for the period January 2007 through April 2013. The Company is working with the OIG to understand the scope of the subpoena and its request for documents, but do not expect to have greater clarity regarding the request for several months. The Company intends to fully cooperate with the OIG's request. At June 30 2013, the Company is unable to determine the potential financial impact, if any, that will result from this investigation.

(Id. ¶ 270.) That same day, during a conference-call with investors, Defendant Lukianov described the subpoena as follows:

> The OIG subpoena is a very broad document request. It was very focused on interbody CoRoent and biologics Osteocel and Formagraft, but very, very broad beyond those as well. And again, it's a request for information. It's not litigation. And this will be going on for a few months, I'm sure, as we sort it out with OIG in terms of the specific information that they would like to see.

(Id. ¶ 271.) After releasing this news, NuVasive securities declined $3.28 per share, or over 12%, to close at $22.84 per share on July 31, 2013. (Id. ¶¶ 16, 272.) The company's most recent Form 10-Q, filed July 30, 2014, indicates that "the OIG's investigation remains ongoing" and has resulted in increased legal expenses. (Id. ¶ 273.) As a result of these acts and omissions, Plaintiff alleges, he and other class members have suffered significant losses and damages. (Id. ¶ 18.)

## LEGAL STANDARDS

### A.   Federal Rule of Civil Procedure 12(b)(6)

A Rule 12(b)(6) motion to dismiss challenges the legal sufficiency of the pleadings. See Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). In deciding such a motion, the court must construe the pleadings in the light most favorable to the non-moving party, accepting as true all material allegations in the complaint and any reasonable inferences to be drawn from them. See Broam v. Bogan, 320 F.3d 1023, 1028 (9th Cir. 2003). While dismissal is proper only in "extraordinary" cases, United States v. City of Redwood City, 640 F.2d 963, 966 (9th Cir. 1981),

1  "[f]actual allegations must be enough to raise a right to relief above the speculative
2  level," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The court's review
3  "is limited to the complaint, materials incorporated into the complaint by reference,
4  and matters of which the court may take judicial notice." Metzler Inv. GMBH
5  v. Corinthian Colls., Inc., 540 F.3d 1049, 1061 (9th Cir. 2008). The court should
6  grant relief under Rule 12(b)(6) if the complaint lacks either a cognizable legal
7  theory or facts sufficient to support a cognizable legal theory. See Balistreri
8  v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990).

### B.   Federal Rule of Civil Procedure 9(b) and the PSLRA

Because Plaintiff has alleged securities-fraud claims governed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, Plaintiff must also satisfy the heightened pleading standards set forth by Rule 9(b) of the Federal Rules of Civil Procedure and by the PSLRA, the latter of which has imposed "formidable pleading requirements to properly state a claim and avoid dismissal under [Rule] 12(b)(6)." Metzler, 540 F.3d at 1055; see Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 990 (9th Cir. 2009).

Section 10(b) of the Securities Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe . . . ." 15 U.S.C. § 78j(b). Pursuant to that section, the SEC promulgated Rule 10b-5, which makes it unlawful, among other things, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading" in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5(b).

There are six elements to a private securities-fraud claim under Section 10(b) and Rule 10b-5: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation and the purchase or sale of a

security; (4) reliance upon the misrepresentation; (5) economic loss; and (6) loss causation. See Loos v. Immersion Corp., 762 F.3d 880, 886–87 (9th Cir. 2014).

Rule 9(b) requires a plaintiff alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); see Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1230 (9th Cir. 2004). "Averments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." Vess v. Ciba-Geigy Corp., USA, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks omitted).

In addition to Rule 9(b)'s heightened pleading requirements for allegations of fraud, the PSLRA requires a plaintiff alleging securities fraud to "plead with particularity both falsity and scienter." Zucco Partners, 552 F.3d at 990 (internal quotation marks omitted). The complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1)–(2); Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 321 (2007). The complaint's scienter allegations must give rise not simply to a plausible inference of scienter, but rather to an inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id. at 314.

