# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRAD MAUSS, individually and on behalf of all other persons similarly situated, | CASE NO. 13cv2005 JM (JLB) |
| | ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIFTH AMENDED COMPLAINT |
| Plaintiff, | |
| vs. | |
| NUVASIVE, INC.; ALEXIS V. LUKIANOV; KEVIN C. O'BOYLE; and MICHAEL J. LAMBERT, | |
| Defendants. | |

Defendants move to dismiss Plaintiff's fifth amended complaint for failure to state a claim (Doc. No. 73), and both parties request judicial notice of several items (Doc. Nos. 73, 77). These matters were fully briefed and found suitable for resolution without oral argument pursuant to Local Civil Rule 7.1.d.1. For the reasons set forth below, the requests for judicial notice are granted, and Defendant's motion to dismiss is denied in part, and granted in part.

## BACKGROUND

A.      **Procedural History**

This case is a putative securities-fraud class action on behalf of those who purchased NuVasive securities between October 22, 2008, and July 30, 2013. Danny Popov filed the initial complaint in August 2013. (Doc. No. 1). Brad Mauss was appointed as lead plaintiff in December 2013. (Doc. No. 15).

1    Plaintiff filed a first amended complaint in February 2014.  (Doc. No. 22).

2  The first amended complaint was dismissed for failure to state a claim because it

3  did not link the allegedly false statements to the asserted reasons for their falsity,

4  and it did not identify which Defendant made the statements.  (Doc. No. 29.)

5    Plaintiff filed a second amended complaint in September 2014.  (Doc.

6  No. 30).  The second amended complaint was dismissed because the loss-causation

7  allegations were insufficient under Loos v. Immersion Corp., 762 F.3d 880, 890 (9th

8  Cir. 2014), which had recently held that the announcement of an investigation,

9  without more, is insufficient to establish loss causation.  (Doc. No. 38).  At that

10  point, Plaintiff's loss-causation theory rested solely on the announcement that the

11  company was being investigated for possible false or improper claims submitted to

12  Medicare or Medicaid.  Additionally, although the claims were premised on alleged

13  misrepresentations about the company's compliance with federal healthcare laws,

14  Plaintiff had not provided enough details about the violations and the relevant laws

15  to make it possible to assess whether the challenged statements were false.

16    Plaintiff filed a third amended complaint in December 2014.  (Doc. No. 39).

17  Soon thereafter, the parties sought leave for Plaintiff to file a fourth amended

18  complaint (Doc. No. 44), which the court granted (Doc. No. 45).  Plaintiff filed a

19  fourth amended complaint ("FAC") in February 2015.  (Doc. No. 47.)  The FAC

20  was also dismissed because the court found the loss-causation allegations

21  insufficient under Loos v. Immersion Corp., 762 F.3d 880, 890 (9th Cir. 2014).

22  However, the court took note of several new developments: the company's

23  announcement that Defendant Lukianov resigned for failure to comply with certain

24  of the company's expense-reimbursement and personnel policies; the company's

25  announcement that it agreed to pay the Department of Justice (the "DOJ")  $13.8

26  million to settle the investigation; the DOJ's announcement of the settlement and

27  the underlying allegations regarding false claims and kickbacks; and the filing and

28  purported settlement of a *qui tam* action in Maryland, which also involved

allegations of false claims and kickbacks.  In its previous order dismissing Plaintiff's

FAC, the court held:

> . . . [A]bsent something more substantial from Defendants, Plaintiff's theory—that Defendants engaged in illegal practices and did not disclose the true risk of regulatory scrutiny to investors, who bought their shares at an artificially inflated price and were harmed when the foreseeable result of that risk materialized, beginning with the investigation and culminating with Lukianov's resignation and the settlement—appears to be enough to support a claim.

(Doc. No. 69, p. 28).  Additionally, the court found the scienter allegations against

Defendant O'Boyle insufficient and dismissed the claims against him.  The court

granted Plaintiff leave to file a fifth amended complaint incorporating the new

developments.  Plaintiff filed a fifth amended complaint ("5AC") (Doc. No. 70).

**B.    The Operative Complaint**

Like the complaints before it, the 5AC asserts two claims, for (1) securities

fraud, in violation of Section 10(b) of the Securities and Exchange Act of 1934 and

Rule 10b-5, against all Defendants; and (2) control-person liability under Section

20(a) of the Securities and Exchange Act, against Defendants Lukianov, O'Boyle,

and Lambert.  Lukianov was NuVasive's Chief Executive Officer and Chairman of

the Board of Directors at all relevant times.  O'Boyle was the company's Executive

Vice President and Chief Financial Officer through November 2009.  Lambert has

been Chief Financial Officer since November 2009.

Plaintiff alleges, in sum, that Defendants engaged in illegal sales, marketing,

and billing practices that exposed the company to an increased risk of regulatory

liability under the federal Anti-Kickback Statute and the False Claims Act, but they

did not disclose that risk to investors, who bought their shares at an inflated price

and were harmed when the concealed risk materialized.  He provides the following

account:

NuVasive develops and markets products and services for use in the

surgical treatment of spine disorders.  To sustain and grow its business, NuVasive

faces constant pressure to innovate, promote its products, establish relationships

with surgeons and hospitals, and convince surgeons to choose its products over those of its competitors.  At the same time, the company is subject to an extensive regulatory framework that is designed to protect patients and government-funded healthcare programs from fraud and abuse.  Under that framework, sales and marketing practices and other conduct that are commonplace in other industries may be illegal when soliciting business that is ultimately paid for, in whole or in part, by government healthcare programs.  Failure to adhere to the applicable laws and regulations can result in civil and criminal penalties and exclusion from participation in government healthcare programs.