**DISCUSSION**

**A.   Section 10(b) Claim**

As noted above, there are six elements to a private securities-fraud claim under Section 10(b) and Rule 10b-5: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance upon the misrepresentation; (5) economic loss; and (6) loss causation. See Loos, 762 F.3d at 886–87. Defendants seek dismissal of Plaintiff's Section 10(b) claim on grounds that Plaintiff did not adequately plead loss causation, falsity, or scienter. The court addresses each below.

### 1. Loss Causation

"[L]oss causation is the causal connection between the defendant's material misrepresentation and the plaintiff's loss." Metzler, 540 F.3d at 1062 (brackets and internal quotation marks omitted). To survive a motion to dismiss, "the complaint must allege that the defendant's share price fell significantly after the truth became known." Id. (internal quotation marks omitted). In other words, "[t]he complaint must allege that the practices that the plaintiff contends were fraudulent were revealed to the market and caused the resulting losses." Id. at 1063.

Defendants contend that Plaintiff cannot show loss causation in light of the Ninth Circuit's recent decision in Loos v. Immersion Corp., 762 F.3d 880 (9th Cir. 2014), which was decided around the time Plaintiff filed the SAC. (Doc. No. 31-1 at 4–6.) Loos held that "[t]he announcement of an investigation, without more, is insufficient to establish loss causation." 762 F.3d at 890. The defendant company in Loos had reported increases in revenues over the course of several years, until it announced an internal investigation into its revenue-recognition practices in one sector of its business. Id. at 884–85. After the announcement, the company's stock price dropped over 23%. Id. at 885. The plaintiff asserted claims for violations of Section 10(b) and 20(a) of the Securities Exchange Act and Rule 10b-5. (Id. at 883.) The district court dismissed the case because the allegations did not plausibly allege loss causation, see id. at 883–84, and the Ninth Circuit affirmed the dismissal, see id. at 887–90. It reasoned that "any decline in a corporation's share price following the announcement of an investigation can only be attributed to market speculation about whether fraud has occurred." Id. at 890. Such an announcement merely "puts investors on notice of a *potential* future disclosure of fraudulent conduct" but does not "'reveal' fraudulent practices to the market." Id. "This type of speculation cannot form the basis of a viable loss causation theory." Id.

In reaching that conclusion, the Ninth Circuit agreed with the Eleventh

Circuit's similar treatment of an announcement of an SEC investigation in Meyer v. Greene, 710 F.3d 1189 (11th Cir. 2013). There, the Eleventh Circuit held that "the commencement of an SEC investigation, without more, is insufficient to constitute a corrective disclosure for purposes of § 10(b)." Id. at 1201. It reasoned that "stock prices may fall upon the announcement of an SEC investigation, but that is because the investigation can be seen to portend an added *risk* of future corrective action. That does not mean that the investigations, in and of themselves, reveal to the market that a company's previous statements were false or fraudulent." Id.

In this case, as in Loos and Meyers, the only "truth" that the SAC alleges was revealed to the market was that NuVasive had received a subpoena from the OIG "in connection with an investigation into possible false or otherwise improper claims submitted to Medicare and Medicaid." (SAC ¶ 270.) Plaintiff indicates that the investigation "remains ongoing," (id. ¶ 273), but does not allege any further disclosure of fraud to the market.

Because the entire revelation to the market, thus far, is that NuVasive is under investigation, Plaintiff has not adequately alleged loss causation. See Loos, 762 F.3d at 890 (without more, such allegations "cannot form the basis of a viable loss causation theory"); see also Neborsky v. Valley Forge Composite Techs., Inc., 2014 WL 1705522, at *7 (S.D. Cal. Apr. 28, 2014) (announcement of investigation was insufficient to establish loss causation because it "did not reveal the alleged fraudulent scheme of stock price manipulation").