Because NuVasive and its customers—mainly hospitals and surgeons—rely primarily on third-party reimbursement for surgical and monitoring fees, exclusion from participation in government healthcare programs could be fatal to NuVasive's business.  If hospitals and physicians cannot recover adequate payments from programs like Medicare or Medicaid because NuVasive is ineligible to participate or because there is a disagreement about reimbursement, they are unlikely to use NuVasive's products and services.

Plaintiff alleges that Defendants knew and recognized in public filings that the Anti-Kickback Statute prohibits the knowing and willful solicitation, offer, payment or receipt of any remuneration, direct or indirect, in cash or in kind, in return for or to induce the referral of patients for items or services covered by Medicare, Medicaid and certain other government health programs.  They also knew that by compromising the independent judgment of physicians, promoting the use of equipment that was not medically necessary, manipulating and exploiting loopholes in the billing coding system, and encouraging customers to do the same, improper claims would be submitted for payment to Medicare and Medicaid in violation of the False Claims Act.  Nevertheless, Plaintiff claims, Defendants determined to sustain NuVasive's revenues and expand its customer base by employing numerous aggressive sales and marketing practices that violated the

1   Anti-Kickback Statute and False Claims Act.

2      Plaintiff identifies four specific practices that he claims violated these laws.
3 First, NuVasive lured surgeons to use its products and services and to encourage
4 other surgeons to do the same by devising purported educational and training
5 programs and clinical studies that included, among other things, all-expense paid
6 trips to New York, San Diego, Puerto Rico, and other locations, first-class flights
7 on private jets, tickets to Broadway shows and NFL games, expensive cocktail
8 receptions and dinners, luxury hotel stays, and gift cards.  Defendants also created
9 a network of prominent physicians, known within the company as "high end
10 rollers," who received rewards and special treatment, such as all-expense-paid
11 travel, concierge services, and speaking engagements based on the number of
12 patients they referred to NuVasive and their promotion and publication of peer-
13 reviewed papers touting the benefits of NuVasive's products and services.

14      Second, in the course of these interactions with physicians, Defendants
15 knowingly marketed NuVasive products and services for uses that were not
16 approved or cleared by the Food and Drug Administration ("FDA").  This off-label
17 marketing further increased NuVasive's revenues and resulted in submission of
18 false and improper claims to government healthcare programs in violation of the
19 False Claims Act and FDA regulations.

20      Third, after losses in revenue in NuVasive's monitoring business due
21 to changes in the rules for billing and coding intra-operative monitoring services,
22 the company responded by having sales representatives place monitoring equipment
23 in operating rooms when it was redundant and not medically necessary; allowing
24 doctors to remotely monitor several patients simultaneously, then generating
25 separate invoices for the same time billed; developing marketing materials to
26 instruct customers on how to code monitoring services so as to take advantage of
27 coding loopholes; and improperly coding monitoring services in claims submissions
28 to Medicare and Medicaid.

Fourth, when coding disputes threatened to impact revenues for NuVasive's Extreme Lateral Interbody Fusion ("XLIF") procedure, NuVasive's most lucrative and well-known line of business, the company waged a heated battle with third-party payers, including Medicare and Medicaid, insisting that they accept the coding designation assigned by NuVasive. Ultimately, NuVasive decided to continue to use the coding that resulted in the highest reimbursement for the XLIF procedure.

Plaintiff supports this account with the alleged statements of various confidential witnesses who observed and raised concerns about the company's apparent indifference to healthcare laws and regulations. For example, CW1 was Defendant Lukianov's executive assistant from December 2009 through September 2012, and had access to the company's sales and marketing-related programs and expenses, including Lukianov's expense reports. CW1 became aware of millions of dollars in gifts given to doctors who used NuVasive products extensively, including flights on private jets to meetings with Lukianov in San Diego or New York, and all-expense-paid vacations to destinations like Puerto Rico. According to CW1, twenty or so doctors who were Lukianov's favorites, some identified by name, participated in Medicare and Medicaid, used the entire line of NuVasive products to the exclusion of all others, were known within the company as "high end rollers," and received more gifts than others.

CW6, a NuVasive accounting manager from June 2010 to April 2012 who audited the company's expenses every quarter offers a similar account. According to CW6, surgeons were flown on private jets or first-class flights to San Diego, New York, Puerto Rico, and other destinations for luxury trips, costing between $80,000 and $200,000 per month, which Lukianov partook in and submitted as expenses. A 2011 look-back audit requested by the board of directors revealed that half of the expenses under review were inappropriate, including expense reports that did not comply with the requirements set forth in the Patient Protection and Affordable Care Act, and other expenses that violated the company's internal

compliance policy, which was designed to maintain compliance with the regulations.  For example, the audit identified $40,000 spent on NFL tickets and other entertainment, which was categorized as "employee recognition," when, in fact, the money had been used to entertain doctors.

The audit results were provided to the executive leadership team and the Board of Directors.  Additionally, CW1 and CW6 informed Defendant Lambert, NuVasive's Chief Financial Officer, that inappropriate expenses were being billed to the company.  In early 2010, CW1 began informing Lambert of inappropriate expenses.  Lambert nevertheless "approved the expenses anyway.  Always." (Id. ¶ 76).  CW6 also didn't see any change in the company.  Instead, steps were taken to conceal the expenses after the audit.  At the direction of the Controller and General Counsel, CW6 was instructed to categorize inappropriate travel and entertainment expenses for doctors with nondescript code names like "Wolverine," and senior executives, including Lukianov and Lambert, began approving each others' expense reports.