Plaintiff contends, however, that there is "more" in this case, in the form of an analyst's report that was released the day after the company announced the subpoena. (Doc. No. 35 at 22–23.) Plaintiff asks the court to take judicial notice of the report, (id. at 23 n.9.), but did not mention the report in the SAC and did not provide a copy of it in either the SAC or his opposition to Defendants' motion to dismiss. The court declines to take notice of the report, as there is

nothing to take notice of other than Plaintiff's account of it.[1]

Plaintiff contends alternatively that his allegations satisfy loss causation under the materialization-of-the-risk approach. (Id. at 24–25.) Under that approach, "a misstatement or omission is the proximate cause of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor." Nuveen Mun. High Income Opportunity Fund v. City of Alameda, 730 F.3d 1111, 1120 (9th Cir. 2013) (internal quotation marks omitted). Plaintiff contends that Defendants' failure to implement internal regulatory-compliance controls and refusal to stop the illegal kickbacks exposed NuVasive to increased regulatory risk, which materialized in the OIG's investigation. (Doc. No. 35 at 25.)

There are two problems with this. First, although the Ninth Circuit has discussed the materialization-of-the-risk approach, see Nuveen, 730 F.3d at 1120, it has never actually endorsed it. Second, and more importantly, applying that approach in the circumstances of this case would create an end-run around the Ninth Circuit's clear holding in Loos that the announcement of an investigation, without more, does not establish loss causation. See 762 F.3d at 890. Plaintiff has not offered any reason why one characterization of loss causation should produce a viable claim while another, on the same set of facts, does not.

The court concludes, therefore, that in the absence of some further disclosure to the market substantiating Plaintiff's allegations of fraud, Plaintiff has not adequately alleged loss causation.

---

[1] The court doubts that the report would change the analysis. According to Plaintiff, the report predicted that the investigation in this case, like "almost all" OIG investigations, is "likely" to result in increased legal costs in the near term, an eventual settlement in which the company will agree to hire a government-appointed monitor, substantial fines, and business disruption during the monitoring period. (Doc. No. 35 at 22.) The report thus appears to predict only that this investigation will proceed as such investigations ordinarily do, but does not appear to provide any additional information that was not already available to the market. See Meyer, 710 F.3d at 1199 ("[T]he mere repackaging of already-public information by an analyst . . . is simply insufficient to constitute a corrective disclosure.").

**2.    Falsity**

Defendants contend that Plaintiff has not adequately alleged falsity because his entire case is based on Defendants' misrepresenting NuVasive's compliance with federal healthcare laws, but the SAC does not allege particularized facts to show that NuVasive violated any laws. (Doc. No. 31-1 at 8–9.) Plaintiff responds that he is not required to prove his case in the complaint, and that the SAC "is replete with specific factual allegations that Defendants engaged in fraudulent and abusive practices, contravened regulatory guidelines related to compliance programs, exposed NuVasive to regulatory risk, and violated the law." (Doc. No. 35 at 8.)

It is true that Plaintiff does not have to prove his case at this stage. But he must allege enough facts to make it plausible that he can ultimately prevail. Plaintiff alleges, in sum, that NuVasive failed to disclose that it used kickbacks "in violation of federal and state laws and regulations," that it "submitt[ed] false or otherwise improper claims to Medicare and Medicaid," that it advised customers on "how to code NuVasive products and procedures in order to take advantage of loopholes and maximize reimbursement," and that its "earnings and revenues were earned, in part, as a result of violations of healthcare fraud and abuse laws." (SAC ¶ 17.) Thus, it appears that Plaintiff can prevail only if he can show that Defendants were not in compliance with the law and misrepresented that fact, or at least that they risked illegality in a way that should have been disclosed to investors. Hence, whether Defendants plausibly violated the law matters.

On those points Plaintiff alleges that NuVasive, among other things, lured surgeons to use its products with luxury "education and training programs and clinical studies," rewarded "high end rollers" for patient referrals, paid large consulting fees and commissions for participating in clinical trials and using Nuvasive products, coached customers on how to take advantage of loopholes in billing for procedures, and used coding that resulted in the highest reimbursement

for certain procedures. (SAC ¶¶ 7–12.) Plaintiff supports these claims with allegations of confidential-witness statements, in which various employees state that they perceived various improprieties within the company. (Id. ¶¶ 50–104.)