Nevertheless, in various public filings, press releases, and investor calls beginning on October 22, 2008 (the beginning of the proposed class period), Defendants stated that figures representing the company's financial condition were accurate and that the company was in compliance with regulatory requirements, including the Anti-Kickback Statute and the False Claims Act.  According to Plaintiff, those statements were false or misleading, in sum, because they failed to disclose that

> (1) the Company utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors to utilize its products and services and to encourage other doctors to do the same in violation of federal and state laws and regulations; (2) the Company promoted its products and services, which were unapproved and/or uncleared by the FDA; (3) the Company employed improper sales and billing practices to sustain revenues related to its monitoring business and XLIF procedure, including by submitting false or otherwise improper claims to Medicare and Medicaid; (4) the Company provided guidance to its customers as to how to code NuVasive's products and procedures in order to take advantage of loopholes and maximize reimbursement by third party

1   payers, including Medicare and Medicaid; and (5) the Companys
2   earnings and revenues were earned, in part, as a result of violations of
    healthcare fraud and abuse laws.

3   (Id. ¶ 24).

4       Plaintiff alleges the Company's aggressive marketing and billing practices

5   and purported "educational" programs, which served as a thinly-disguised kickback

6   system to reward doctors for using NuVasive's products, inevitably attracted the

7   attention of regulators and could no longer be concealed by Defendants.  Thus, on

8   July 30, 2013, the end of the proposed class period, NuVasive disclosed in its Form

9   10-Q for the second quarter of 2013 that it was being investigated in connection

10  with possible false or improper claims submitted to Medicare and Medicaid.  The

11  statement read:

12
13      During the three months ended June 30, 2013, the Company received
    a federal administrative subpoena from the Office of the Inspector
    General of the U.S. Department of Health and Human Services (OIG)
14  in connection with an investigation into possible false or otherwise
    improper claims submitted to Medicare and Medicaid.  The subpoena
15  seeks discovery of documents for the period January 2007 through
    April 2013.  The Company is working with the OIG to understand the
16  scope of the subpoena and its request for documents, but do not expect
    to have greater clarity regarding the request for several months.  The
17  Company intends to fully cooperate with the OIG's request.  At June
    30, 2013, the Company is unable to determine the potential financial
18  impact, if any, that will result from this investigation.

19  (Id. ¶ 336).

20      Later that day, during a conference call with investors, Lukianov described

21  the subpoena, stating:

22
23      The OIG subpoena is a very broad document request.  It was very
    focused on interbody CoRoent and biologics Osteocel and Formagraft,
    but very very broad beyond those as well.  And again, it's a request
24  for information.  It's not litigation.  And this will be going on for a few
    months, I'm sure, as we sort it out with OIG in terms of the specific
25  information that they would like to see.

26  (Id. ¶ 337).  After an analyst remarked that the subpoena had the earmarks of a

27  false-claims or whistleblower action, Lukianov acknowledged that the subpoena

28  was not part of a broader request of similarly situated companies, but rather was

"specific to NuVasive and a very broad request."  (Id.)

Almost immediately, analysts reported that the likely outcome of the subpoena was a settlement, increased legal fees, the costs of hiring a government-appointed monitor, fines in the tens of millions of dollars, and business disruptions during the monitoring period:

> [The OIG subpoena] has plenty of precedence on how it plays out: The [OIG] has requested documents for the period January 2007 through April 2013.  While the government is mainly focused on Medicare billing claims on inter-body fusions (used for most of NUVA's fusion procedures) and biologics (Osteocel Plus), they are 'casting a very broad net.'  As NUVA points out, no charges have been filed against the company, and they are complying with the investigation.  However, as these investigations have become commonplace in the device industry (usually relating to sales practices in violating Federal anti-kickback legislation, or the Federal Healthcare Fraud and False Claims statute, which appears to be the case here) there is plenty of precedence on the likely outcome. Specifically, almost all of these inquiries have led to a settlement, in the form of a Corporate Integrity Agreement, which includes a Deferred Prosecution Agreement (where the company agrees to clean up questionable practices over a 1–2 year period to avoid prosecution and disqualification from Medicare participation).  Assuming the investigation follows this path, the initial impact will be increased legal cost near term (which the company has assumed in 2013, leaving us to believe NUVA is not peripheral, but the focus of the investigation), and an eventual settlement, leading to a DPA that will require additional cost for hiring a government appointed monitor (WMGI $27.37, Buy was of similar size, and paid $50 million per year over initially a year and a half period), fines (hard to gauge, but historically in the $25–75 million range, for a company of NUVA's size), and the strong likelihood of business disruptions over the monitoring period.  In addition, there is increased headline risk, and given that NUVA is less likely to be acquired until the investigation is resolved, we think valuation is capped at ~$25 or 2x 2014 EV/Sales, as a near-term acquisition becomes unlikely.

(Id. ¶ 338).  On July 31, 2013, the day after the investigation was announced, NuVasive securities declined $3.28 per share, or over 12%, to close at $22.84 per share.

The 5AC details the following post-class period "confirming events."  First, on April 1, 2015, NuVasive announced the forced resignation of Defendant Lukianov from both his position as CEO and as a member of the Company's Board of Directors, based upon violations of the Company's expense reimbursement and

personnel policies.  On this news, NuVasive's securities declined 5.4% on higher-than-average trading volume, to close at $43.52 after a trading halt put in place prior to the announcement was lifted.

On April 29, 2015, NuVasive announced that it had reached an agreement in principle with the DOJ to resolve potential claims arising from the OIG's investigation of false and/or improper claims submissions to Medicare and Medicaid in exchange for payment of approximately $13.8 million, including fees. Thereafter, on July 30, 2015, the DOJ announced that NuVasive had entered into a definitive agreement to pay the U.S. $13.5 million, plus fees, to resolve allegations that the Company caused false claims to be submitted to Medicare and other federal health care programs by marketing the CoRoent System for surgical uses not approved by the FDA and by paying kickbacks to induce physicians to use the Company's products, including the CoRoent System.