But the allegations only state in a general fashion that NuVasive was pampering and paying doctors; there are no particulars on the purported violations. For example, there are no facts to show that the company submitted improper Medicare claims or who received the purported kickbacks and under what circumstances. Certainly, various confidential witnesses assert that they perceived improprieties, but the court is not bound to accept as true legal conclusions or employee opinions on the propriety of Defendants' conduct. Without the "who, what, when, where, and how" of at least some of the purportedly illegal conduct, and without some indication of how those facts constitute violations of healthcare laws and regulations, the court cannot meaningfully evaluate the plausibility of Plaintiff's claims that Defendants misrepresented NuVasive's compliance with the laws. The court concludes, therefore, that Plaintiff has not pleaded the circumstances of fraud with sufficient particularity.

### 3. Scienter

Where plaintiffs claiming securities fraud "fail to plead falsity, *a fortiori* they have not established that defendants knew those statements were false." Karacand v. Edwards, 53 F. Supp. 2d 1236, 1252 (D. Utah 1999); In re Cisco Sys. Inc. Sec. Litig., 2013 WL 1402788, at *7 (N.D. Cal. Mar. 29, 2013). Because Plaintiff has not adequately pleaded falsity, he has also not adequately pleaded scienter. Accordingly, this claim is dismissed.

### B. Section 20(a) Claim

Defendants seek dismissal of Plaintiff's Section 20(a) claim on grounds that Plaintiff failed to establish an underlying Section 10(b) violation. (Doc. No. 31-1 at 19.) Section 20(a) of the Securities Exchange Act provides that persons directly or indirectly in control of a violator of securities laws may be jointly and

severally liable for such a violation.  See 15 U.S.C. § 78t(a).  "To establish a cause of action under this provision, a plaintiff must first prove a primary violation of underlying federal securities laws, such as Section 10(b) or Rule 10b-5, and then show that the defendant exercised actual power over the primary violator."  In re NVIDIA Corp. Securities Litigation, 768 F.3d 1046, 1052 (9th Cir. 2014).  "Section 20(a) claims may be dismissed summarily . . . if a plaintiff fails to adequately plead a primary violation of section 10(b)."  Zucco, 552 F.3d at 990.  Because Plaintiff has not alleged a plausible Section 10(b) violation, the court dismisses his Section 20(a) claim.

## C.  Leave to Amend

Defendant asserts that dismissal should be without leave to amend because Plaintiff's case is fundamentally defective in that it is premised on the announcement of an investigation, which cannot be the basis for loss causation, falsity, or scienter.  (Doc. No. 31-1 at 19–20.)  Plaintiff requests leave to amend to reference the analyst's report and because Defendants raised the loss-causation issue for the first time in their most recent motion to dismiss.  (Doc. No. 35 at 23 n.9.)

"Dismissal with prejudice and without leave to amend is not appropriate unless it is clear . . . that the complaint could not be saved by amendment."  Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003).  "Adherence to these principles is especially important in the context of the PSLRA," which "requires a plaintiff to plead a complaint of securities fraud with an unprecedented degree of specificity and detail."  Id.

Although the deficiencies in the SAC are significant, it is possible that Plaintiff will be able to rectify them if given the opportunity to do so.  Accordingly, the court grants Plaintiff's request for leave to amend.  Any amended complaint should address the loss-causation and specificity issues identified here.

**CONCLUSION**

Defendants' motion to dismiss (Doc. No. 31) is GRANTED. Plaintiff's request for leave to amend, however, is GRANTED. If Plaintiff wishes to file a third amended complaint, he must do so within fourteen days after entry of this order.

IT IS SO ORDERED.

DATED: December 9, 2014

_____
Hon. Jeffrey T. Miller
United States District Judge