The DOJ announcement explained the U.S. alleged that between 2008 and 2013, NuVasive promoted the use of the CoRoent System for surgical uses that were not approved or cleared by the FDA, which caused physicians and hospitals to submit false claims to federal health care programs for certain spine surgeries that were not eligible for reimbursement.  The U.S. further alleged that NuVasive knowingly offered and paid illegal remuneration to certain physicians, including promotional speaker fees, honoraria, and expenses related to attending company events, to induce them to use the company's products.

The DOJ settlement also resolved a *qui tam* action involving NuVasive, captioned U.S. ex rel. Kevin J. Ryan v. NuVasive, Inc., Case No. 12cv2683 (D. Md), which similarly alleged that "NuVasive's illegal scheme to promote the use of CoRoent XL implants for indications that were not FDA approved greatly increased CoRoent XL implants' sales to the great financial benefit of NuVasive, but caused federal and state health care programs to pay millions of dollars for the use of medical devices that were not approved, were not reasonable and medically

1    necessary and were medically unsafe for non-approved uses." (Id. ¶ 346).

2    **C.    The Motion to Dismiss and Subsequent Procedural Developments**

3        Defendants moved to dismiss the 5AC for failure to state a claim. (Doc.

4    No. 73). Defendants also filed a request for judicial notice of a number of

5    documents relating to historic stock prices, SEC filings and press releases as

6    evidence of what information NuVasive disclosed to the market, and evidence of

7    NuVasive's annual revenues for the periods beyond the class period. (Doc. No. 73-

8    20). Plaintiff opposed the motion to dismiss (Doc. No. 76), and also filed a request

9    for judicial notice of two documents: (1) the RBC Capital markets Equity Research

10   Report, April 29, 2015, and (2) the PiperJaffray Comment, April 29, 2015 (Doc. No.

11   77). Defendant filed a reply. (Doc. No. 79).

12       After the motion to dismiss was taken under submission, Plaintiff filed a

13   notice of supplemental authority in support of his opposition. (Doc. No. 81). The

14   court requested supplemental briefing on the loss causation issue. (Doc. No. 82).

15   Specifically, the parties were asked to address the question of the impact, if any, of

16   Lloyd, et al. v. CVB Financial Corporation, et al., No. 13-56838 (9th Cir. Feb. 1,

17   2016) on the pending issues before the court. Both parties submitted supplemental

18   briefing. (Doc. Nos. 83 and 84).

19                              **DISCUSSION**

20   **A.    Requests for Judicial Notice**

21       Courts can take judicial notice of matters that are either generally known

22   within the court's jurisdiction or capable of accurate and ready determination by

23   resort to sources whose accuracy cannot reasonably be questioned. See Fed. R.

24   Evid. 201(b). Courts must take judicial notice of such facts if a party requests it and

25   the court is supplied with the necessary information. See Fed. R. Evid. 201(c)(2).

26       In securities cases, courts routinely take judicial notice of SEC filings,

27   press releases, and other publicly available financial documents. See Metzler Inv.

28   GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (stock-

price history and publicly available financial documents); <u>Dreiling v. Am. Express</u> <u>Co.</u>, 458 F.3d 942, 946 n.2 (9th Cir. 2006) (SEC filings); <u>Mallen v. Alphatec</u> <u>Holdings, Inc.</u>, 861 F. Supp. 2d 1111, 1122 n.5 (S.D. Cal. 2012) (SEC filings, press releases, and transcripts of conference calls).  Courts may take judicial notice that the market was aware of the information contained in such documents.  <u>See</u> <u>Heliotrope Gen., Inc. v. Ford Motor Co.</u>, 189 F.3d 971, 981 n.18 (9th Cir. 1999).

Defendants request judicial notice of the following documents: (1) NuVasive's Form 8-K filed with the SEC on April 1, 2015, and exhibit announcing the resignation of Alex Lukianov; (2) NuVasive's April 29, 2015 press release announcing agreement in principle with DOJ; (3) NuVasive's historic stock prices for April 28-30, 2015, and July 28-29, 2015, reported by Yahoo! Finance; (4) NuVasive's Form 8-K filed with the SEC on July 28, 2015, and Ex. 99.2; (5) press release by the DOJ, dated July 30, 2015; (6) excerpts from NuVasive's Form 10-K for Fiscal Year 2008, ended December 31, 2008, filed with the SEC on March 2, 2009; (7) excerpts from NuVasive's Form 10-K for Fiscal Year 2012, ended December 31, 2012, filed with the SEC on February 27, 2013; (8) settlement agreement between the DOJ and NuVasive; (9) form 10-Q for the quarterly period ended September 30, 2013, filed with the SEC on October 30, 2013; (10) excerpts from NuVasive's Form 10-K for Fiscal Year 2013, ended December 31, 2013, filed with the SEC on March 3, 2014; (11) NuVasive's Form 10-Q for the quarterly period ended March 31, 2014, filed with the SEC on April 30, 2014; (12) NuVasive's Form 10-Q for the quarterly period ended June 30, 2014, filed with the SEC on July 30, 2014;  (13) NuVasive's Form 10-Q for the quarterly period ended September 30, 2014, filed with the SEC on October 30, 2014; (14) excerpts from NuVasive's Form 10-K for Fiscal Year 2014, ended December 31, 2014, filed with the SEC on February 25, 2015; (15) NuVasive's Form 10-Q for the quarterly period ended March 31, 2015, filed with the SEC on May 4, 2015; (16) NuVasive's Form 10-Q for the quarterly period ended June 30, 2015, filed with the SEC on

1  July 28, 2015; and (17) NuVasive's Form 10-Q for the quarterly period ended June

2  30, 2013, filed with the SEC on July 30, 2013.  (Doc. No. 73-20).  Plaintiff does not

3  oppose Defendants' request for judicial notice.

4      Plaintiff requests judicial notice of (1) the RBC Capital Markets Equity

5  Research Report, April 29, 2015, and (2) the PiperJaffray Comment, April 29, 2015

6  (Doc. No. 77).  Defendants do not oppose Plaintiff's request for judicial notice.

7      NuVasive's financial forms and press releases are appropriate for judicial

8  notice under the rules set forth above. As for the settlement agreement between the

9  DOJ and NuVasive (Doc. No. 73-10), and the documents requested by Plaintiff

10  (Doc. Nos. 77-1, 77-2) , the court takes notice of those items to the extent that they

11  reflect the information available to the market.

12  **B.      Defendants' Motion to Dismiss**

13      A Rule 12(b)(6) motion to dismiss challenges the legal sufficiency of

14  the pleadings.  See Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  When

15  deciding such a motion, the court must construe the pleadings in the light most

16  favorable to the non-moving party, accepting as true all material allegations in

17  the complaint and any reasonable inferences to be drawn from them.  See Broam

18  v. Bogan, 320 F.3d 1023, 1028 (9th Cir. 2003).  While dismissal is proper only in

19  "extraordinary" cases, United States v. City of Redwood City, 640 F.2d 963, 966

20  (9th Cir. 1981), "[f]actual allegations must be enough to raise a right to relief above

21  the speculative level," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

22      The court's review "is limited to the complaint, materials incorporated into

23  the complaint by reference, and matters of which the court may take judicial notice."

24  Metzler, 540 F.3d at 1061.  The court should grant relief under Rule 12(b)(6) if

25  the complaint lacks either a cognizable legal theory or facts sufficient to support a

26  cognizable legal theory.  See Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699

27  (9th Cir. 1990).

28      Because Plaintiff has alleged securities-fraud claims governed by the

1   Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4,

2   he must satisfy the heightened pleading standards set forth by Rule 9(b) of the

3   Federal Rules of Civil Procedure and the PSLRA, the latter of which imposed

4   "formidable pleading requirements to properly state a claim and avoid dismissal

5   under [Rule] 12(b)(6)." Metzler, 540 F.3d at 1055; see Zucco Partners, LLC v.

6   Digimarc Corp., 552 F.3d 981, 990 (9th Cir. 2009).

7        Rule 9(b) requires a plaintiff alleging fraud to "state with particularity

8   the circumstances constituting fraud." Fed. R. Civ. P. 9(b); see Nursing Home

9   Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1230 (9th Cir. 2004).

10  To satisfy this requirement, "[a]verments of fraud must be accompanied by the

11  who, what, when, where, and how of the misconduct charged." Vess v. Ciba-

12  Geigy Corp., USA, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks

13  omitted).  Recently, the Ninth Circuit held that "Rule 9(b) applies to all elements

14  of a securities fraud action, including loss causation." Oregon Pub. Emps. Ret.

15  Fund v. Apollo Group Inc., 774 F.3d 598, 604 (9th Cir. 2014).

16       Similarly, the PSLRA requires a plaintiff alleging securities fraud to "plead

17  with particularity both falsity and scienter." Zucco Partners, 552 F.3d at 990

18  (internal quotation marks omitted).  The complaint must "specify each statement

19  alleged to have been misleading [and] the reason or reasons why the statement is

20  misleading," and "state with particularity facts giving rise to a strong inference that

21  the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1)–(2);

22  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 321 (2007).  The

23  allegations must give rise not simply to a plausible inference of scienter, but to

24  an inference of scienter that is "cogent and at least as compelling as any opposing

25  inference of nonfraudulent intent." Tellabs, 551 U.S. at 324.

26       **1.      Section 10(b) Claim**

27       Section 10(b) of the Securities Exchange Act makes it unlawful "[t]o use or

28  employ, in connection with the purchase or sale of any security . . . any

manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe . . . ."  15 U.S.C. § 78j(b).  SEC Rule 10b-5 makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading" in connection with the purchase or sale of any security.  17 C.F.R. § 240.10b-5(b).

There are six elements to a private securities-fraud claim under Section 10(b) and Rule 10b-5: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance upon the misrepresentation; (5) economic loss; and (6) loss causation.  See Loos, 762 F.3d at 886-87.  Defendants challenge Plaintiff's allegations on loss causation, falsity, and scienter with respect to Defendant O'Boyle.  The court addresses each of these elements below.

### a.   Loss Causation

"Broadly speaking, loss causation refers to the causal relationship between a material misrepresentation and the economic loss suffered by an investor."  Loos v. Immersion Corp., 762 F.3d 880, 887 (9th Cir. 2014).  "Ultimately, a securities fraud plaintiff must prove that the defendant's misrepresentation was a substantial cause of his or her financial loss."  Id. (internal quotation marks omitted).  "At the pleading stage, however, the plaintiff need only allege that the decline in the stock price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors."  Id.  "In other words, the plaintiff must plausibly allege that the defendant's fraud was revealed to the market and caused the resulting losses."  Id. (internal quotation marks omitted).

In its previous order dismissing Plaintiff's FAC, the court held that under Loos, the controlling Ninth Circuit precedent at the time, the announcement of an investigation, without more, was insufficient to establish loss causation.  Id. at 890.

The court noted, however, that <u>Loos</u> did not hold that the announcement of an investigation could never be part of a viable loss-causation theory, and acknowledged that the company's settling or paying fines could provide the "something more" required for a viable theory of loss-causation.  The Ninth Circuit answered the "something more" question in <u>Lloyd v. CVB Financial Corp.</u>, 811 F.3d 1200, 1209-11 (9th Cir. 2016), where it held that the announcement of a government investigation, coupled with subsequent information revealing the inaccuracy of prior representations, is sufficient to plead loss causation.

<u>Lloyd</u> involved allegations against a lender, CVB Financial Corporation ("CVB").  Plaintiff alleged that CVB misrepresented in its SEC filings that it was unaware of any credit problems of its borrowers that would cause serious doubts about such borrowers' ability to comply with payment terms.  <u>Id.</u> at 1203-04.  Plaintiff further alleged that CVB failed to disclose that one of its borrowers, Garret Group, had informed CVB that it was contemplating bankruptcy and would not make the payments on its loans.

CVB made the last two representations in March and May 2010.  In May and June 2010, an anonymous blogger suggested that CVB was engaging in a "cycle of extend and pretend" with its loans to Garrett Group and others.  <u>Id.</u> at 1204.  On July 26, 2010, CVB received a subpoena from the SEC.  In its August 9, 2010 form 10-Q, CVB disclosed the receipt of the subpoena, stating:

> The subpoena requests information regarding our loan underwriting guidelines, our allowance for credit losses and our allowance for loan loss calculation methodology, our methodology for grading loans and the process for making provisions for loan losses, and our provision for credit losses. In addition, the subpoena requests information regarding presentations we have given or conferences we have attended with analysts, brokers, investors or prospective investors.

<u>Id.</u>

The day following this announcement, CVB's stock fell 22%, from $10.30 to $8.00 per share.  <u>Id.</u>  A month later, CVB announced that Garrett Group was unable to pay its loans as scheduled; the bank charged off $34 million in Garrett Loans and

characterized the remaining $48 million as nonperforming.  Id. at 1205.  The following day, CVB's stock dropped only slightly, from $7.05 to $6.99.  Id.   By the following week, the stock had risen above $7.05, and it never again fell below that price.  Id.

In determining whether loss causation was sufficiently pled here, the court noted that Loos had left open whether the announcement of an investigation could form a basis for a viable loss causation theory if the complaint also alleged a subsequent corrective disclosure by defendant.  The court answered that question in the affirmative.  The court discussed that while CVB's stock fell over 20% the day after the announcement of the subpoena receipt, the market reacted hardly at all to CVB's "bombshell" disclosure about charging off millions in Garrett loans, "confirming that investors understood the SEC announcement as at least a partial disclosure of the inaccuracy of the previous serious doubts statements."  Id. at 1210.  Thus, under the facts of the case, the Ninth Circuit found that loss causation was sufficiently pled, explaining that "any other rule would allow a defendant to escape liability by first announcing a government investigation and then waiting until the market reacted before revealing that prior representations under investigation were false."  Id.

The court stated that its conclusion was consistent with a recent Fifth Circuit decision, Public Employees' Retirement System of Mississippi v. Amedisys, Inc., 769 F.3d 313, 317-19 (5th Cir. 2014), which held that a government investigation can constitute a corrective disclosure in the absence of discovery of actual fraud.  Id. at 324-25.   The Fifth Circuit held that an announcement of government investigation, when "viewed together with the totality of the other alleged partial disclosures," can be sufficient to plead loss causation.  Id. at 324.  Additionally, "[t]o be corrective, the disclosure need not precisely mirror the earlier misrepresentations, but it must at least relate back to the misrepresentation and not to some other negative information about the company."  Id. at 321.  The Fifth

Circuit found that the combination of five partial disclosures, which spanned a period of about two years, collectively constituted and culminated in a corrective disclosure sufficient to allege loss causation.  Id. at 324.  The partial disclosures included (1) an inconclusive report, ending with a statement that "it is not yet concluding that Amedisys is committing Medicaid fraud, but there are many indications that this inquiry needs deeper scrutiny"; (2) the company's announcement of the resignations of Amedisys' Chief Operating Officer and Chief Information Officer "to pursue other interests"; (3) a Wall Street Journal article discussing questionable Medicare practices at Amedisys; (4) the announcement of government investigations into Amedisys' billing practices; and (5) Amedisys' disappointing second quarter earnings report, followed by a 24.13% decline in company's share prices.  Id.

Consistent with the approach of the Fifth Circuit, the Ninth Circuit concluded Plaintiff had adequately pled loss causation by alleging that:

> (1) CVB's disclosure of the subpoena caused its stock price to drop precipitously; (2) the market and various analysts perceived the subpoena to be related to CVB's alleged misstatements about Garrett's ability to repay; (3) the market's fears about the subpoena were confirmed by CVB's September 9 disclosure that it was writing off $34 million in Garrett loans and categorizing the remainder as non-performing; and (4) the September 9 disclosure's minimal effect on CVB's stock price indicates that the earlier 22% drop reflected, at least in part, the market's concerns about the Garrett loans.

Id. at 1210-11.

Plaintiff argues that the 5AC is "on all fours" with Lloyd and Amedisys:

> It alleges that NuVasive disclosed the receipt of an OIG subpoena probing false and improper claims submitted to Medicare and Medicaid, followed by a significant drop in NuVasive's securities, that NuVasive's CEO resigned as a result of his improper expenses, resulting in a further decline in NuVasive's share price, and that NuVasive eventually reached an agreement with the DOJ, requiring the Company to pay $13.8 million in fines and penalties to resolve allegations of Medicare and Medicaid fraud.

(Doc. No. 83, p. 1).

More specifically, Plaintiff argues the following facts illustrate loss causation is sufficiently pled here.  The 5AC alleges that on July 30, 2013, NuVasive disclosed that it received a subpoena from the OIG probing possibly false and improper claims submitted to Medicare and Medicaid.  (Id. ¶ 336).  On the same day, during an investor conference call, Defendant Lukianov stated: "The OIG subpoena is a very broad document request.  It was very focused on interbody CoRoent and biologics Osteocel and Formagraft, but very, very broad beyond those as well."  (Id. ¶ 337).  The 5AC further alleges that analysts remarked the subpoena "ha[d] kind of the earmarks of false claims or whistleblower type action" and advised the market that the OIG subpoena "ha[d] a predictable outcome," likely to result in tens of millions of dollars to be paid by NuVasive as a result of illicit sales practices in violation of the federal anti-kickback legislation or the Federal Healthcare Fraud and False Claims statutes.  (Id. ¶ 338).  The 5AC alleges that on this news, NuVasive's securities declined $3.28 per share or over 12%, to close at $22.84 per share on July 31, 2013.  (Id. ¶ 339).

Next, the 5AC alleges that subsequent developments confirmed what investors partially recognized upon the announcement of the OIG investigation.  (Id. ¶ 340).  First, on April 1, 2015, NuVasive announced the forced resignation of Defendant Lukianov from both his position as CEO and as a member of the company's Board of Directors based upon violations of the company's expense reimbursement and personnel policies.  (Id.).  On this news, NuVasive's securities declined 5.4%.  (Id.).  Less than one month later, on April 29, 2015, NuVasive announced that it had reached an agreement in principle with the DOJ to resolve claims arising from the OIG's investigation of false and improper claims submissions to Medicare and Medicaid, in exchange for payment of approximately $13.8 million, including fees.  (Id. ¶ 341).  Subsequently, on July 30, 2015, the DOJ announced that NuVasive had entered into a definitive agreement to pay the U.S. $13.5 million, plus fees, to resolve allegations that NuVasive caused false claims to

1   be submitted to Medicare and other federal health care programs by marketing the

2   CoRoent System for surgical uses not approved by the FDA and by paying

3   kickbacks to induce physicians to use NuVasive products, including the CoRoent

4   System.  (Id. ¶ 342).  The DOJ further alleged that NuVasive knowingly offered and

5   paid illegal remuneration to certain physicians, including, inter alia, promotional

6   speaker fees, honoraria, and expenses related to attending company events, to

7   induce them to use the company's products.  (Id. ¶ 344).  Plaintiff concludes that

8   these facts, taken together, compel the inescapable conclusion that the 5AC

9   adequately alleges loss causation, similar to Lloyd.  "Any other finding "would

10  allow [NuVasive] to escape liability by first announcing the [OIG] investigation and

11  then waiting until the market reacted before revealing that prior representations

12  under investigation were false."  (Doc. No. 83, p. 13, citing Lloyd, 811 F.3d at

13  1210) (internal quotations omitted).

14          Defendants argue Lloyd is inapposite and that its application to this case is

15  impractical.  First, Defendants argue, unlike Lloyd, the announcement of the

16  investigation here was not preceded by speculation in the market that NuVasive was

17  engaged in improper conduct.  (Doc. No. 84, p. 3).  Second, while the analysts in

18  Lloyd noted a connection between the subpoena and Garret loans, the analysts'

19  predictions here were both incorrect, as the investigation did not lead to a "deferred

20  prosecution agreement," and far less specific because they did not note the

21  connection between the subpoena and the alleged off-label uses for CoRoent®.

22  (Id.).   Third, the announcement of Defendant Lukianov's departure did not suggest

23  that it was connected to the investigation.  (Id.).  Fourth, the DOJ press release

24  stated that the DOJ and NuVasive settled *allegations* only and did not make any

25  reference to "fines" and "penalties" or findings of liability.  (Id. at p. 4, 5).  Fifth,

26  while in Lloyd, only one month had passed between the announcement of the

27  investigation and the write-off of Garrett loans, here, more than 20 months elapsed

28  between the disclosure of the investigation and the announcement of the settlement.

1   This, according to Defendants, illustrates that the lack of market reaction is far less

2   telling here than in Lloyd.  (Id. at p. 8).  Finally, Defendants argue that the

3   application of Lloyd in this case is impractical because "[i]f a plaintiff only had to

4   allege that the outcome of an investigation 'confirmed the market's fears' at the time

5   an investigation was announced, securities cases arising from an announcement of

6   an investigation would be unmanageable." (Id.).  Since it took two years to resolve

7   the investigation in this case, Defendants suggest courts would have to wait years or

8   even stay cases, pending investigations if they applied Lloyd to cases such as this.

9   (Id.).

10         Defendants' position is too restrictive and ultimately unpersuasive.  While the

11   facts of this case are not identical to Lloyd, the logic behind Lloyd is perfectly

12   applicable here.  The court finds that just as in Lloyd and Amedisys, the

13   combination of "partial disclosures" here, including (1) the disclosure of the receipt

14   of an OIG subpoena probing false and improper claims submitted to Medicare and

15   Medicaid, followed by a significant drop in NuVasive's securities; (2) the market

16   analysts' remarks regarding the subpoena having "earmarks of false claims or

17   whistleblower type action," resulting in a decline in Nuvasive's share price; (3) the

18   resignation of NuVasive's CEO, resulting in a further decline in NuVasive's share

19   price; and (4) the settlement reached between NuVasive and the DOJ, requiring

20   NuVasive to pay $13.8 million, is sufficient to plead loss causation at this stage of

21   the lawsuit.

22         The factual differences outlined by Defendants are inconsequential.  First,

23   Lloyd does not require that an announcement of an investigation be preceded by

24   market speculation of company wrongdoing in order for the announcement to

25   qualify as a corrective disclosure.  The important consideration is the market's

26   understanding of a given disclosure at the time it was made.  Here, the

27   announcement, followed by a significant drop in NuVasive's securities and the

28   market analysts' remarks about the nature of the subpoena, sufficiently rendered this

1  a partial disclosure under <u>Lloyd</u> and <u>Amedisys</u>.  Second, while the market analysts

2  here did not predict the outcome of the subpoena with the same particularity and

3  accuracy as the analysts in <u>Lloyd</u>, they did remark that the subpoena had "earmarks

4  of false claims or whistleblower type action."  Requiring that the market accurately

5  predict precise company wrongdoing is neither a necessary nor realistic standard for

6  the court to adopt.

7      Third, the announcement of Defendant Lukianov's resignation can qualify as

8  a partial disclosure, even if the announcement did not connect his resignation to the

9  investigation.  <u>See</u> <u>Amedisys</u>, 769 F.3d. at 323 (holding that the announcement of

10  the resignations of Amadisys' two executive officers to "pursue other interests"

11  constituted a "partial disclosure").  Fourth, the fact that NuVasive and the DOJ

12  settled *allegations* without findings of liability is similarly inconsequential.  <u>See id.</u>

13  at 324-25 (holding that a government investigation can constitute a corrective

14  disclosure in the absence of a discovery of actual fraud).  Finally, the 20 month

15  interval between the disclosure of the investigation and the announcement of the

16  settlement does not buttress the theory that lack of market reaction to the settlement

17  renders it irrelevant as a partial disclosure.  While <u>Lloyd</u> involved only one month

18  between the announcement of an investigation and the write-off of Garrett loans,

19  <u>Amedisys</u> considered a series of five disclosures and their corresponding market

20  reactions in the span of two years.

21      Similar logic applies here: the combination of partial disclosures, which

22  spanned a period of 20 months, including (1) the disclosure of the receipt of the

23  subpoena, followed by a significant drop in NuVasive's securities; (2) the market

24  analysts' remarks regarding the subpoena having "earmarks of false claims or

25  whistleblower type action," resulting in a decline in Nuvasive's share price; (3) the

26  resignation of NuVasive's CEO, resulting in a further decline in NuVasive's share

27  price; and (4) the settlement reached between NuVasive and the DOJ, requiring

28  NuVasive to pay $13.8 million, is sufficient to plead loss causation at this stage.

13cv2005

1        **b.     Falsity**

2        To adequately plead falsity, the complaint must identify "(1) each statement

3    alleged to have been misleading; (2) the reason or reasons why the statement was

4    misleading; and (3) all facts on which that belief is formed." <u>Desaigoudar v.</u>

5    <u>Meyercord</u>, 223 F.3d 1020, 1023 (9th Cir. 2000).  The plaintiff must "set forth, as

6    part of the circumstances constituting fraud, an explanation as to why the disputed

7    statement was untrue or misleading when made." <u>Yourish v. Cal. Amplifier</u>, 191

8    F.3d 983, 993 (9th Cir. 1999).  This requirement can be satisfied "by pointing to

9    inconsistent contemporaneous statements or information (such as internal reports)

10   which were made by or available to the defendants." <u>Id.</u> (internal quotation marks

11   omitted).

12       The court points the parties to the court's discussion of falsity in its previous

13   order dismissing Plaintiff's FAC.  (<u>See</u> Doc. No. 69).  The court previously found

14   Plaintiff had sufficiently pled falsity, a finding not undermined by the 5AC's

15   inclusion of newly acquired information alleged by Plaintiff as a result of the DOJ

16   settlement and the unsealing of the *qui tam* action.  The 5AC sets forth sufficient

17   details regarding NuVasive's off-label marketing, including statements directly

18   related to it by two confidential witnesses, CW14 and CW18.

19       **c.     Scienter**

20       In the context of Section 10(b), scienter is defined as a "mental state

21   embracing intent to deceive, manipulate, or defraud." <u>Ernst & Ernst v. Hochfelder</u>,

22   425 U.S. 185, 193 n.12 (1976).  To satisfy the scienter requirement at the pleading

23   stage, "the complaint must allege that the defendants made false or misleading

24   statements either intentionally or with deliberate recklessness." <u>In re Daou Sys.,</u>

25   <u>Inc.</u>, 411 F.3d at 1015.  The allegations must give rise to an inference of scienter

26   that is "cogent and at least as compelling as any opposing inference of

27   nonfraudulent intent." <u>Tellabs</u>, 551 U.S. at 314.

28       In its previous order dismissing Plaintiff's FAC (Doc. No. 69), the court

found scienter sufficiently pled as to Defendants Lukianov and Lambert, but not as to Defendant O'Boyle.  For O'Boyle, Plaintiff previously relied and continues to rely on the "core operations" inference, under which scienter may be imputed to key officers based on their role in the company.  In its previous order, the court found the scienter allegations against O'Boyle's presented a close call, but ultimately fell short of the proposition that it would have been "absurd" to think that he did not know the truth about the company's alleged misconduct.  (Doc. No. 69, p. 23).  As to O'Boyle, the 5AC has not alleged additional facts sufficient to meet the scienter threshold either with respect to intentional or deliberately reckless conduct. Because Plaintiff has been provided with several opportunities to plead a viable case against O'Boyle and has been unsuccessful in doing so, O'Boyle is dismissed without leave for Plaintiff to further amend.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (Doc. No. 73) is DENIED in part and GRANTED in part.  The claims against Defendant O'Boyle are dismissed without leave to amend.  Remaining Defendants are to file an answer to the 5AC within 14 days after the entry of this order.

DATED:  July 12, 2016

_____
Hon. Jeffrey T. Miller
United States District Judge