LIONEL Z. GLANCY (#134180)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
E-mail: info@glancylaw.com
lglancy@glancylaw.com

***Counsel for Lead Plaintiff***

(*Additional Counsel appear on Signature page)*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRAD MAUSS, Individually and on Behalf of All Other Persons Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>NUVASIVE, INC., ALEXIS V. LUKIANOV, KEVIN C. O'BOYLE, and MICHAEL J. LAMBERT,<br><br>Defendants. | Case No.: 13-cv-02005-JM<br><br>**SIXTH AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Lead Plaintiff Brad Mauss ("Plaintiff"), and plaintiff Danny Popov, individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding NuVasive, Inc. ("NuVasive" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased NuVasive securities between October 22, 2008 and July 30, 2013, inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange

Act of 1934 (the "Exchange Act") and Rule 10b-5 against the Company and certain of its top officials.

2. NuVasive is a medical device company focused on developing surgical products and procedurally integrated solutions for the spine. The Company's principal product is a surgical platform called Maximum Access Surgery ("MAS"), which includes a proprietary software-driven nerve detection and avoidance system, Intra-Operative Monitoring ("IOM") support, a unique retractor system, an innovative lateral procedure known as eXtreme Lateral Interbody Fusion ("XLIF"), and a wide variety of specialized implants and biologic products utilized in spinal surgery.

3. NuVasive operates in an intensely-competitive industry. As the Company itself has acknowledged, many of its competitors are bigger, better financed, and more-widely known and accepted by surgeons, hospitals, and third-party payers, such as insurance companies. As a result, to sustain and grow its business, the Company faces constant pressure to innovate, promote and market its products, establish relationships with surgeons and hospitals, and convince spine surgeons to choose its products over those of its competitors.

4. At the same time, NuVasive is subject to an extensive regulatory framework, which is intended to protect patients and government-funded health care programs, such as Medicare and Medicaid, from fraud and abuse. Thus, sales

and marketing practices and other conduct that may be common in other industries may be unacceptable or illegal when soliciting business that ultimately is paid for in whole or in part by governmental healthcare programs. Failure to adhere to these laws and regulations can result in civil and criminal penalties, or even exclusion from participation in governmental health care programs.

5. Because NuVasive and its customers – mainly hospitals and surgeons – rely primarily on third-party reimbursement for the surgical and monitoring fees that they earn, exclusion from participation in programs, such as Medicare and Medicaid, can be fatal to its business. As NuVasive explains, "We expect that sales volumes and prices of our products and services will continue to be largely dependent on the availability of reimbursement from third-party payers, including government-funded programs, such as Medicare and Medicaid." Consequently, if hospitals and physicians cannot recover adequate payments from programs like Medicare and Medicaid – either because NuVasive is ineligible to participate or because there is a disagreement about reimbursement – it is unlikely that they will use NuVasive's products and services.

6. Despite their recognition that "[h]ealthcare fraud and abuse laws apply to our business," Defendants determined to sustain the Company's revenues and expand its customer base by employing numerous, aggressive and illegal sales and marketing practices that constitute violations of federal and state laws,

including but not limited to, the Anti-Kickback Statute, the False Claims Act, and other applicable healthcare fraud and abuse laws.

7. First, the Company lured surgeons to utilize NuVasive products and services and encourage other surgeons to do the same by devising so-called educational and training programs and clinical studies, which included, among other things, all-expense paid trips to New York, San Diego, Puerto Rico, and other locations, first-class flights on private jets, tickets to Broadway shows and NFL games, expensive cocktail receptions and dinners, luxury hotel stays, and gift cards.

8. Defendants also created a network of prominent physicians, known within the Company as "high end rollers," who received rewards and special treatment, such as all-expense paid travel, concierge services, and speaking engagements, based upon the number of patients they referred to the Company and their promotion and publication of peer-reviewed papers touting the benefits of NuVasive products and services.

9. Certain physicians were also paid exorbitant consulting fees and commissions, often in excess of $1 million per year per doctor, for participating in clinical trials and utilizing and promoting NuVasive products in surgeries.

10. Defendants engaged in this wrongful and illegal conduct, knowing that the resulting increases in sales and revenues would be paid, in part, by governmental healthcare programs, including Medicare and Medicaid.

11. Second, in the course of these interactions with physicians, Defendants knowingly marketed NuVasive products and services for uses that were not approved or cleared by the Food and Drug Administration ("FDA"). This off-label marketing further increased NuVasive's revenues and resulted in submission of false and improper claims to government healthcare programs in violation of the False Claims Act and FDA regulations.

12. Third, following losses in revenue in its monitoring business due to changes in rules for billing and coding IOM services, the Company responded by, among other things, (1) having sales representatives place monitoring equipment in operating rooms, when the equipment was redundant and not medically necessary; (2) allowing doctors to remotely monitor several patients simultaneously, and then generating separate invoices for the same time billed; (3) developing marketing materials to instruct customers on coding monitoring services so as to take advantage of loopholes in coding procedures; and (4) improperly coding monitoring services in claims submissions to Medicare and Medicaid.

13. Fourth, when coding disputes threatened to impact revenues for NuVasive's XLIF procedure, which was the Company's most lucrative and well-known line of business, the Company waged a very heated battle with third-party payers, insisting that those payers, including Medicare and Medicaid, accept the coding designation assigned by NuVasive. Ultimately, NuVasive decided to continue to utilize the coding that resulted in the highest reimbursement for the XLIF procedure.

14. Defendants knew and disclosed in their public filings that the Anti-Kickback Statute "***prohibits the knowing and willful solicitation, offer, payment or receipt of any remuneration, direct or indirect, in cash or in kind, in return for or to induce the referral of patients for items or services covered by Medicare, Medicaid and certain other governmental health programs.***" Yet, despite their awareness of numerous practices in violation of the law, Defendants claimed, "***We believe that our operations materially comply with the anti-kickback statutes…"***

15. Likewise, Defendants knew that by compromising the independent judgment of physicians, promoting uses of equipment that were not approved or cleared by the FDA and/or were not medically necessary, and manipulating and exploiting loopholes in the billing coding system and encouraging customers to do

the same, improper claims would be submitted for payment to Medicare and Medicaid in violation of the False Claims Act.

16. Defendants' thinly-veiled kickback scheme, off-label promotion of NuVasive products and services, and deceptive billing practices ultimately caught the attention of regulators. On July 30, 2013, the Company disclosed in its Form 10-Q for its second quarter 2013 that it had "received a federal administrative subpoena from the Office of the Inspector General of the U.S. Department of Health and Human Services ("OIG") in connection with an investigation into possible false or otherwise improper claims submitted to Medicare and Medicaid. The subpoena seeks discovery of documents for the period January 2007 through April 2013."

17. On this news, NuVasive securities declined $3.28 per share or over 12%, closing at $22.84 per share on July 31, 2013.

18. Following the exposure of NuVasive's compliance failures and the onset of a regulatory investigation related to alleged False Claims Act violations, investors' worst fears were confirmed on April 1, 2015, when the Company announced the resignation of Defendant Lukianov due to violations of the Company's expense reimbursement and personnel policies.

19. Subsequent events provided further confirmation of the full extent of risk to which investors had unknowingly been exposed. On April 29, 2015, less

than one month after Defendant Lukianov's forced resignation, NuVasive announced that it had reached an agreement in principle with the U.S. Department of Justice ("DOJ") in connection with the OIG investigation, which would require the Company to pay $13.8 million in fines and penalties to the United States to resolve the matter (the "DOJ Settlement").

20. Then, on July 30, 2015, the DOJ released the Settlement Agreement between the U.S. and NuVasive, which explained the results of the OIG investigation as follows:

> The United States contends that it and the Medicaid Participating States have certain civil claims against NuVasive for engaging in the following conduct (hereinafter referred to as the "Covered Conduct"):
>
> 1. During the period January 1, 2008, through December 31, 2013, NuVasive knowingly marketed the CoRoent for uses that were not approved or cleared by FDA, most notably spine fusion procedures involving more than two contiguous levels of the spine, use in the thoracic region of the spine, and use in treating severe scoliosis and severe spondylolisthesis. Some of these uses were not reasonable and necessary for the diagnosis or treatment of an illness or injury under 42 U.S.C. § 1395y(a)(1(A), and thus were not covered by Medicare, Medicaid, TRICARE, or FEHBP.
>
> 2. During the period January 1, 2008, through December 31, 2013, NuVasive knowingly offered and paid illegal remuneration to certain physicians to induce them to use CoRoent in spinal fusion surgeries, in violation of the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b). The illegal remuneration consisted of promotional

> speaker fees, honoraria and expenses for attending events sponsored by the Society of Lateral Access Surgery ("SOLAS"). Despite its outward appearance of independence, SOLAS was created, funded, and operated solely by NuVasive.
>
> As a result of the foregoing conduct, the Government alleges that NuVasive knowingly caused false or fraudulent claims for CoRoent to be submitted to, or caused purchases by, Medicare, Medicaid, TRICARE, and FEHBP.

21. In a press release announcing the DOJ Settlement, U.S. Attorney Rod J. Rosenstein explained: "Health care providers need to be free to make medical decisions without improper influence by material or incentives from manufacturers. A medical device manufacturer violates the law if it knowingly causes physicians to use its products for purposes that are not medically reasonable and necessary and to bill federal health insurance programs."

22. Special Agent in Charge Nick DiGiulio of the OIG similarly emphasized: "Defrauding Medicare and Medicaid by paying kickbacks to physicians and promoting uses not covered by Federal health care programs will not be tolerated. Settlements such as the one entered into today by NuVasive send a message to the medical device industry that such practices will be closely monitored."

23. NuVasive's off-label marketing and kickback schemes were also the subject of a *qui tam* lawsuit, captioned *U.S. ex rel. Kevin J. Ryan v. Nuvasive, Inc.*,

Case No. 12-cv-2683 (D. Md.) (the "*Qui Tam* Action"), originally filed on September 10, 2012 by a former Company employee, who was trained to promote NuVasive products for off-labels uses during the Class Period. The *Qui Tam* Action was resolved as part of the DOJ Settlement.

24. Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that, inter alia: (1) the Company utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors to utilize its products and services and to encourage other doctors to do the same in violation of federal and state laws and regulations; (2) the Company promoted its products and services, and trained physicians in surgical uses of its products and services, which were unapproved and/or uncleared by the FDA; (3) the Company employed improper sales and billing practices to sustain revenues related to its monitoring business and XLIF procedure, including by submitting false or otherwise improper claims to Medicare and Medicaid; (4) the Company provided guidance to its customers as to how to code NuVasive products and procedures in order to take advantage of loopholes and maximize reimbursement by third party payers, including Medicare and Medicaid; and (5) the Company's

earnings and revenues were earned, in part, as a result of violations of healthcare fraud and abuse laws. As a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

25. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

26. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

27. This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

28. Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as the securities of NuVasive were publicly traded in this District.

29. In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

30. Lead Plaintiff, as set forth in the previously-filed certification, purchased NuVasive securities at artificially inflated prices during the Class Period and suffered damages upon the materialization of risks caused by Defendants' misstatements.

31. Plaintiff Danny Popov, as set forth in the attached certification, purchased NuVasive securities at artificially inflated prices during the Class Period and suffered damages upon the materialization of risks caused by Defendants' misstatements.

32. Defendant NuVasive is a Delaware corporation with its headquarters located at 7475 Lusk Boulevard, San Diego, CA 92121.

33. Defendant Alexis V. Lukianov ("Lukianov") at all relevant times has been the Company's Chairman of the Board of Directors and Chief Executive Officer.

34. Defendant Kevin C. O'Boyle ("O'Boyle") served as the Company's Executive Vice President and Chief Financial Officer through November 2009.

35. Defendant Michael J. Lambert ("Lambert") has been the Company's Chief Financial Officer since November 9, 2009.

36. The defendants referenced above in ¶¶ 24 - 28 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

37. NuVasive began as small start-up, venture capital-backed company in 1999. Led by Chairman and CEO Alex Lukianov, the Company has grown at an extraordinary rate to become the third-largest spinal product and surgical company in the U.S. and the fourth largest in the world, with annual revenues totaling over $620 million in 2012. According to the Company's website, NuVasive attributes its success, in part, to "Speed of Innovation®, Absolute Responsiveness®,… and a distinct culture of 'A Players,'" who "embrace the culture of teamwork, innovation, and high expectations."

38. NuVasive offers a comprehensive spine portfolio of over 80 unique products and services. The Company's principal procedural solution is its Maximum Access Surgery ("MAS"), platform, which includes the XLIF® procedure, a minimally disruptive procedure that allows spine surgeons to have direct access to the intervertebral disc space (the "joint" of the spine) from the side of the body, as opposed to the front or back.

39. NuVasive has also developed a nerve avoidance monitoring system (NVJJB™ /M5®) designed to help ensure nerve and spinal cord safety by alerting surgeons to possible injury to neural elements during procedures. Additionally,

NuVasive offers a portfolio of biologics products, including FormaGraft and Osteocel Plus, to help the bone healing process.

40. In October 2011, NuVasive expanded its products and services by acquiring Impulse Monitoring, Inc. ("Impulse Monitoring"), which operates as a wholly-owned subsidiary of NuVasive, for $80 million. Impulse Monitoring provides Intra-Operative Monitoring ("IOM") services, which allow doctors to detect neural structures and potential neural compromise during surgical procedures. The IOM model employs two doctors, a neurophysiologist, who oversees the use of monitoring equipment during surgery, and a physician, who monitors and interprets neurological data transmitted from sensors attached to the patient by the neurophysiologist, usually from a remote location outside the hospital. Both of these doctors work for Impulse Monitoring either as employees or as independent contractors.

41. The acquisition of Impulse Monitoring was intended to leverage NuVasive's nerve monitoring platform and facilitate sales of its other products and services, such as the Company's existing nerve monitoring system, NeuroVisionTM, as well as surgical kits, from which the Company derives significant revenue. At the time of the acquisition, the Company estimated that Impulse Monitoring would contribute approximately $40 million to NuVasive's annual revenue and would grow at a rate of approximately 15% per year.

42. According to NuVasive's public filings, the Company's sales volumes and revenues are largely dependent on its ability to obtain reimbursement for its products and services, either directly or indirectly, from third-party payers, including governmental healthcare programs, such as Medicare and Medicaid. With respect to its medical devices and biological products, the Company sells directly to doctors and hospitals on a consignment basis. The hospitals then stock the products for use during surgery. After a surgery is complete, NuVasive invoices the hospital for the amount of products the surgeon utilizes. The hospital, in turn, then pays NuVasive and submits claims for reimbursement to third-party payers, including Medicare and Medicaid. Although NuVasive is not directly involved in preparation of these claims, the Company knows and understands that if claims for reimbursement are rejected by third party payers, for example, because the procedure is not properly coded or is not considered reasonably priced or necessary, then doctors and hospitals will likely switch to competitors' products and services for which they can receive reimbursement.

43. In contrast, NuVasive generates two invoices in connection with provision of IOM services. The first invoice, which NuVasive sends to the hospital, covers the cost of the neurophysiologist and the use of the remote monitoring equipment in the operating room. The second invoice covers the physician's fees for remotely monitoring the procedure. NuVasive bills this

portion directly to the patient's insurer, including Medicare and Medicaid. In order to be reimbursed, NuVasive must code IOM services in accordance with the Centers for Medicare and Medicaid Services ("CMS") guidelines and published fee schedules.

**NuVasive Operates In A Highly-Competitive Industry**

44. Despite its apparent success, NuVasive faced intense competition during the Class Period in the medical device industry and is under constant pressure to develop and market its products and services. As NuVasive acknowledged:

> Our currently marketed products are, and any future products we commercialize will be, subject to intense competition. Several of our current and potential competitors have substantially greater financial, technical and marketing resources than we do, and they may succeed in developing products that would render our products obsolete or noncompetitive. In addition, these competitors may have significantly greater operating history and reputations than we do in their respective fields.

45. Thus, the key to the Company's commercial success is to "convince spine surgeons that [NuVasive's] minimally disruptive surgical products are an attractive alternative to [its] competitors' products for the treatment of spine disorders." Otherwise, as NuVasive warns, "[I]f we fail to adequately and continually promote and market our products to these spine surgeons or if a spine surgeon adopts a competitor's products into their practice, our sales could

significantly decrease which could significantly impact our profitability and cash flow."

46. In addition, NuVasive must continue to innovate and expand its product uses in order to remain competitive. As the Company has stated: "We have the objective of staying ahead of the spine market by obsoleting our own products with new products and enhancements…" However, new and modified products must clear regulatory hurdles before they can be marketed or sold. As NuVasive has acknowledged, "The process of obtaining regulatory clearances or approvals to market a medical device, particularly from the FDA, can be costly and time consuming, and there can be no assurance that such clearances or approvals will be granted on a timely basis, if at all."

47. In response to this enormous competitive pressure, the Company has dedicated significant resources to build an exclusive sales force, which sells only NuVasive's products, and to develop training and education programs for surgeons. These training and education programs include, but are not limited to, building state-of-the-art cadaver operating theaters on both the East and West Coasts and creating and financing medical societies, such as the Society of Lateral Access Surgery ("SOLAS"), which purportedly studies lateral spine surgery techniques, including NuVasive's own XLIF procedure.

48. According to the Company's annual report, in 2012 alone, the Company spent over $372 million on sales, marketing, and administrative expenses ("SMA"), consuming approximately 60% of the Company's total revenues. The annual report explains that SMA includes, inter alia, "compensation, commission and training costs …; surgeon training costs; shareowner (employee) related expenses for our administrative functions; and third-party professional service fees."

49. Indeed, since 2008, SMA has comprised in excess of 65% of total revenues for each year, amounting to over a billion dollars in sales and marketing expenses for 2008 through 2012.

50. The percentage of revenue funneled to SMA is also disproportionately large as compared to NuVasive's competitors. On average, the competitors identified by NuVasive in its annual report only spent 34% of total revenues on SMA in 2012.

51. Therefore, the Company has been willing to expend significant resources to fight for market share, meet expectations, and expand the Company's reach and influence among doctors and hospitals.

**<u>NuVasive's Business Depends On Its Ability To Participate In Federal Healthcare Programs</u>**

52. While NuVasive may have been highly motivated to do everything necessary to increase sales and revenues, numerous federal and state laws and regulations, as well as industry ethical guidelines, restrict the Company's ability to adopt certain practices in the sales and marketing of and billing for its products and services. While some of these sales and marketing practices may be commonly accepted and legal in many types of businesses, the medical device and related industries, like pharmaceuticals, are unique, because certain government programs, such as Medicare and Medicaid, depend on physicians and healthcare professionals to exercise independent judgment in the best interests of the patient. Thus, as explained by the Office of the Inspector General ("OIG"), the purpose of these laws and regulations is "to protect patients and federal healthcare programs from fraud and abuse by curtailing the corrupting influence of money on health care decisions."

53. Specifically, in 1972, Congress enacted the Federal Anti-Kickback Statute to address concerns regarding conflicts of interest and unfair competition, which lead to abuses of federal health care programs. The Anti-Kickback Statute provides, in pertinent part:

> "Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
>
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both."

42 U.S.C. § 1320a-7b(b).

54. In addition to criminal and civil fines and penalties, including up to five years in prison, violation of the Anti-Kickback Statute can also result in exclusion from participating in and receiving reimbursement from state and federal healthcare programs. For most medical device and pharmaceutical businesses, including NuVasive, exclusion from these programs makes it nearly impossible to compete, as healthcare providers will find alternative products and services for which they can obtain reimbursement from third-party payers, including Medicaid and Medicare.

55. Under the Anti-Kickback Statute, both the giver and the receiver of the gift may be held accountable. There is no gift-giving exception under the

Anti-Kickback Statute, but the OIG has determined that incentives of nominal value (not more than $10 per item or $50 in the aggregate for a year to a single individual) are likely acceptable. The OIG cautioned:

> "Manufacturers, providers, and suppliers of health care products and services frequently cultivate relationships with physicians in a position to generate business for them through a variety of practices, including gifts, entertainment, and personal services compensation arrangements. These activities have a high potential for fraud and abuse and, historically, have generated a substantial number of anti-kickback convictions."

56. The OIG similarly warned that:

> "Also of concern are compensation relationships with physicians for services connected directly or indirectly to a manufacturer's marketing and sales activities, such as speaking, certain research, or preceptor or 'shadowing' services . . . In particular, the use of health care professionals for marketing purposes—including, for example, ghost-written papers or speeches—implicate the anti-kickback statute."

57. With respect to "business courtesies and other gratuities," the OIG warned that entertainment, recreation, travel, meals, gifts, gratuities, and other business courtesies implicate the Anti-Kickback Statute if given to physicians in a position to make or influence referrals or if any one purpose is to generate business for the company.

58. Similarly, consulting arrangements also may implicate the Anti-Kickback Statute. Although the Anti-Kickback Statute contains a number of "safe

harbors" for certain business arrangements, strict adherence with all applicable conditions set out in the relevant safe harbor is required in order to ensure compliance with the law. Among other things, compensation paid to consultants must be reasonable and must not be tied to the volume of business generated or the value of referrals.

59. Furthermore, under the Federal False Claims Act, the government may recover losses due to fraud and abuse by persons seeking payment from the United States. *See* S. Rep. No. 345, 99 Cong., 2d Sess. at 2 (1986), reprinted in 1986 U.S.C.C.A.N 5266. The False Claims Act makes it unlawful for any person to knowingly present a false or fraudulent claim, record or statement to the government for payment or approval. *See* 31 U.S.C. § 3729. With respect to Medicare and Medicaid, claims may be false if they claim reimbursement for services or costs that either are not reimbursable or were not rendered as claimed. Medicare and Medicaid coverage is *also limited to medical goods and services that are "**reasonable and necessary**" for the diagnosis and treatment of a patient*. *See* 42 U.S.C. § 1395y(a)(1)(A). The amounts reimbursed by Medicare and Medicaid depend upon established coding for given procedures, which are determined by the American Medical Association and the Centers for Medicare and Medicaid Services ("CMS"). ***Improper coding is a basis for liability under the False Claims Act***.

60. Similarly, medical devices that are not approved for marketing by the FDA or that are marketed for other-than FDA-approved uses are not considered "reasonable and necessary," and therefore, are excluded from coverage under federal healthcare programs. ***Submission of claims for medical procedures and services performed using devices for unapproved uses also violates the False Claims Act.***

61. Regulatory scrutiny of the medical industry has also increased with the enactment of the Physician Payments Sunshine Act of 2009 and the Patient Protection and Affordable Care Act in 2010 ("PPACA"). These laws broaden the scope of the Anti-Kickback Statute and False Claims Act and require companies to report all transfers of value to physicians to the U.S. Department of Health and Human Services on an annual basis beginning March 31, 2013.

62. With the enactment of the PPACA in 2010, violations of the Anti-Kickback Statute are *per se* violations of the False Claims Act. Specifically, the PPACA changed the language of the Anti-Kickback Statute to provide that claims submitted in violation of the statute automatically constitute false claims for purposes of the False Claims Act. The new language provides that "a claim that includes items or services resulting from a violation of [the Anti-Kickback Statute] constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of Title 31 [the False Claims Act]." 42 U.S.C. §1320a-7b(g). In

effect, the PPACA codifies as law almost two decades of federal court decisions affirming fraud liability for Anti-Kickback Statute violations. Congress also added a new section that eliminates the requirement that a person have actual knowledge of the law or specific intent to commit a violation of the statute. *See* 42 U.S.C. §1320a-7b(h). Under the PPACA, even an unwitting and non-benefitting party within the stream of a reimbursement claim to Medicare or Medicare is liable for fraud if unlawful kickbacks taint any part of the claim.

63. The PPACA also created reporting requirements to the U.S. Department of Health and Human Services ("HHS") for medical device manufactures like NuVasive regarding payments to doctors. These requirements are known as the Physician Payments Sunshine provisions. *See* Pub. L. No. 111-148. These reporting requirements require medical device companies to report any compensation or benefit of value provided by the company to a physician. In turn, HHS will submit summary reports to Congress and to each state. Each disclosure in the report must contain the receiving physician's name, address, national provider identifier, value of transfer, form and nature of the payment and the date of the payment. The payments referenced in these reports will include transfers to physicians and teaching hospitals as *compensation, food, entertainment, gifts, travel, consulting fees, honoraria, research funding, grants,*

*education or conference funding, stocks or stock options, ownership or investment interest, royalties or license and charitable contributions*.

64. The OIG has issued Compliance Program Guidance to encourage companies like NuVasive to monitor and adhere to applicable laws and program requirements. Among other things, this guidance recommends that companies evaluate whether any remuneration paid to physicians (i) depends on the volume or value of business generated for the company; (ii) reflects fair market value of the services provided; (iii) has the potential to affect costs to any federal healthcare programs; and (iv) creates potential conflicts of interest that diminish, or appear to diminish, objectivity of professional judgment, as these pose a risk of fraud and abuse. The OIG also cautions that certain consulting and advisory payments, business courtesies and gratuities (e.g., entertainment, travel, gifts), and education and research funding can violate the Anti-Kickback Statute, particularly where these arrangements originate through sales or marketing functions or are connected in some way to marketing or promotion of the company's products and services.

65. Moreover, according to the Pharmaceutical Research and Manufacturers of America (PhRMA)'s Code on Interaction with Health Care Professionals, which the OIG considers, "to ensure the appropriate focus on education and informational exchange and to avoid the appearance of impropriety,

companies should not provide any entertainment or recreational items, such as tickets to the theater or sporting events, sporting equipment, or leisure or vacation trips, to any healthcare professional who is not a salaried employee of the company."

66. The federal OIG Compliance Program Guidance for Pharmaceutical Manufacturers also warns that such gift giving violates the anti-kickback laws. *See* May 5, 2013 Notices, Federal Register Doc. 03-10934, Vol. 68, No. 86. The Compliance Program Guidance is a major initiative of the OIG in its effort to engage the health care community in preventing and reducing fraud and abuse in the federal health care programs. The Guidance warns that in the health care industry, common business activities, for example sales, marketing, discounting, and purchaser relations are grounds for Anti-Kickback Statute violations.

67. The OIG's ongoing concern regarding improper remuneration to physicians in exchange for business was also reflected in a Special Fraud Alert published on March 26, 2013. Although the alert focused on certain physician-owned distributorships, the OIG noted its "longstanding position that the opportunity for a referring physician to earn a profit, including through an investment in an entity for which he or she generates business, could constitute illegal remuneration under the anti-kickback statute."

68. In their public filings, Defendants acknowledge that these laws apply to their business.

**Defendants' Unethical And Illegal Kickbacks In Exchange For Business**

69. Despite the potentially serious repercussions, Defendants employed numerous sales and marketing practices that were illegal and exposed the Company to liability and enforcement under healthcare fraud and abuse laws, including, inter alia, the Anti-Kickback Statute and the False Claims Act.

70. These sales and marketing practices included, but were not limited to, (1) providing millions of dollars of gifts, such as vacations, private jet travel, Broadway shows, hotel stays, expensive dinners, and tickets to sporting events, to doctors who used NuVasive products and services; (2) utilizing Company-financed clinical trials and medical societies to promote its products and services; (3) rewarding certain prominent physicians for exceeding goals set by the Company for referring patients to clinical trials; (4) developing training and educational programs that also included numerous "perks" for participating doctors; (5) paying surgeons exorbitant consulting fees and commissions for using and promoting the Company's products; and (6) paying large sums of money to doctors who published favorable articles touting the benefits of the Company's products and services in peer-reviewed journals.

71. Upon information and belief, in the Company's public disclosures, these kickbacks paid to doctors for referrals of business and promotion of NuVasive's products and services were disguised under innocuous descriptions, such as "surgeon training costs; shareowner (employee) related expenses for our administrative functions; and third-party professional service fees." In actuality, Defendants spent millions of dollars of revenue to purchase influence and increase sales. Defendants engaged in this wrongful and illegal conduct, knowing that the resulting increases in sales and revenues would be paid, in part, by governmental healthcare programs, including Medicare and Medicaid, which was accepted by physicians using NuVasive's products and services.

72. Defendants' fraudulent and abusive sales and marketing practices have been confirmed by numerous former employees and by Kevin J. Ryan, the relator in the *Qui Tam* Action. For example, Confidential Witness 1 ("CW1") was the Executive Assistant to Chairman and CEO Defendant Lukianov from December 2009 through September 2012. CW1 had access to the Company's sales and marketing-related programs and expenses, including expense reports submitted by Defendant Lukianov. During CW1's tenure, CW1 became aware of millions of dollars of gifts given to doctors who used NuVasive products in surgeries. These gifts included flights on private jets from such cities as San Diego and New York to Florida, where doctors met with Defendant Lukianov, and

then travelled on to Puerto Rico for all-expense paid vacations. The Company also paid for similar trips to New York City, where doctors were treated to expensive dinners, hotel stays, and Broadway shows. The Company also paid for suites and tickets to Giants and Jets games, and also paid all expenses for trips to Memphis, where doctors received free tickets to the opening of the musical *Memphis*, which was kicking off its nationwide tour.

73. CW1 said the gifts exceeded appropriate limits on such arrangements between pharmaceutical manufacturers and doctors who refer or purchase a company's products. According to CW1, there were about 20 doctors receiving this special treatment during the time of CW1's employment, and "they used the entire line of [NuVasive] spinal products. They didn't use any other of our competitors." CW1 also indicated that "doctors [who] were Lukianov's favorites …received more gifts than others." These doctors were known internally as "high-end" rollers. They included: Dr. Gregory Mundis, Dr. Cappucchino, Dr. J. Allan Goodrich, Dr. J. Volcan, Dr. Behrooz Akbarnia, Dr. William Smith, and Dr. William Taylor. ***These doctors participate in Medicare and Medicaid programs, and as a result, all claims that they submitted for reimbursement from Medicare and Medicaid in connection with NuVasive products and services violated healthcare fraud and abuse laws .***

74. The gifts and perks described by CW1 to the named high-end rollers violate the Anti-Kickback Statute, because they were used by Defendants to induce the referral of patients for items or services covered by Medicare and Medicaid, and they were predicated on the volume of business generated and the value of referrals. There is no gift-giving exception under the Anti-Kickback Statute, and the gifts described above fall outside the acceptable OIG amount of $10 per item or $50 in the aggregate for a year to a single individual.

75. In addition, CW1 learned that Defendant Lukianov's excessive business and personal expenses were all being paid by the Company. "Millions of dollars were spent on private airfare when I was there. Personal dinners with his wife were sent through the company. There was a giant wine storage cabinet that houses I can't even tell you how many bottles of $150 bottle wines. There was excess. Definitely."

76. CW1 also said that the Company purchased an Audi A8 and Lincoln Navigator used almost exclusively by Defendant Lukianov. Defendant Lukianov also had a corporate driver at his disposal, who Defendant Lukianov mainly employed for personal use, including transporting his wife and children. The driver was paid by the Company and earned well over $100,000 per year.

77. In early 2010, CW1 began informing Defendant Lambert that Defendant Lukianov was billing large personal expenses through the Company as

business expenses. On several occasions, CW1 brought Defendant Lukianov's expense reports to Defendant Lambert's office and specifically identified improper and excessive expenses. Disappointingly, CW1 stated that "[Defendant Lambert] approved the expenses anyway. Always."

78. Similarly, Confidential Witness 2 ("CW2"), a former project administrator who worked in the marketing department from August 2008 through October 2013, and Confidential Witness 3 ("CW3"), a former clinical research coordinator from June 2012 to February 2013, described a training program called the Marquis Visit Program ("MVP"). According to a Company brochure, MVP is a "hands-on cadaveric experience in NuVasive's state-of-the-art MAS Operating Room. The lab experience is facilitated by the engineers and product managers who are integral to the product development process. Each visit includes an introduction to NuVasive via a corporate overview, clinical and product discussions, and interaction with senior management."

79. In addition, the Company brochure promises that "NuVasive has a dedicated team that manages all Surgeon Marquis Visits on virtually a '24/7' basis to accommodate surgeons' schedules from across the United States. … [T]he MVP team will handle all logistics and associated costs for surgeons, including travel, lodging and hospitality."

80. CW3, who dealt directly with clinical research sites and doctors participating in the research, also said that certain prominent physicians, who exceeded goals set by the Company for referring patients to clinical trials, were referred to internally as "high end rollers." The high end rollers received special treatment, and they were flown around the country to conventions and events, where they demonstrated and spoke about NuVasive's products and services. The high end rollers also were flown in weekly to conduct demonstrations in the Marquis Visit Program. According to CW3, when the high end rollers were attending events at the Company's headquarters, there would be a catered affair with large quantities of champagne and wine. As CW3 emphasized, "The CEO did not skimp on champagne and wine."

81. Other confidential witnesses corroborate CW3. CW16 worked for NuVasive as a Customer Service Representative and then as a Spine Sales Associated from January 2008 to August 2012. CW16's job was to interest surgeons in making use of NuVasive procedures and products for spinal surgeries. But even after CW16 would convince a surgeon to try or use the products, he/she then had to ensure that the hospital would agree to buy or stock it for the surgeon. The process to convince a hospital to buy and stock a new product was sometimes difficult. CW16 was required to fill out new product forms, and the hospital's new product committee had to review and approve each NuVasive product. Some

hospitals that had deals with other device companies would give CW16 a "hard no." If a hospital said no, the surgeons were told if they want to use the product, they would have to try to convince the hospital themselves. CW16 added that a doctor could not attend the Marquis Visitors Program unless the hospital where they worked had already approved the purchase of NuVasive products. If the hospital did not approve it, the surgeon was told they could not attend the Marquis Visitors Program.

82. The perks given to the high-end rollers in connection with the Marquis Visitors Program, as described by CW2, CW3, and CW16, violate the Anti-Kickback Statute, because they were used by Defendants to induce the referral of patients for items or services covered by Medicare and Medicaid, and because they were tied to the volume of business and value of referrals generated by the doctors receiving the benefits. There is no gift-giving exception under the Anti-Kickback Statute, and the perks described above fall outside the acceptable OIG amount of $10 per item or $50 in the aggregate for a year to a single individual.

83. NuVasive also paid "high-roller" surgeons consulting fees, commissions, and illegal royalties. CW17 was a Senior Financial Analyst at NuVasive headquarters from 2005 to 2010. CW17 reported to Patrick Williams, the Vice President of Finance. CW17's job involved tracking expenses within

different departments and working with department heads on budgeting. CW17 said that the company had a long list of surgeons on the payroll who were receiving consulting fees or royalties or both from NuVasive. Surgeons received consulting fees for going to trade shows or conventions to discuss and promote NuVasive products and procedures. Surgeons also received consulting fees for offering their opinions to the company's R&D teams who were developing new products. When a surgeon consulted on a product development, the surgeon received a royalty percentage from all sales of that product, according to CW17. Some surgeons consulted on 20 to 30 products and some products paid out royalties to several surgeons who were involved in its development. The royalty percentage was different for every doctor and depended upon the contract the doctor signed with the Company. CW17 confirmed that some surgeons received $1 million or more a year in royalty and consulting fees. CW17 identified Dr. Andrew Cappucchino as a surgeon who was paid royalty and consulting fees at this high level. These consulting and royalty fees paid by Defendants to the high-end rollers violated the Anti-Kickback Statute, because they were direct compensation paid by Defendants to induce the referral of patients for items or services covered by Medicare and Medicaid, and because the compensation was based upon the volume of business generated and the value of referrals provided to the Company.

84. The Company also developed educational programs and medical societies to market and promote its products and generate business. For instance, the Company formed the Society of Lateral Access Surgery ("SOLAS"), which, according to SOLAS's website, is intended "to foster research, education and advocacy around the lateral approach." Significantly, several high level positions within SOLAS are occupied by doctors who are also high end rollers, including Dr. Luiz Pimenta, SOLAS president, and Dr. William Smith, SOLAS vice president. Similarly, Dr. William Taylor is the Chair of the Membership Committee. Dr. Behrooz Akbarnia is the chair of the Deformity Committee.

85. Moreover, according to Confidential Witness 4 ("CW4"), a former coordinator in the surgeon education department from January 2011 to May 2013, who worked in NuVasive's Paramus, New Jersey office coordinating surgeon travel and accommodations for the Company's training programs, sales representatives determined which doctors to invite to educational programs based on how much business the doctor could refer to the Company. CW4 explained that sales representatives would talk to hospitals where surgeons practiced and interview doctors about the size of their practice, the number of procedures they performed, and their level of interest in using NuVasive's products.

86. Similarly, according to Confidential Witness 8 ("CW8"), a former area business manager and XLIF market development manager, who worked for

NuVasive from December 2009 to March 2012, sales people had to convince the Company that a surgeon was worth the time and money the Company would spend to send to educational programs, such as the MVP, and that the surgeon would "convert" to using NuVasive's procedures and products after attending. Thus, receipt of "perks" and other remuneration was explicitly tied to the volume of business a doctor was expected to generate.

87. Furthermore, doctors who published favorable articles about the benefits of Nuvasive's products and services also received payments and other remuneration. Dr. J. Allan Goodrich and Dr. J. Volcan, two of the Company's high end rollers, edited the SOLAS textbook that promotes the importance of using NuVasive's NVM5 monitoring system during surgical procedures. According to CW3, to commemorate the publication of the textbooks' second edition last year, the Company gave Dr. J Goodrich and Dr. Volcan wine bottles etched with the cover of the book, with matching wine glasses. CW3 said the gifts cost about $1,700 to $2,000 for 10 bottles.

88. Likewise, Confidential Witness 5 ("CW5"), a former product manager in Intraoperative Monitoring, who reported to the Senior Director of Marketing from June 2010 through February 2011, said that in what "seemed like a complete conflict of interest," the same doctors who were paid hundreds of thousands of dollars in consulting fees also authored peer-reviewed papers about

the benefits and positive results of NuVasive's products and procedures, which the Company used to "grease the wheels" for clearing hurdles with the FDA and persuading other doctors to use NuVasive products.

89. The perks given in connection with the educational programs and medical societies, as described by CW4, CW8, CW3, and CW5, violate the Anti-Kickback Statute, because they were used by Defendants to induce the referral of patients for items or services covered by Medicare and Medicaid, and because they were based upon the volume of business and the value of referrals generated by the doctor receiving the benefits. There is no gift-giving exception under the Anti-Kickback Statute, and the perks described above fall outside the acceptable OIG amount of $10 per item or $50 in the aggregate for a year to a single individual.

90. The accounts of these former NuVasive employees were substantiated by Confidential Witness 6 ("CW6"), a former accounting manager from June 2010 to April 2012 who conducted weekly audits of employee reimbursement requests for travel and entertainment, as well as payments to doctors for consulting fees and commissions. CW6 described an extensive and excessive kickback system, where Company executives "pampered [doctors] with a lot of things. Wining and dining them and paying for their flights. … [O]bviously, [the doctors] were going to be favoring the company." According to

CW6, NuVasive frequently flew surgeons on private jets or first class to New York City, San Diego, Puerto Rico and other locations for luxury trips that included fine dining, high-end hotels and plenty of entertainment. Private jet rental for the surgeon trips and executive trips totaled between $80,000 and $200,000 a month. The jets usually seated about 20 people. CW6 said that generally, Defendant Lukianov and other top-level executives, including Jason Hannon and Patrick Miles, traveled with the doctors and then submitted to the Company all expenses from the trips, including all of the doctors' expenses. On trips to New York City, the surgeons and executives usually went to Broadway shows and/or NFL games. CW6 said that a bill for a group of 3 to 4 doctors was usually $800 to $1000. On other occasions, executives took doctors out just for drinking, spending "thousands and thousands of dollars." CW6 was also aware of two ski trips, where executives invited surgeons to attend and then paid for all expenses, including ski lift tickets. CW6 was asked to categorize expenses under different non-descript company projects with names such as "Wolverine." Such categorization violated the Anti-Kickback Statute and the PPACA, because it was designed to mask the benefits provided to physicians to induce them to utilize NuVasive products and services.

91. CW6 said in addition to the trips, dinners and entertainment given to surgeons, NuVasive also paid surgeons consulting fees, and some were also paid

commissions. The commissions were apparently paid for using NuVasive products in surgeries. According to CW6, the doctors were paid different amounts but usually it was in the range of $250,000 to $280,000 a quarter, which totals $1 million or more annually for each doctor. These consulting fees and commissions clearly violated the Anti-Kickback Statute (and as a result the False Claims Act), because the amounts paid to doctors were intended to induce the referral of business or patients covered by Medicare and Medicaid and were expressly based upon the volume of business generated and the value of referrals. As a result, these arrangements do not adhere to the strict requirements for protection under any of the "safe harbor" provisions under the Anti-Kickback Statute.

92. CW6 said he/she audited the expenses every quarter and submitted his/her audit to the Controller Patricia Lynn Bitar, who passed it on to C-Level executives, including the CFO. CW6 said the audit highlighted the expenses as excessive and suggested the luxury pampering of the doctors might be inappropriate. CW6 remarked that other employees in accounting and finance also completed in-depth audits and came to the same conclusions about the excessive expense spending and gifting to surgeons. CW6 discussed the issue with the CFO, Michael Lambert, who told her that he would "allow it to go through, but next time, he wouldn't allow it." Still, he/she said: "I didn't see any change in the company."

93. CW6 said that at the beginning of 2011, the Board of Directors requested a "look-back" audit of travel and entertainment expenses through October 2010. The Company's compliance team, led by Stuart White, the Director of Healthcare and Corporate Compliance and Internal Audit and SOX, was in charge of the audit.

94. One of the main objectives of the audit was to ensure compliance with healthcare laws, regulations, and policies. The audit procedure tested and verified whether meals, gifts, and entertainment with Health Care Professionals ("HCP") were in compliance with laws and policies, and whether HCP interactions were in accordance with NuVasive's Comprehensive Healthcare Compliance Program.

95. ***The Board's audit ultimately identified a number of inappropriate expenses and violations of policies, procedures, and guidelines***. According to an internal report prepared by NuVasive's Audit Committee and obtained from a former employee whose identity is not revealed in order to protect this witness from possible retaliation, these violations included:

- (1) non-business expenses approved by and reimbursed to senior members of management;

  (2) expense reports that did not comply with NuVasive's Corporate Travel Policy;

- (3) expense reports that *did not comply with the requirements set forth in the Patient Protection and Affordable Care Act*; and

- (4) meals and entertainment expenses that *violated NuVasive's Comprehensive Healthcare Compliance Program policies*.

96. One hundred twenty seven expense reports that were paid by NuVasive between January 1, 2010 and October 31, 2010 were audited as part of the "look-back" audit. Approximately half of those reports were found to be improper. With respect to Healthcare compliance, the audit concluded that approximately 10% of the selected expense reports have one or more expenses that contained instances in which meals with HCPs exceeded the maximum allowable amount ($125) by more than 30% and instances where non-compliant gifts were made to HCPs. These 14 reports were found to have a total value of $177,411.

97. A failed HCP audit example showed an entry for "gift" as "goodwill" for $190.53 for September 30, 2010, with a comment indicating that "no gifts are allowed to HCP." Another failed audit example showed an entry for "entertainment" for $121.25 on September 24, 2010, with a comment that "no entertainment is allowed with HCPs."

98. With respect to a $121 expense classified as entertainment and incurred on September 22, 2010 for late night desserts and/or drinks with doctors

at the Ritz Carlton in New Orleans, which lists in attendance Dr. Volk (seemingly Dr. Volcan, a high end roller), Dr. Traha[] and Dr. Tend[], employees were instructed to alter the entry and classify it instead as a meal, saying that "going to a restaurant for dessert and drinks along with a business discussion should be classified as a meal and not entertainment."

99. Other expenses that failed the audit test include $40,000 spent on Giants NFL tickets and multiple thousands of dollars spent on other entertainment events and gifts. These expenses were flagged in the audit because they were categorized under "employee recognition" when in fact the money was used impermissibly to treat doctors. One such expense included tickets to the Eagles at the Cricket Wireless Amphitheatre in Chula Vista, California, for May 23, 2010, for a total of $1,640.00, for doctors and Defendant Lukianov. Other illicit expenses included: a $579.72 purchase and a $523.80 purchase from Walgreens made on September 15, 2011; a $299.95 purchase from the Bose Factory Store made on August 17, 2011; a $975.75 purchase, a $797.75 purchase, and a $1,500 purchase from Telecharge Ticketing (the official site for Broadway and off-Broadway theater tickets) made on September 3, 2011; a $652.00 bill for the Coronado Golf Course on August 8, 2011; a $689.96 purchase from the Brooks Brothers on August 4, 2011; two $20,000.00 purchases of tickets to the Giants Stadium (for a total of $40,000.00) for August 17, 2011; and theater tickets at

Shubert Theater for $2,893.00 on August 31, 2011 and for $263.00 on September 2, 2011.

100. The audit concluded that the substantive issues of the audit that were determined to be deficient as dictated by policy, procedure, practice or guideline "were not insignificant." The audit results were provided to the executive leadership team and the Board of Directors.

101. These types of violations continued unabated. For example, an expense for $34,366.26 in connection with SOLAS Latin America, a doctors' "educational" association of doctors who promote NuVasive products and who are high rollers at the Company, failed the audit test conducted for August 1, 2011 to September 30, 2011, as "non-allowable." SOLAS members include Dr. William (Bill) Smith, Dr. William Taylor, Dr. Craig Meyer, Dr. Blake Rodgers, Dr. Juan Uribe, Dr. Jonathan Hyde, Dr. Jim Youssef, and Dr. Mark Peterson, who are Medicare participants.

102. Other examples of improper expenses include a $614.84 dinner on July 14, 2011 at Trivoli A/S, with Drs. Bill Smith and Juan Uribe, and a $284.57 dinner on September 22, 2011 at Sushi Samba Strip with Dr. Bill Smith.

103. Moreover, a number of doctors, including several high-end rollers, attended NuVasive's annual Employee Christmas Party in 2011. The doctors' airfare, with spouse, hotel costs, limo service and all expenses were covered by

NuVasive. The Company expensed the event as an internal employee event, but the cost, which was about $1 million, included expenses for doctor attendees and their spouses. The doctors in attendance included William Smith (high end roller), William Taylor (high end roller), Jim Youssef (study participant, chair of advocacy committee for SOLAS), John Atwater (consultant),[1] and Greg Mundis (high end roller). The high end rollers spoke at the event to employees and other doctors in the audience about the quality of NuVasive's products and procedures.

104. NuVasive's utter indifference to healthcare laws and regulations was chronic and pervasive. Other examples of kickbacks include numerous instances of illicit expenses in favor of Dr. Cappuccino, a high end roller. For example, NuVasive paid Cappuccino: $496.50 in "travel reimbursement, lodging and transportation on December 29, 2008; $1,581.47 in "travel reimbursement, lodging and transportation" for a trip to Montreal on April 18, 2009; $8,306.52 in "expenses" for "meetings and tradeshows" on June 2, 2009; $4,700 for "Remote Marquis Visits" on June 12, 2009; $3,200 for "Mid-Year Sales Marketing Participation" on July 30, 2009; $652.65 for "Chairmans Club Travel Reimbursement" related to "Company Meeting" on March 2, 2009; $999.25 in "travel expenses" for "meetings and tradeshows" on November 10, 2009; and

[1] Like the other doctors, Dr. Atwater is a Medicare participant.

$9,600 in "CAB Expense Reimbursements" for "3 Days Consulting" on January 29, 2009.

105. In addition to violating NuVasive's own Comprehensive Healthcare Compliance Program, these paid expenses also violated the Patient Protection and Affordable Care Act and constituted illegal kick-backs in violation of the Anti-Kickback statute and the False Claims Act.

106. Defendants knew these perks were illegal. In fact, NuVasive, in conjunction with its Board of Directors and Senior Management, had created a Global Business Ethics and Compliance Program designed in accordance with the Compliance Program Guidance published by the Office of Inspector General, U.S. Department of Health and Human Services (the "HHS-OIG Guidance"). The purpose of NuVasive's Compliance Program was "to prevent and detect any violations of law or company policy." "Consistent with HHS-OIG Guidance, NuVasive has tailored its business as a medical device manufacturer and implemented the Program to deal with any such violations." The HHS-OIG Guidance had identified several potential risk areas for medical device manufacturers like NuVasive, and called on companies to develop compliance policies in these risk areas. As relevant to medical device manufacturers, these risk areas include: *(i) data integrity pertaining to government reimbursement practices, and (ii) kickbacks and other illegal remuneration.* In response,

NuVasive adopted the "MDMA Revised Code of Conduct for Interactions with Healthcare Providers as assembled by the Medical Device Manufacturers' Association (the "MDMA Code") to address specific risk areas for medical devices companies. A specific *annual* dollar limit of $2,500 was imposed on gifts, promotional materials, items, or activities provided by NuVasive to covered recipients.

107. There is no gift-giving exception under the Anti-Kickback Statute. The OIG has determined that incentives of nominal value—not more than $10 per item or $50 in the aggregate for a year to a single individual—are likely acceptable.

108. Nevertheless, CW6 indicated that rather than improving and correcting expense reporting problems, steps were taken to continue to conceal these fraudulent practices. At the direction of the Controller and Jason Hannon, the Company's General Counsel, CW6 was instructed to categorize excessive and inappropriate expenses related to travel and entertainment of physicians under different non-descript projects, with names such as "Wolverine." According to CW6, Project Wolverine was run by Jason Hannon, Executive Vice President and General Counsel. Other projects with similar non-descript "code names" to disguise excessive expenses were run by other executives.

109. Additionally, an email communication dated August 30, 2010 shows an expense of $1,500.00 "paid by Elizabeth Turner" and "approved by Alex Lukianov," with the handwritten note: "Golf – recorded to office supplies."

110. In addition, senior executives developed a system to circumvent expense reporting by approving each other's expense reports. Thus, after the Board's audit, Defendant Lambert approved Defendant Lukianov's expenses; Defendant Lukianov approved Jason Hannon's expenses; and Peter Valentine and other senior executives approved each other's expenses.

111. These sales and marketing practices were intended to, and did in fact, induce doctors to utilize and promote NuVasive products and services in exchange for financial and other personal benefits, which were awarded based on the volume of business generated for the Company. Many of these products and services were also eligible for reimbursement through government-funded healthcare programs, including Medicare and Medicaid, which were accepted by many physicians, including certain "high end rollers," and Defendants knew that any resulting increases in sales and revenues would be paid, in part, by governmental healthcare programs, including Medicare and Medicaid.

112. Not only are such arrangements fraught with conflicts of interest that compromise doctors' objective clinical judgment, but they violate numerous healthcare fraud and abuse laws, including the Anti-Kickback Statute and the

False Claims Act, thereby exposing the Company to civil and criminal investigations and penalties, as well as loss of its eligibility to participate in federal healthcare programs.

113. At various times, the payments and other remuneration received by doctors were reported to other senior executives within the Company, who knew or should have known about the strict regulatory environment in which the Company operated and the importance of maintaining compliance with applicable laws and regulations. CW1 and CW6 separately informed Defendant Lambert that inappropriate expenses were being billed to the Company. Beginning in early 2010, CW1 met with Defendant Lambert on several occasions to discuss improper expenses. CW1 noted that "[Defendant Lambert] approved the expenses anyway. Always." CW1 also reported these expenses to NuVasive's legal, finance, and human resource departments. Ultimately, CW1 left the Company, because CW1 "could not stomach it anymore."

114. CW6 began raising concerns about improper expenses in late 2010. CW6 sent reports to Brian Adashek, Manager of Compliance, as well as Stuart White, who was responsible for conducting the audit requested by the Board in 2011. After raising concerns with the Controller, General Counsel, and compliance group, CW6 also spoke directly with Defendant Lambert about these issues. CW6 was told by Defendant Lambert that he would "allow [the expenses]

to go through, but next time, he wouldn't allow it." However, CW6 "didn't see any change in the company" at any time.

115. By failing to implement adequate internal controls to monitor the Company's compliance with applicable laws and by refusing to take steps to stop inappropriate and illegal kickbacks to doctors even when presented with evidence by numerous employees in a position to identify the wrongful conduct, Defendants exposed the Company to increased regulatory risk, which contributed, in part, to the OIG's subpoena and investigation related to improper claims submitted to Medicare and Medicaid, as well as the filing of a *qui tam* lawsuit, culminating in the removal of Defendant Lukianov as the Company's CEO and a $13.8 million settlement to resolve the OIG Investigation and the *Qui Tam* Action.

**<u>Defendants' Off-Label Marketing Scheme</u>**

116. Defendants acknowledged that "Speed of Innovation" was essential to the Company's success: "We have the objective of staying ahead of the spine market by obsoleting our own products with new products and enhancements…" However, Defendants were also aware that new and enhanced products must be cleared for marketing by the FDA, and even then, they can only be sold for intended uses that are approved in advance – oftentimes an expensive and time-consuming process. Undeterred by such regulatory requirements, Defendants knowingly and deliberately determined to increase sales of the Company's

products by promoting the use of its devices for treatments and surgical uses that were not indicated or otherwise approved by the FDA.

117. This off-label marketing scheme consisted of, *inter alia*: (1) training NuVasive's national sales force to market and sell NuVasive products, including but not limited to, CoRoent XL implants, Osteocel Plus, and Formagraft, for off-label uses; (2) disseminating promotional materials to physicians and hospitals, which contained false and misleading information related to approved uses for NuVasive's products; (3) utilizing Company-sponsored training programs to provide device training to doctors for non-approved uses; and (4) employing paid consultants to advocate applications of NuVasive products for non-approved uses.

118. Defendants' fraudulent and illegal conduct resulted in increased sales of NuVasive products, contributing to NuVasive's year-over-year revenue growth in every year throughout the Class Period. For example, in 2008, NuVasive's reported revenues from spine surgery products and biologics were approximately $221 million and $28 million, respectively. By 2013, revenues from spine surgery products had more than doubled, to approximately $530 million, while revenues from biologics expanded exponentially to nearly $116 million.

119. In the Company's public filings, Defendants attributed this rapid growth to "[t]he continued adoption of minimally invasive procedures for spine [which] has led to the expansion of our procedure volume." Defendants further

noted: "We expect continued adoption of our innovative minimally invasive procedures and deeper penetration into existing accounts and international markets as our sales force executes on our strategy of selling the full mix of our products."

120. In reality, numerous confidential witnesses substantiate that "expansion of [NuVasive's] procedure volume" and "selling the full mix of [NuVasive] products" meant selling for off-label uses.

121. For instance, Confidential Witness 14 ("CW14"), a former sales director for NuVasive from January 2005 to May 2010 explained that the Company's sales representatives and distributors were encouraged by NuVasive to meet with doctors and promote the use of the Company's CoRoent XL implants and the Company's biologics, Osteocel Plus and Formagraft, for a wide variety of surgeries that had not been FDA approved, including degenerative scoliosis, thoracic degenerative disc disease, thoracic disc herniation, psudoarthrois, and osteoporosis. CW14 stated: "We all marketed the product for these procedures,"

122. CW14 conclusively added: "There's no question that when doctors were at NuVasive's training facility they talked extensively with NuVasive employees about all the different off-label surgeries that they could perform with the [CoRoent] XL devices."

123. Confidential Witness 18 ("CW18"), a spine specialist for a NuVasive distributorship from May 2012 to November 2013 substantiated CW14's account. CW18 described training sessions for spinal sales specialists, which included both classroom instruction and laboratory demonstrations, During these sessions, sales representatives were instructed to inform doctors about other diseases and conditions the CoRoent XL implant could be used for, other than those approved by the FDA.

124. Moreover, CW14 confirmed that Defendants knew and participated in the implementation and execution of this off-label marketing scheme. CW14 explained that he reported to the Executive Vice President of Sales, Jeff Rydin, who held quarterly sales meetings in which he encouraged the sale of the CoRoent XL devices for non-FDA approved treatments and surgical procedures as a good tactic to drive revenues. Defendant Lukianov also drove off-label sales through sales meetings with sales representatives and distributors. CW14 stated: "[Defendant Lukianov] knew everything that was going on at that company. You didn't question [Lukianov] about anything being done at NuVasive or you would be fired." CW14 explained that the Company's emphasis was on growth, and that was the ultimate goal of the off-label sales.

125. CW14 said that the sales meetings were also attended by Executive Vice President of Corporate Development and General Counsel Jason Hannon and

other Company attorneys. CW14 said that none of the attorneys, including Mr. Hannon, ever raised any questions during any of the sales meetings concerning any of the off-label sales that were discussed.

126. The reports of CW14 and CW18 are consistent with the public statements of other witnesses, including Kevin Ryan, a former NuVasive Spine Specialist who filed the *Qui Tam* Action, captioned *U.S. ex rel. Kevin J. Ryan v. NuVasive, Inc.*, Case No. 12-cv-2683 (D. Md.), based upon the same off-label marketing and kickback schemes described herein.

127. According to Mr. Ryan, NuVasive trained its sales force to sell NuVasive products for off-label uses and made countless false and misleading statements and omissions in training materials, device training to doctors, and promotional materials. Specifically, NuVasive published marketing brochures that recommended NuVasive products for the treatment of specific conditions for which NuVasive had not obtained FDA approval. In addition, the brochures quoted paid consultants, including high-end roller Dr. William Smith, describing uses and treatment options involving NuVasive products, which were not FDA approved. The brochures did not disclose that the quoted doctors were paid by the Company.

128. Mr. Ryan further explained how examples of off-label uses were written up as case studies and then distributed by NuVasive executives to all

members of the sales force as models to be utilized in marketing and promoting NuVasive products. For example, in or about October 2010, NuVasive's Director of Marketing sent a case study to the sales force on the use of a CoRoent XL implant to treat degenerative scoliosis. According to Mr. Ryan, the patient was a Medicare beneficiary, and the federal government paid for his surgery. However, CoRoent XL implants are not approved for use in the treatment of degenerative scoliosis. Instructing sales representatives to promote this off-label use and causing ineligible claims to be submitted for reimbursement from federal health care programs constituted a violation of the False Claims Act.

129. Mr. Ryan also documented similar case studies involving off-label marketing, including, among others: (i) a November 2010 case study distributed nationally by Director of Market Development Teams, Peter Marzano, using CoRoent XL implants to treat degenerative scoliosis on three contiguous spinal levels in a 70-year-old Medicare beneficiary; (ii) a September 2010 case study distributed nationally by XLIF Market Development Manager, Ron Johnson, using CoRoent XL implants to treat severe degenerative disc disease and scoliosis in a 65-year-old Medicare beneficiary; (iii) an August 2011 case study distributed nationally by XLIF Market Development Manager, JJ Grandusky, using CoRoent implants to treat Pseudoarthrosis in a 74-year-old Medicare beneficiary; and (iv) a February 2011 case study distributed nationally by NuVasive Spine Specialist

Dean D'Agnostino, using CoRoent XL implants to treat thoracic spine and Neurogenic Claudication. None of the uses for CoRoent implants cited herein were approved by the FDA. The pattern and practice of instructing sales representatives to promote this off-label use and causing ineligible claims to be submitted for reimbursement from federal health care programs constituted repeated violations of the False Claims Act.

130. Additionally, Mr. Ryan confirmed that during NuVasive-sponsored training sessions, such as the MVP sessions attended by high-rollers and by Company executives, including Defendants, NuVasive used paid physicians to train other physicians on off-label uses of NuVasive products. The MVP program also included peer-to-peer events where proctor surgeons paid by NuVasive would discuss off-label uses of NuVasive products over a meal, which was also paid for by the Company.

131. By adopting a competitive growth strategy that encouraged employees to increase revenues by violating numerous laws and regulations, including the False Claims Act and the Anti-Kickback Statute, Defendants artificially inflated the Company's revenues and exposed the Company to increased regulatory risk.

**Defendants' Scheme To Prop Up Revenues From The Company's Monitoring Business**

132. At the time of its acquisition, Impulse Monitoring was heralded as a complementary business, which would generate approximately $40 million in additional revenue per year, as well as facilitate sales of other NuVasive products and services, especially NeuroVisionTM, which was designed for use during the XLIF procedure.

133. Impulse Monitoring's revenues are derived from services provided by neurophysiologists, who attend surgical procedures, attach sensors and equipment to the patient, and make sure the equipment is transmitting information, and physicians, who are responsible for monitoring the patient's condition during surgery from a remote location. Both the neurophysiologist and the physician work for Impulse Monitoring, either as employees or independent contractors.

134. Most of Impulse Monitoring's revenue is derived from services provided by physicians, who bill at a higher rate than neurophysiologists and who historically, could monitor multiple patients at the same time. In fact, according to Confidential Witness 9 ("CW9"), who worked as a manager of integrative operative solutions for NuVasive from 2006 through August 2013 and who oversaw the integration of Impulse Monitoring after its acquisition in 2011, nearly

80% of Impulse Monitoring's revenues come from services provided by physicians as compared to neurophysiologists.

135. Besides expanding its product offerings, the acquisition of Impulse Monitoring exposed NuVasive to additional regulatory scrutiny, because unlike other aspects of the Company's business, Impulse Monitoring directly bills third party payers and governmental healthcare programs, including Medicare and Medicaid, for monitoring services rendered by its doctors. As the Company explained in its annual report in 2012, this "brings with it additional risks associated with proper billing practice regulations, HIPAA compliance, corporate practice of medicine laws, and new collections risk associated with third party payers."

136. Confidential Witness 11 ("CW11"), a former billing clerk with Impulse Monitoring from February 2011 to January 2013, explained that during his/her tenure with Impulse Monitoring from February 2011 to January 2013, employees who worked on physician services that were billed to Medicare often complained that their supervisor, Mary Laue, submitted invoices with the wrong CPT codes on them. CW11 said the employees also complained that Laue would review their invoices and tell employees that they had used the wrong code, even though the employees had followed Laue's instructions on how to code. Laue would then change the codes before submitting the invoices.

137. As discussed, *supra* at ¶50, improper coding is a basis for liability under the False Claims Act.

138. In January 2013, on the heels of NuVasive's high hopes for growth in its IOM services, CMS promulgated new guidelines stating that companies could no longer bill Medicare and Medicaid for a physician remotely monitoring multiple patients. The change in CMS guidelines threatened to significantly impact Impulse Monitoring's revenues. According to CW9, this new restriction cut into the revenue stream for Medicare and Medicaid patients by an estimated 50 to 80%.

139. Prior to this rule change, Confidential Witness 7 ("CW7"), who worked as a neurophysiologist for Impulse Monitoring from 2011 to 2012, explained that it was "common knowledge" among employees that a single physician would monitor multiple patients remotely at the same time. CW7 had access to schedules showing which physicians were assigned to various patients during surgeries, and CW7 said it was "standard practice" for physicians to monitor up to six patients simultaneously. The ability to generate multiple invoices for the same block of time at the higher rates charged by physicians was key to Impulse Monitoring's profitability.

140. In its 2012 Annual Report, NuVasive disclosed that there was "downward pressure on reimbursement for the IOM services provided by Impulse

Monitoring." Specifically, the Company explained that new coding rules "may lead to reduced reimbursement by private payers for the professional remote oversight component of [IOM] service. Medicare patients will be subject to additional coding changes imposed by CMS which may restrict access to care and limit Impulse Monitoring's ability to cover, bill and collect for cases performed."

141. Nevertheless, NuVasive pressured Impulse Monitoring to keep revenues up after the rule change. CW9 explained, "Everyone was nervous about this. NuVasive was worried it had paid $80 million for a company that might not be profitable anymore. The magnifying glass was on Impulse as far as its profitability. [NuVasive executives] said, 'These are the goals we set for [Wall Street] and we're going to try to hit that.'"

142. Unable to employ its standard multiple-billing business model, NuVasive had to find other ways to make up the shortfall. NuVasive began to pressure neurophysiologists to assist with sales efforts during surgeries and had sales representatives place monitoring equipment in operating rooms, which was redundant and not medically necessary. The Company also developed marketing materials to instruct customers on coding monitoring services so as to take advantage of loopholes in coding procedures and maximize reimbursement. These practices resulted in the improper submission of claims to insurance providers such as Medicare and Medicaid, which violated the False Claims Act.

143. For example, Confidential Witness 10 ("CW10"), a former director at Impulse Monitoring from 2006 through July 2013, explained that after the coding rule changes took effect, the Company asked neurophysiologists who sat in on surgeries to "be more in line with how sales people wanted them to do things" and encouraged neurophysiologists to "get … more involved in working with sales people." This practice contravened OIG guidance, which provided that medical and marketing and sales functions should be kept separate to avoid compromising clinical judgment and to ensure that services provided were reasonable and medically necessary.

144. The increasing overlap between medical and marketing functions ***also resulted in installation of monitoring equipment that was redundant*** and that required the use of more expensive surgical kits, which were a high profit center for the Company. Confidential Witness 12 ("CW12") and Confidential Witness 13 ("CW13"), former neurophysiologists for Impulse Monitoring working in separate locations, both complained that sales representatives began to install NuVasive's M5 monitoring system, in addition to the Impulse Monitoring's Cascade system, even though both systems monitor the same neurophysiological activities. CW12 said, "It sounded like they wanted us to do both. No one on my team was excited about that. Either you do one [monitoring system] or the other. Why you would need both, I don't know."

145. As discussed, *supra* at ¶50, billing for unnecessary medical services violates the False Claims Act.

146. During his/her tenure at Impulse Monitoring from September 2011 to September 2012, CW12 also described how the Company had neurophysiologists attach redundant equipment to patients. Specifically, the Company asked the neurophysiologists to monitor, in addition to the median nerve, the posterior tibia nerve at the ankles. CW12 explained that monitoring the median nerve was a known practice that offered some beneficial support for monitoring the patient, because it allowed for a faster recognition of a particular problem that could arise but might not be immediately detected by the neuromonitoring process (the electroencephalogram or EEG). CW12 said that monitoring the posterior tibia nerve, however, was not necessary. There was no reason to monitor nerves in the ankles when the surgery did not impact any nerves below the arms.

147. As discussed, *supra* at ¶50, billing for unnecessary medical services violates the False Claims Act.

148. CW13 also described numerous incidents, which "seemed really inappropriate," where sales representatives would try to tell neurophysiologists what to do and what equipment to use, often claiming that the surgeon preferred NuVasive's products. CW13 stated, "[The sales rep] would try to talk to us and try to tell us what to do … he'd say, 'Oh, the surgeon wants this and this.' He

would try to recommend things. He had no idea of what we were doing. He had no understanding of monitoring." CW13 described the sales rep as the only male NuVasive rep in the Boston area.

149. In one instance, a sales representative opened an expensive surgical kit, and then told the neurophysiologist to wheel it into the operating room so it appeared to be used, so that the sales representative would not have to "eat the cost of it." In another case, CW13 said that one of the surgeons seemed to choose NuVasive's M5 monitoring system "as a favor to the rep, even if it was not medically necessary." CW13 explained, "It seemed like the surgeon was trying to help the rep out by ordering us to use the M5 system even if everything could be done with just the Cascade. It almost seemed like the surgeon was trying to throw the guy a bone. It was very strange." CW13 said the surgeon was the head orthopedic surgeon at Beth Israel Hospital in Boston.

150. As discussed, *supra* at ¶50, billing for unnecessary medical services violates the False Claims Act.

151. In May or June 2013, CW13 received an email from the Company about what he recalled was a federal audit of the Company. CW13 recalled that it had to do with NuVasive hardware and how it was billing for monitoring. According to CW13, the audit had something to do with NuVasive's hardware products and "how they were billing for monitoring." It appears to CW13 that the

federal audit might be looking at the use of monitoring modalities and equipment that were not needed.

152. With respect to coding and billing, Defendants added remote monitoring capabilities to M5 equipment as an additional selling feature, in the hopes of increasing sales and market share. Although the M5 had been designed to allow doctors in the operating room to monitor readings themselves, the remote monitoring feature was promoted as a way for doctors to use another physician, usually a partner at the doctors' practices, to monitor the same readings from another location and then separately bill for these services.

153. The remote monitoring component of the M5 was added to its capabilities and launched to the market in the weeks before CW5 resigned from the Company on February 1, 2011. CW5 was bothered that NuVasive was pushing remote monitoring of the M5 because she thought it would put patients at risk and because she believed "it was a misuse of Medicare billing."

154. According to CW5, the Company believed that by showing doctors how to make additional money when using the M5 – essentially, "using a loophole in insurance coding to double bill," doctors would be more likely to choose the product. In one instance, CW5 said that one of the Company's top consultants, high-end roller Dr. John Atwater, was set up with remote monitoring with the M5. While he performed surgery, his wife, who was also a partner in his medical

practice, would monitor the M5 readings remotely, thus enabling both doctors to bill for monitoring the same readings during the same surgery.

155. As discussed, *supra* at ¶50, billing for unnecessary medical services violates the False Claims Act.

156. In addition, CW5 said that she helped develop marketing material that the Company's sales people used to inform doctors as to how to bill Medicare and Medicaid for remote monitoring using the M5: "Part of what we did was create guides to help surgeons bill Medicare and other insurance companies down to the exact codes that they used to bill, which really shouldn't have been our business … I don't know if it was illegal, but it was billing twice for the same surgery."

157. These "reimbursement guides" instructed doctors in basic coding pitfalls, such as making sure that the physician billing for remote monitoring had a different specialty than the operating surgeon. The purpose of these guides was to maximize reimbursement for IOM services so that doctors would continue to use the M5 and other NuVasive products and equipment after the changes in Medicare and Medicaid billing codes took effect. According to CW5, these reimbursement guides were distributed to sales people at the Company's national sales meetings, including a meeting in San Diego in 2011. Sales people were told to talk to doctors about how to bill for remote monitoring as part of their sales efforts.

CW5 explained that his/her superior, David Brownlee, the Senior Director of Marketing, instructed CW5 to develop the reimbursement guides for remote monitoring. CW5 said that he/she and Brownlee worked with Patrick Miles, President of Global Products and Services, on the marketing effort. Brownlee also worked with CEO Alexis Lukianov. According to CW5, Lukianov "was aware of what we were doing in that space."

158. By compromising the independent clinical judgment of neurophysiologists, failing to separate medical and marketing functions, installing equipment and features that required the use of more expensive surgical kits and that were not medically necessary, and instructing doctors to inappropriately apply Medicare and Medicaid coding for reimbursement, Defendants, directly and indirectly, caused improper claims to be submitted to Medicare and Medicaid in violation of the False Claims Act.

159. Executives within the Company were aware that these practices were taking place. CW5 said that she and her direct supervisor, a senior director of marketing, worked with Patrick Miles, President of Global Products and Services on marketing efforts related to monitoring equipment and services, including development of the reimbursement guides. In addition, CW5 stated that her direct supervisor worked with Defendant Lukianov, who "was aware of what we were doing" to promote the Company's IOM services.

160. Defendants' conduct exposed the Company to increased regulatory risk, which contributed, in part, to the OIG's subpoena and investigation related to improper claims submitted to Medicare and Medicaid.

**The Company's Improper Coding For XLIF**

161. According to former employees, NuVasive also inappropriately coded for its XLIF procedure, which was the Company's most lucrative and well-known innovation in spinal surgery techniques.

162. Typically, when performing spinal fusion surgery, doctors must access the spine using either an anterior or posterior approach. However, utilizing the Company's MAS platform and nerve monitoring system, a surgeon performing the XLIF procedure is able to access the spine from the side of the patient's body, which the Company claims is less invasive and efficacious than either anterior or posterior methods.

163. Because XLIF is neither a front nor a back procedure, it did not fit neatly into existing billing codes for reimbursement. Nevertheless, NuVasive was aware that if the hospital coded XLIF as an "anterior-posterior" procedure, which is considered more complicated and difficult and therefore more expensive, the Company could bill the hospital at a higher rate than if XLIF was coded as either "anterior" or "posterior" alone, and the hospital, in turn, could demand higher reimbursement from third party payers, including Medicare and Medicaid.

164. As CW14, a former sales director for NuVasive from January 2005 to May 2010 explained, if a hospital was known to code XLIF as "anterior-posterior," the Company charged the hospital approximately $30,000, knowing that third party payers would accept a higher price based on the perceived difficulty of the procedure as reflected by the code. But if the hospital coded XLIF as either "anterior" or "posterior," then, based on what third party payers considered a reasonable price for such a procedure, the Company could only bill approximately $20,000. CW14 estimated that convincing hospitals and third party payers that XLIF should be coded as "anterior-posterior" potentially impacted the Company's revenues by tens of millions of dollars each year.

165. According to Confidential Witness 15 ("CW15"), a former Vice President of research and development from June 2009 through January 2013, NuVasive developed a reputation for aggressively pushing back if there was a disagreement about how NuVasive products and procedures should be coded. For example, CW15 explained that during 2010, NuVasive fought with insurance companies concerning the proper coding for the XLIF procedure. Ultimately the dispute was resolved, with NuVasive adopting the coding for XLIF that it demanded, which also allowed the Company to charge more for the procedure.

166. By taking an aggressive stance and forcing its own interpretation of billing codes on third party payers, Defendants exposed the Company to increased

regulatory risk, which contributed, in part, to the OIG's subpoena and investigation related to improper claims submitted to Medicare and Medicaid.

## MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

### Quarterly Report for 3Q 2008

167. On October 22, 2008, the Company issued a press release announcing its financial results for the quarter ended September 30, 2008. For the quarter, the Company reported a net loss of $23.1 million, or ($0.64) diluted earnings per share ("EPS") and revenue of $66.9 million, compared to a net loss of $2.3 million or ($0.07) diluted EPS and revenue of $38.5 million for the same period a year ago.

168. On November 7, 2008, the Company filed a quarterly report for the period ended September 30, 2008 on a Form 10-Q with the SEC ("3Q 2008 10-Q"), which was signed by Defendants Lukianov and O'Boyle, and reiterated the Company's previously reported financial results and financial position. The Form 10-Q contained signed certifications by Defendants Lukianov and O'Boyle, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

169. These reports of financial results were false and misleading and/or omitted material information, because, as confirmed by CW2, CW9, and CW14, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices that contravened regulatory guidance; violated healthcare fraud and abuse laws, for example the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act; violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program and its Global Business Ethics and Compliance Program; and exposed the Company to increased regulatory risk.

170. In addition, the 3Q 2008 10-Q indicated that for the three months ended September 30, 2008, the Company spent approximately $54.5 million on sales, marketing, and administrative expenses, comprising 81.5% of total revenues for that period. According to the 3Q 2008 10-Q, sales, marketing and administrative expenses included, *inter alia*, "commission and training costs for personnel engaged in sales, marketing and customer support functions, distributor commissions, surgeon training costs, shareowner (employee) related expenses for our administrative functions, third party professional service fees, amortization of acquired intangible assets, and facilities and insurance expenses."

171. The Company's statements concerning sales, marketing, and administrative expenses were false and misleading and omitted material

information, because as confirmed by, among others, CW2, the Company's expenditures for sales and marketing included, *inter alia*, millions of dollars of gifts and payments to doctors in exchange for use and promotion of NuVasive products and services in violation of healthcare fraud and abuse laws, for example the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act, and violated NuVasive's Comprehensive Healthcare Compliance Program and its Global Ethics and Compliance Program, as well as the MDMA Code. Defendants also failed to disclose that these improper and illegal expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme in violation of the Anti-Kickback Statute and PPACA.

**2008 Annual Report**

172. On February 25, 2009, the Company issued a press release announcing its financial results for the quarter and year ended December 31, 2008. For the quarter, the Company reported net income of $3.7 million, or $0.10 diluted EPS and revenue of $74.6 million, compared to a net loss of $1.1 million or ($0.03) diluted EPS and revenue of $46.9 million for the same period a year ago. For the year, the Company reported net loss of $27.5 million, or ($0.77) diluted EPS and revenue of $250.1 million, compared to net loss of $11.3 million,

or ($0.32) diluted EPS and revenue of $154.3 million for the same period a year ago.

173. On March 2, 2009, the Company filed an annual report for the period ended December 31, 2008 on Form 10-K with the SEC (the "2008 Annual Report"), which was signed by Defendants Lukianov and Lambert, and stated, inter alia, the Company's financial results and financial position, as well as its compliance with regulatory requirements, including, but not limited to, the Anti-Kickback Statute and False Claims Act. In addition, the Form 10-K contained signed certifications by Defendants Lukianov and O'Boyle, stating that the information contained in the Form 10-K was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

174. These reports of financial results were false and misleading and/or omitted material information, because as confirmed by CW2, CW9, and CW14, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices that contravened regulatory guidance; violated healthcare fraud and abuse laws, for example the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act; violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program; and exposed the Company to increased regulatory risk.

175. With respect to training and education programs and expenses, the 2008 Annual Report stated:

> NuVasive devotes significant resources to training and educating surgeons regarding the safety and reproducibility of our surgical techniques and our complimentary instruments and implants. We maintain a state-of-the-art cadaver operating theatre and training facility at our corporate headquarters to help promote adoption of our products. Currently, we are training approximately 400 to 500 surgeons annually in the XLIF® technique and our other Maximum Access Surgery, or MAS platform, products including: NeuroVision, MaXcess and SpheRx DBR.

176. Defendants' statement that the Company "devotes significant resources to training and education," as well as related statements describing purported training programs, were materially false and misleading and omitted material information, because Defendants failed to disclose that Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business. As confirmed by numerous former employees, including CW2, doctors attending training programs received free travel, lodging, and entertainment, including lavish dinners and other perks. These practices violated the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act, as well as the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global

Business Ethics and Compliance Program, and exposed the Company to increased regulatory risk.

177. The 2008 Annual Report also stated: "NuVasive has also helped to establish SOLAS™, the Society of Lateral Access Surgery, a group of spine surgeons dedicated to the development and expanded application of lateral spine surgery techniques that offer significant patient benefits and improved clinical outcome through peer-to-peer communication, clinical education efforts, and research."

178. This statement is similarly false and misleading and omits material information, because Defendants failed to disclose that the Company used these medical societies as a platform to promote its products and services for both approved and off-label uses. Specifically, several confidential witnesses, including CW3, identified certain prominent physicians, known internally as "high end rollers," who received consulting fees and other remuneration and gifts in exchange for using NuVasive products and referring patients to clinical trials. These same "high end rollers" occupy high level positions within certain medical societies financed by NuVasive. These practices contravened regulatory guidance and policies; violated the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act; violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global

Business Ethics and Compliance Program; and exposed the Company to increased risk of regulatory scrutiny and prosecution for violations of healthcare fraud and abuse laws.

179. The 2008 Annual Report further stated, "In addition, we believe recommendations and support of our products by influential surgeons are essential for market acceptance and adoption. If we do not receive support from such surgeons or have favorable long-term data, surgeons and hospitals may not use our products."

180. The 2008 Annual Report also indicated that 75% of total revenue in 2008 was spent on sales, marketing and administrative expenses, including but not limited to, "compensation, commission and training costs for personnel engaged in sales, marketing and customer support functions; distributor commissions; surgeon training costs; shareowner (employee) related expenses for our administrative functions; third party professional service fees; amortization of acquired intangible assets; and facilities and insurance expenses."

181. The statements concerning purported training and education programs and sales and marketing expenses were false and misleading and omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW2, CW9, and CW14: (1) Defendants' education and training programs and expenses related thereto were a

contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2) Defendants utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; (3) improper and illegal sales and marketing expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme in violation of the Anti-Kickback Statute and the PPACA; and (4) Defendants' actions violated the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, the False Claims Act, and the MDMA Code, and violated NuVasive's Comprehensive Healthcare Compliance Program and its Global Business Ethics and Compliance Program.

182. With respect to the Company's compliance with healthcare fraud and abuse laws, the 2008 Annual Report stated acknowledged:

> Healthcare fraud and abuse laws apply to our business if a customer submits a claim for an item or service that is reimbursed under Medicare, Medicaid or most other federally-funded health care programs … If a governmental authority were to conclude that we are not in compliance with applicable laws and regulations, we and our officers and employees could be subject to severe criminal and civil penalties including, for example,

> exclusion from participation as a supplier of product to beneficiaries covered by Medicare or Medicaid.

183. The Company explained that the regulatory environment had become more intense, as several states "mandate[d] implementation of commercial compliance programs, along with the tracking and reporting of gifts, compensation, and other remuneration to physicians." In addition, the U.S. DOJ "has increased its scrutiny of interactions between healthcare companies and healthcare providers which has led to an unprecedented level of investigations and settlements in the healthcare industry."

184. The following statements were false and misleading and/or omitted material information, because they failed to disclose that Defendants knew or recklessly disregarded the fact that the Company's sales and marketing practices exposed the Company to increased regulatory scrutiny and prosecution for violations of applicable healthcare fraud and abuse laws. As confirmed by numerous former employees, including CW2, CW9, and CW14: (1) Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2) Defendants utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians

referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; (3) Defendants employed improper sales and billing practices to sustain revenues, including, *inter alia*, promotion of NuVasive products for off-label uses, with knowledge that its customers ultimately would submit claims for reimbursement to governmental healthcare programs, including Medicare and Medicaid; (4) Defendants provided guidance to its customers as to how to improperly code NuVasive products in violation of the False Claims Act; and (5) Defendants' actions violated the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, the False Claims Act, and the MDMA Code, and violated NuVasive's Comprehensive Healthcare Compliance Program and its Global Business Ethics and Compliance Program. As a result, there was no reasonable basis to believe that NuVasive was in compliance with healthcare fraud and abuse laws and would not be subject to regulatory scrutiny.

**Quarterly Report for 1Q 2009**

185. On April 22, 2009, the Company issued a press release announcing its financial results for the quarter ended March 31, 2009. For the quarter, the Company reported a net loss of $4.3 million, or ($0.12) diluted EPS and revenue of $80 million, compared to a net loss of $7.7 million or ($0.22) diluted EPS and revenue of $51.2 million for the same period a year ago.

186. On May 8, 2009, the Company filed a quarterly report for the period ended March 31, 2009 on a Form 10-Q with the SEC ("1Q 2009 10-Q") signed by Defendants Lukianov and O'Boyle, where it reiterated the Company's previously reported financial results and financial position. In addition, the Form 10-Q contained signed certifications by Defendants Lukianov and O'Boyle stating that the financial information contained in the Form 10-Q was accurate, and that they disclosed any material changes to the Company's internal control over financial reporting.

187. These reports of financial results were false and misleading and/or omitted material information, because as confirmed by CW2, CW9, and CW14, as well as Kevin J. Ryan, the relator in the *Qui Tam* Action, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices that contravened regulatory guidance; violated healthcare fraud and abuse laws, for example the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act; violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program; and exposed the Company to increased regulatory risk.

188. In addition, the 1Q 2009 10-Q indicated that for the three months ended March 31, 2009, the Company spent approximately $58.5 million on sales,

marketing, and administrative expenses, comprising 73.1% of total revenues for that period. According to the 1Q 2009 10-Q, sales, marketing and administrative expenses included, *inter alia*, "commission and training costs for personnel engaged in sales, marketing and customer support functions, distributor commissions, surgeon training costs, shareowner (employee) related expenses for our administrative functions, third party professional service fees, amortization of acquired intangible assets, and facilities and insurance expenses."

189. The Company's statements concerning sales, marketing, and administrative expenses were false and misleading and omitted material information, because as confirmed by, among others, CW2, CW9, and CW14, as well as Kevin J. Ryan, the relator in the *Qui Tam* Action, the Company's expenditures for sales and marketing included, *inter alia*, millions of dollars of gifts and payments to doctors in exchange for use and promotion of NuVasive products and services in violation of healthcare fraud and abuse laws, for example the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act, and in violation of the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program. Defendants also failed to disclose that these improper and illegal expenditures were recorded under non-descript "code names" in order

to conceal Defendants' fraudulent kickback scheme in violation of the Anti-Kickback Statute and the PPACA.

**April 22, 2009 Investor Conference Call**

190. On April 22, 2009, Defendants held a conference call with analysts to discuss the Company's financial results for the first quarterly period ended March 31, 2009. During that conference call, Defendant Lukianov stated:

> On the compliance front, we expect the government and medical societies to adopt stricter policy related to disclosure of surgeon relationships, which will provide increasing details on remuneration. We will continue to acquire innovative product ideas and intellectual property from surgeons, and we will continue to work closely with surgeons to proctor and teach our innovative techniques, all within the bounds that have been determined by the government and industry groups.

191. Defendant Lukianov's statements concerning the Company's compliance with applicable policies, regulations, and healthcare fraud and abuse laws were false and misleading and omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW2, CW9, and CW14, as well as Kevin J. Ryan, the relator in the *Qui Tam* Action: (1) Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2) Defendants utilized kickbacks, in the form of gifts, entertainment, improper

commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; (3) Defendants employed improper sales and billing practices to sustain revenues, including, *inter alia*, promotion of NuVasive products for off-label uses,with knowledge that its customers ultimately would submit claims for reimbursement to governmental healthcare programs, including Medicare and Medicaid; (4) Defendants provided guidance to its customers as to how to improperly code NuVasive products and procedures in violation of the False Claims Act; and (5) Defendants' actions violated the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, the False Claims Act, and the MDMA Code, and violated NuVasive's Comprehensive Healthcare Compliance Program, as well as its Global Ethics and Compliance Program. As a result, there was no reasonable basis to believe that NuVasive was in compliance with healthcare fraud and abuse laws and would not be subject to regulatory scrutiny.

192. When asked to address concerns about potential reimbursement changes and competitive pressures, Defendant Lukianov claimed: "Our reimbursement prospects have not changed. There is nothing being done differently by surgeons. We are following the exact same coding process that we've been following since 2006 as was established by NAS. So absolutely

nothing has changed. And frankly, it's just – it's baloney and there's absolutely no truth to it."

193. Defendant Lukianov's statements concerning reimbursement for NuVasive products and services were false and misleading and omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW9 and CW14, Defendants provided guidance to its customers as to how to improperly code NuVasive products and procedures in violation of the False Claims Act. According to CW14, convincing hospitals and third party payers to utilize particular coding for procedures such as XLIF potentially impacted the Company's revenues by tens of millions of dollars each year.

194. Furthermore, according to CW14 and *qui tam* relator, Kevin J. Ryan, Defendants promoted off-label uses of NuVasive products in brochures and training materials and provided instruction to doctors on off-label uses, which Defendants knew would cause ineligible claims to be submitted to and reimbursed by federal health care programs in violation of, *inter alia*, the False Claims Act.

**Quarterly Report for 2Q 2009**

195. On July 23, 2009, the Company issued a press release announcing its financial results for the quarter ended June 30, 2009. For the quarter, the Company reported net income of $2.8 million, or $0.07 diluted EPS and revenue

of $88.5 million, compared to a net loss of $495,000 or ($0.01) diluted EPS and revenue of $57.4 million for the same period a year ago.

196. On August 6, 2009, the Company filed a quarterly report for the period ended June 30, 2009 on a Form 10-Q with the SEC ("2Q 2009 10-Q") signed by Defendants Lukianov and O'Boyle, where it reiterated the Company's previously reported financial results and financial position. In addition, the Form 10-Q contained signed certifications by Defendants Lukianov and O'Boyle stating that the financial information contained in the Form 10-Q was accurate, and that they disclosed any material changes to the Company's internal control over financial reporting.

197. These reports of financial results were false and misleading and/or omitted material information, because as confirmed by CW2, CW9, CW14, and CW15, as well as Kevin J. Ryan, the relator in the *Qui Tam* Action, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices that contravened regulatory guidance; violated healthcare fraud and abuse laws, for example the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act; violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program; and exposed the Company to increased regulatory risk.

198. In addition, the 2Q 2009 10-Q indicated that for the three months ended June 30, 2009, the Company spent approximately $58.1 million on sales, marketing, and administrative expenses, comprising 65.7% of total revenues for that period. According to the 2Q 2009 10-Q, sales, marketing and administrative expenses included, *inter alia*, "commission and training costs for personnel engaged in sales, marketing and customer support functions, distributor commissions, surgeon training costs, shareowner (employee) related expenses for our administrative functions, third party professional service fees, amortization of acquired intangible assets, and facilities and insurance expenses."

199. The Company's statements concerning sales, marketing, and administrative expenses were false and misleading and omitted material information, because as confirmed by, among others, CW2, the Company's expenditures for sales and marketing included, *inter alia*, millions of dollars of gifts and payments to doctors in exchange for use and promotion of NuVasive products and services in violation of healthcare fraud and abuse laws, for example Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act, and in violation of the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program. Defendants also failed to disclose that these improper and illegal expenditures were recorded under non-descript "code names" in order

to conceal Defendants' fraudulent kickback scheme in violation of the Anti-Kickback Statute and the PPACA.

**Quarterly Report for 3Q 2009**

200. On October 20, 2009, the Company issued a press release announcing its financial results for the quarter ended September 30, 2009. For the quarter, the Company reported net income of $5.1 million, or $0.13 diluted EPS and revenue of $94.9 million, compared to net loss of $23.1 million, or ($0.64) diluted EPS and revenue of $66.9 million for the same period a year ago.

201. On November 6, 2009, the Company filed a quarterly report for the period ended September 30, 2009 on a Form 10-Q with the SEC ("3Q 2009 10-Q") signed by Defendants Lukianov and O'Boyle and where it reiterated the Company's previously reported financial results and financial position. In addition, the Form 10-Q contained signed certifications by Defendants Lukianov and O'Boyle stating that the financial information contained in the Form 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

202. These reports of financial results were false and misleading and/or omitted material information, because as confirmed by CW2, CW9, CW14, and CW15, as well as Kevin J. Ryan, the relator in the *Qui Tam* Action, they failed to disclose that the Company's earnings and revenues were attributable, in part, to

sales, marketing, and billing practices that contravened regulatory guidance; violated healthcare fraud and abuse laws, for example the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act; violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program; and exposed the Company to increased regulatory risk.

203. In addition, the 3Q 2009 10-Q indicated that for the three months ended September 30, 2009, the Company spent approximately $59.8 million on sales, marketing, and administrative expenses, comprising 63% of total revenues for that period. According to the 3Q 2009 10-Q, sales, marketing and administrative expenses included, *inter alia*, "commission and training costs for personnel engaged in sales, marketing and customer support functions, distributor commissions, surgeon training costs, shareowner (employee) related expenses for our administrative functions, third party professional service fees, amortization of acquired intangible assets, and facilities and insurance expenses."

204. The Company's statements concerning sales, marketing, and administrative expenses were false and misleading and omitted material information, because as confirmed by, among others, CW2, the Company's expenditures for sales and marketing included, *inter alia*, millions of dollars of gifts and payments to doctors in exchange for use and promotion of NuVasive

products and services in violation of healthcare fraud and abuse laws, for example the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act, and in violation of the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program. Defendants also failed to disclose that these improper and illegal expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme in violation of the Anti-Kickback Statute and the PPACA.

**2009 Annual Report**

205. On February 25, 2010, the Company issued a press release announcing its financial results for the quarter and year ended December 31, 2009. For the quarter, the Company reported net income of $2.3 million, or $0.06 diluted EPS and revenue of $106.9 million, compared to net income of $3.7 million or $0.10 diluted EPS and revenue of $74.6 million for the same period a year ago. For the year, the Company reported net income of $5.8 million, or $0.15 diluted EPS and revenue of $370.3 million, compared to a net loss of $27.5 million, or ($0.77) diluted EPS and revenue of $250.9 million for the same period a year ago.

206. On February 26, 2010, the Company filed an annual report for the period ended December 31, 2009 on Form 10-K with the SEC (the "2009 Annual

Report"), which was signed by Defendants Lukianov and Lambert, and reiterated the Company's financial results and financial position, as well as its compliance with regulatory requirements, including, but not limited to, the Anti-Kickback Statute and False Claims Act. In addition, the Form 10-K contained signed certifications by Defendants Lukianov and Lambert, stating that the information contained in the Form 10-K was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

207. These reports of financial results were false and misleading and/or omitted material information, because as confirmed by CW2, CW9, CW14, and CW15, as well as Kevin J. Ryan, the relator in the *Qui Tam* Action, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices that contravened regulatory guidance; violated healthcare fraud and abuse laws, for example the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act; violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program; and exposed the Company to increased regulatory risk.

208. With respect to training and education programs and expenses, the 2009 Annual Report stated:

> NuVasive devotes significant resources to training and educating surgeons regarding the safety and reproducibility of our surgical techniques and our complimentary instruments and implants. We maintain a state-of-the-art cadaver operating theatre and training facility at our corporate headquarters to help promote adoption of our products. Currently, we are training approximately 400 to 500 surgeons annually in the XLIF technique and our other MAS platform products including: NeuroVision, MaXcess and specialized implants.

209. Defendants' statement that the Company "devotes significant resources to training and education," as well as related statements describing purported training programs, were materially false and misleading and omitted material information, because Defendants failed to disclose that Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business. As confirmed by numerous former employees, including CW2, doctors attending training programs received free travel, lodging, and entertainment, including lavish dinners and other perks. These practices contravened regulatory guidance and policies; violated the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act; violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program; and exposed the Company to increased risk of regulatory scrutiny and prosecution for violations of healthcare fraud and abuse laws.

210. The 2009 Annual Report also stated:

> NuVasive has also helped to establish SOLAS ®, the Society of Lateral Access Surgery, a group of spine surgeons dedicated to the development and expanded application of lateral spine surgery techniques that offer significant patient benefits and improved clinical outcome through peer-to-peer communication, clinical education efforts, and research. The number of surgeons trained annually includes first-time surgeons new to our MAS product platform as well as surgeons previously trained on our MAS product platform who are attending advanced training programs.

211. These statements were false and misleading and omitted material information, because Defendants failed to disclose that the Company used medical societies like SOLAS as a platform to promote its products and services, including to promote off-label and non-approved uses. Specifically, several confidential witnesses, including CW3, identified certain prominent physicians, known internally as "high end rollers," who received consulting fees and other remuneration and gifts in exchange for using NuVasive products and referring patients to clinical trials. These same "high end rollers" were installed in high level positions within certain medical societies financed by NuVasive. As confirmed by *qui tam* relator, Kevin J. Ryan, the "high end rollers" also published articles in newsletters financed by NuVasive, which recommended off-label uses for NuVasive products. These practices contravened regulatory guidance and policies; violated the Anti-Kickback Statute, the Patient Protection and Affordable

Care Act, and the False Claims Act; violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program; and exposed the Company to increased risk of regulatory scrutiny and prosecution for violations of healthcare fraud and abuse laws.

212. The 2009 Annual Report also indicated that 69% of total revenue in 2009 was spent on sales, marketing and administrative expenses, including but not limited to, "compensation, commission and training costs for personnel engaged in sales, marketing and customer support functions; distributor commissions; depreciation expense for loaned instrument sets used in surgeries; shipping costs; surgeon training costs; shareowner (employee) related expenses for our administrative functions; and third-party professional service fees."

213. The statements concerning purported training and education programs and sales and marketing expenses were false and misleading and omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW2, CW9, CW14, and CW15: (1) Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2) Defendants utilized kickbacks, in the form of gifts, entertainment, improper

commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; (3) Defendants' sales and marketing practices, such as encouraging neurophysiologists to facilitate sales and billing for medically redundant and unnecessary equipment in operating rooms and promoting off-label uses of NuVasive products, contravened regulatory guidance, violated the False Claims Act, and exposed the Company to increased regulatory risk; (4) improper and illegal sales and marketing expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme in violation of the Anti-Kickback Statute and the PPACA; and (5) Defendants violated the Anti-Kickback Statute, the Patient Protection and Affordable Care Act and the False Claims Act, and violated NuVasive's Comprehensive Healthcare Compliance Program, as well as its Global Business Ethics and Compliance Program.

214. With respect to coding and reimbursement, the 2009 Annual Report stated:

> Reimbursement is contingent on established coding for a given procedure, coverage of the codes by the third-party payers, and adequate payment for the resources used.

> In July of 2006 NASS established the proper physician coding for the XLIF procedure by declaring it to be encompassed in existing codes that describe an anterolateral approach to the spine. This position was confirmed in a formal statement in January 2010. Hospital coding is established by the Centers for Medicare and Medicaid Services (CMS). XLIF is not currently included in the nomenclature for hospital codes but has been proposed as an additional descriptor of existing codes. CMS' proposal is slated for review and ratification in 2010. All physician and hospital coding is subject to change which could impact reimbursement and physician practice behavior.
>
> * * *
>
> NuVasive will continue to provide the appropriate resources to patients, physicians, hospitals, and insurers in order to ensure the best in patient care and clarity regarding XLIF reimbursement and work to remove the non-coverage policies.

215. Defendants' statements regarding coding and reimbursement were false and misleading and omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW9, CW14, and CW15, as well as Kevin J. Ryan, the relator in the *Qui Tam* Action: (1) Defendants employed improper sales and billing practices to sustain revenues, including, *inter alia*, promoting off-label uses of NuVasive products, with knowledge that its customers ultimately would submit claims for reimbursement to governmental healthcare programs, including Medicare and Medicaid; and (2) Defendants provided guidance to its customers as to how to improperly code NuVasive products and procedures in violation of the False Claims Act.

216. The Company also indicated:

> Healthcare fraud and abuse laws apply to our business when a customer submits a claim for an item or service that is reimbursed under Medicare, Medicaid or most other federally-funded health care programs … If a governmental authority were to conclude that we are not in compliance with applicable laws and regulations, we and our officers and employees could be subject to severe criminal and civil penalties including, for example, exclusion from participation as a supplier of product to beneficiaries covered by Medicare or Medicaid.

217. The Company explained that the regulatory environment had become more intense, as several states "mandate[d] implementation of commercial compliance programs, along with the tracking and reporting of gifts, compensation, and other remuneration to physicians." In addition, the U.S. DOJ "has increased its scrutiny of interactions between healthcare companies and healthcare providers which has led to an unprecedented level of investigations and settlements in the healthcare industry."

218. The following statements were false and misleading and/or omitted material information, because they failed to disclose that Defendants knew or recklessly disregarded the fact that the Company's sales, marketing, and billing practices exposed the Company to increased regulatory scrutiny and prosecution for violations of applicable healthcare fraud and abuse laws. As confirmed by numerous former employees, including CW2, CW9, CW14, and CW15, as well as

Kevin J. Ryan, the relator in the *Qui Tam* Action: (1) Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2) Defendants utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; (3) Defendants employed improper sales and billing practices to sustain revenues, including, *inter alia*, promotion of NuVasive products for off-label uses, with knowledge that its customers ultimately would submit claims for reimbursement to governmental healthcare programs, including Medicare and Medicaid; (4) Defendants provided guidance to its customers as to how to improperly code NuVasive products and procedures in violation of the False Claims Act; and (5) Defendants violated the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act, and violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program. As a result, there was no reasonable basis to believe that NuVasive was in compliance with healthcare fraud and abuse laws and would not be subject to regulatory scrutiny.

**Quarterly Report for 1Q 2010**

219. On April 20, 2010, the Company issued a press release announcing its financial results for the quarter ended March 31, 2010. For the quarter, the Company reported net income of $1.1 million, or $0.03 diluted EPS and revenue of $109.1 million, compared to net loss of $4.3 million or ($0.12) diluted EPS and revenue of $80 million for the same period a year ago.

220. On May 10, 2010, the Company filed a quarterly report for the first quarterly period ended March 31, 2010 on Form 10-Q with the SEC ("1Q 2010 10-Q"), which was signed by Defendants Lukianov and Lambert, and reiterated the Company's financial results and financial position, as well as the Company's expenses related to training and education and issues with third-party payers. In addition, the Form 10-Q contained signed certifications by Defendants Lukianov and Lambert, stating that the information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

221. These reports of financial results were false and misleading and/or omitted material information, because as confirmed by CW1, CW2, CW8, CW9, CW14, and CW15, as well as Kevin J. Ryan, the relator in the *Qui Tam* Action, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices that contravened

regulatory guidance; violated healthcare fraud and abuse laws, for example the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act; violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program; and exposed the Company to increased regulatory risk.

222. With respect to training and education expenses, NuVasive stated: "We dedicate significant resources to our sales and marketing efforts, including training spine surgeons on our unique technology and products."

223. The Company also disclosed that for the period ending March 31, 2010, 68.4% of total revenues were spent on sales, marketing and administrative expenses, including, among other things, "compensation, commission and training costs for personnel engaged in sales, marketing and customer support functions; distributor commissions; depreciation expense for loaned instrument sets used in surgeries; shipping costs; surgeon training costs; shareowner (employee) related expenses for our administrative functions; and third-party professional service fees."

224. Defendants' statements concerning purported education and training programs and sales and marketing expenses were false and misleading and omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW1, CW2, CW8, and

CW9, as well as Kevin J. Ryan, the relator in the *Qui Tam* Action: (1) Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2) Defendants utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; (3) Defendants' sales and marketing practices, such as encouraging neurophysiologists to facilitate sales and billing for medically redundant and unnecessary equipment in operating rooms and promoting off-label uses of NuVasive products, contravened regulatory guidance, violated the False Claims Act, and exposed the Company to increased regulatory risk; (4) improper and illegal expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme in violation of the Anti-Kickback Statute and the PPACA; and (5) Defendants violated the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act, and violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program.

225. With respect to coding and reimbursement for the XLIF procedure, the Company stated: "Certain insurance providers have stated a policy of not providing reimbursement for the XLIF procedure. NuVasive cannot offer definitive time frames nor final outcomes regarding reversal of the non-coverage policies, as the process is dictated by third-party insurance providers. To date, these policies have not materially impacted our operating results."

226. Defendants' statements concerning coding and reimbursement were false and misleading and omitted material information, because as confirmed by CW14 and CW15, Defendants failed to disclose that: (1) Defendants employed improper sales and billing practices to sustain revenues, including, *inter alia*, promotion of NuVasive products for off-label uses, with knowledge that its customers ultimately would submit claims for reimbursement to governmental healthcare programs, including Medicare and Medicaid; and (2) Defendants provided guidance to its customers as to how to improperly code NuVasive products and procedures in violation of the False Claims Act.

**Quarterly Report for 2Q 2010**

227. On July 27, 2010, the Company issued a press release announcing its financial results for the quarter ended June 30, 2010. For the quarter, the Company reported net income of $6.7 million, or $0.17 diluted EPS and revenue

of $119.6 million, compared to net income of $2.8 million, or $0.07 diluted EPS and revenue of $88.5 million for the same period a year ago.

228. On August 6, 2010, the Company filed a quarterly report for the second quarterly period ended June 30, 2010 on Form 10-Q with the SEC ("2Q 2010 10-Q"), which was signed by Defendants Lukianov and Lambert, and reiterated the Company's financial results and financial position, as well as the Company's expenses related to training and education and issues with third-party payers. In addition, the Form 10-Q contained signed certifications by Defendants Lukianov and Lambert, stating that the information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

229. These reports of financial results were false and misleading and/or omitted material information, because as confirmed by numerous confidential witnesses, including CW1, CW2, CW5, CW6, CW8, CW9, CW13, CW14, and CW15, as well as Kevin J. Ryan, the relator in the *Qui Tam* Action, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices that contravened regulatory guidance; violated healthcare fraud and abuse laws, for example the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act; violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program,

and its Global Business Ethics and Compliance Program; and exposed the Company to increased regulatory risk.

230. With respect to training and education expenses, NuVasive stated: "We dedicate significant resources to our sales and marketing efforts, including training spine surgeons on our unique technology and products."

231. The Company also disclosed that for the period ending June 30, 2010, 65% of total revenues were spent on sales, marketing and administrative expenses, including, among other things, "compensation, commission and training costs for personnel engaged in sales, marketing and customer support functions; distributor commissions; depreciation expense for loaned instrument sets used in surgeries; shipping costs; surgeon training costs; shareowner (employee) related expenses for our administrative functions; and third-party professional service fees."

232. Defendants' statements concerning purported education and training programs and sales and marketing expenses were false and misleading and omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW1, CW2, CW6, CW8, CW9, and CW13, as well as Kevin J. Ryan, the relator in the *Qui Tam* Action,: (1) Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other

remuneration to doctors in exchange for referrals of business; (2) Defendants utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; (3) Defendants' sales and marketing practices, such as encouraging neurophysiologists to facilitate sales and billing for medically redundant and unnecessary equipment in operating rooms and promoting off-label uses of NuVasive products, contravened regulatory guidance, violated the False Claims Act, and exposed the Company to increased regulatory risk; (4) improper and illegal expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme in violation of the Anti-Kickback Statute and the PPACA; and (5) Defendants violated Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act, and violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program.

233. With respect to coding and reimbursement for the XLIF procedure, the Company stated: "Certain insurance providers have stated a policy of not providing reimbursement for the XLIF procedure. NuVasive cannot offer definitive time frames nor final outcomes regarding reversal of the non-coverage

policies, as the process is dictated by third-party insurance providers. To date, we have not experienced lack of payment for our procedures."

234. Defendants' statements concerning coding and reimbursement were false and misleading and omitted material information, because as confirmed by CW5, CW14, and CW15, Defendants failed to disclose that: (1) Defendants employed improper sales and billing practices to sustain revenues, including, *inter alia*, promotion of NuVasive products for off-label uses, with knowledge that its customers ultimately would submit claims for reimbursement to governmental healthcare programs, including Medicare and Medicaid; and (2) Defendants provided guidance to its customers as to how to improperly code NuVasive products and procedures in violation of the False Claims Act.

**<u>July 27, 2010 Investor Conference Call</u>**

235. On July 27, 2010, Defendants held a conference call with analysts to discuss the Company's financial results for the second quarterly period ended June 30, 2010. During that conference call, Defendant Lukianov was asked to address issues concerning the Company's compliance practices. Defendant Lukianov stated:

> I have addressed this many times before and we are extremely compliant and have ensured that we have everything in order. As I've also talked about, if you take a look at the percentage that goes out in royalty and on all consulting cost and so on and so forth, the number is very low. It's in the order of about 3%.

> So we're very comfortable with where we are. We’re very comfortable with how we’ve handled everything related to that area for years, and we’ve spent a lot of money ensuring that we’ve learned from those around us and watched what they’ve had to do with regard to compliance and that we have the same, if not better, systems.

236. Defendant Lukianov’s statements regarding the Company’s compliance with healthcare fraud and abuse laws were false and misleading and omitted material information, because Defendant Lukianov failed to disclose that, *inter alia*: (1) as confirmed by CW1 and CW6, as well as Kevin J. Ryan, the relator in the *Qui Tam* Action, millions of dollars of gifts, including free travel, dinners, and other entertainment were provided to doctors who used NuVasive products and services in violation of the Anti-Kickback Statute; (2) according to CW1, “doctors [who] were Lukianov’s favorites … received more gifts than others”; (3) as confirmed by CW2, certain “high end rollers” received special privileges as part of the “MVP” training program; (4) as confirmed by CW5, doctors were paid hundreds of thousands of dollars in “consulting fees” for authoring peer-reviewed papers promoting NuVasive’s products; (5) as confirmed by CW6, improper expenses were categorized under non-descript project names, such as “Wolverine,” in order to conceal Defendants’ fraudulent gifts and payments in violation of applicable healthcare fraud and abuse laws, including the PPACA; and (6) Defendants violated the Anti-Kickback Statute, the Patient

Protection and Affordable Care Act, and the False Claims Act, and violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program. Furthermore, CW1 and CW6 confirmed that expenses for gifts to doctors appeared on Defendant Lukianov's Company expense reports. In addition to these improper expenses, as confirmed by CW5, Defendant Lukianov was also aware that the Company prepared so-called "reimbursement guides" in order to coach doctors and hospitals on improper coding procedures in violation of the False Claims Act.

237. In addition, as confirmed by CW14, Defendant Lukianov participated in sales meetings and training sessions, in which sales representatives were instructed and encouraged to promote off-label uses of NuVasive products. As *qui tam* relator, Kevin J. Ryan explained, these off-label uses were also contained in marketing and training materials, as well as specially-prepared case studies, which were distributed nationally by senior executives for dissemination to physicians.

238. Therefore, at the time of this statement, Defendant Lukianov had no reasonable basis to state that "we are extremely compliant and have ensured that we have everything in order" and that, with regard to compliance, "we have the same, if not better, systems" as compared to others in the industry.

**<u>Quarterly Report for 3Q 2010</u>**

239. On October 28, 2010, the Company issued a press release announcing its financial results for the quarter ended September 30, 2010. For the quarter, the Company reported net income of $8.5 million, or $0.21 diluted EPS and revenue of $120.3 million, compared to net income of $5.1 million, or $0.13 diluted EPS and revenue of $94.9 million for the same period a year ago.

240. On November 5, 2010, the Company filed a quarterly report for the third quarterly period ended September 30, 2010 on Form 10-Q with the SEC ("3Q 2010 10-Q"), which was signed by Defendants Lukianov and Lambert, and reiterated the Company's financial results and financial position, as well as the Company's expenses related to training and education and issues with third-party payers. In addition, the Form 10-Q contained signed certifications by Defendants Lukianov and Lambert, stating that the information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

241. These reports of financial results were false and misleading and/or omitted material information, because as confirmed by CW1, CW2, CW5, CW6, CW8, CW9, CW13, CW14, and CW15, as well as Kevin J. Ryan, the relator in the *Qui Tam* Action, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices that

contravened regulatory guidance; violated healthcare fraud and abuse laws, for example Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act; violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program; and exposed the Company to increased regulatory risk.

242. With respect to training and education expenses, NuVasive stated: "We dedicate significant resources to our sales and marketing efforts, including training spine surgeons on our unique technology and products."

243. The Company also disclosed that for the period ending September 30, 2010, 64.6% of total revenues were spent on sales, marketing and administrative expenses, including, among other things, "compensation, commission and training costs for personnel engaged in sales, marketing and customer support functions; distributor commissions; depreciation expense for loaned instrument sets used in surgeries; shipping costs; surgeon training costs; shareowner (employee) related expenses for our administrative functions; and third-party professional service fees."

244. Defendants' statements concerning purported education and training programs and sales and marketing expenses were false and misleading and omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW1, CW2, CW6, CW9,

CW10, and CW13, as well as Kevin J. Ryan, the relator in the *Qui Tam* Action: (1) Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2) Defendants utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; (3) Defendants' sales and marketing practices, such as encouraging neurophysiologists to facilitate sales and billing for medically redundant and unnecessary equipment in operating rooms and promoting off-label uses of NuVasive products, contravened regulatory guidance, violated the False Claims Act, and exposed the Company to increased regulatory risk; (4) improper and illegal expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme in violation of the Anti-Kickback Statute and the PPACA; and (5) Defendants violated the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act, and violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program and its Global Business Ethics and Compliance Program.

245. With respect to coding and reimbursement for the XLIF procedure, the Company stated: "Certain insurance providers have stated a policy of not providing reimbursement for the XLIF procedure. NuVasive cannot offer definitive time frames nor final outcomes regarding reversal of the non-coverage policies, as the process is dictated by third-party insurance providers. To date, we have not experienced lack of payment for our procedures based on these policies."

246. Defendants' statements concerning coding and reimbursement were false and misleading and omitted material information, because as confirmed by CW5, CW14, and CW15, Defendants failed to disclose that: (1) Defendants employed improper sales and billing practices to sustain revenues, including, *inter alia*, promotion of NuVasive products for off-label uses, with knowledge that its customers ultimately would submit claims for reimbursement to governmental healthcare programs, including Medicare and Medicaid; and (2) Defendants provided guidance to its customers as to how to improperly code NuVasive products and procedures in violation of the False Claims Act.

**2010 Annual Report**

247. On February 23, 2011, the Company issued a press release announcing its financial results for the quarter and year ended December 31, 2010. For the quarter, the Company reported net income of $61.9 million, or $1.39 diluted EPS and revenue of $129.3 million, compared to net income of $2.3

million, or $0.06 diluted EPS and revenue of $106.9 million for the same period a year ago. For the year, the Company reported net income of $78.3 million, or $1.85 diluted EPS and revenue of $478.3 million, compared to net income of $5.8 million, or $0.15 diluted EPS and revenue of $370.3 million for the same period a year ago.

248. On February 25, 2011, the Company filed an annual report for the period ended December 31, 2010 on Form 10-K with the SEC (the "2010 Annual Report"), which was signed by Defendants Lukianov and Lambert, and reiterated the Company's financial results and financial position, as well as its compliance with regulatory requirements, including, but not limited to, the Anti-Kickback Statute and False Claims Act. In addition, the Form 10-K contained signed certifications by Defendants Lukianov and Lambert, stating that the information contained in the Form 10-K was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

249. These reports of financial results were false and misleading and/or omitted material information, because, as confirmed by, among others, CW1, CW2, CW5, CW6, CW8, CW9, CW13, CW14, and CW15, as well as Kevin J. Ryan, the relator in the *Qui Tam* Action, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices that contravened regulatory guidance; violated healthcare

fraud and abuse laws, for example the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act; violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program; and exposed the Company to increased regulatory risk.

250. With respect to education and training programs and expenses, the 2010 Annual Report stated:

> NuVasive devotes significant resources to training and educating surgeons regarding the safety and reproducibility of our surgical techniques and our complimentary instruments and implants. We maintain state-of-the-art cadaver operating rooms and training facilities at our corporate headquarters and our facility in Paramus, New Jersey to help promote adoption of our products. Currently, we are training over 500 surgeons annually in the XLIF technique and our other MAS platform products including: our proprietary nerve monitoring systems, MaXcess, Biologics, and specialized implants.

251. Defendants' statement that the Company "devotes significant resources to training and education," as well as related statements describing purported training programs, were materially false and misleading and omitted material information, because Defendants failed to disclose that Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business. As confirmed by numerous former

employees, including CW1, CW2, and CW6, as well as Kevin J. Ryan, the relator in the *Qui Tam* Action, doctors attending training programs received free travel, lodging, and entertainment, including lavish dinners and other perks. These practices contravened regulatory guidance and policies, violated the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act, violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program, and exposed the Company to increased risk of regulatory scrutiny and prosecution for violations of healthcare fraud and abuse laws.

252. The 2010 Annual Report also stated:

> NuVasive has also helped to establish SOLAS ®, the Society of Lateral Access Surgery, a group of spine surgeons dedicated to the development and expanded application of lateral spine surgery techniques that offer significant patient benefits and improved clinical outcomes through peer-to-peer communication, clinical education efforts, and ongoing research. The number of surgeons trained annually includes first-time surgeons new to our MAS product platform as well as surgeons previously trained on our MAS product platform who are attending advanced training programs.

253. These statements were false and misleading and omitted material information, because as confirmed by CW2 and *qui tam* relator, Kevin J. Ryan, Defendants failed to disclose that the Company used medical societies like SOLAS as a platform to promote its products and services, including to promote

off-label and non-approved uses. Specifically, several confidential witnesses, including CW3, identified certain prominent physicians, known internally as "high end rollers," who received consulting fees and other remuneration and gifts in exchange for using NuVasive products and referring patients to clinical trials. These same "high end rollers" were installed in high level positions within certain medical societies financed by NuVasive. These practices contravened regulatory guidance and policies; violated the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act; violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program; and exposed the Company to increased risk of regulatory scrutiny and prosecution for violations of healthcare fraud and abuse laws.

254. The 2010 Annual Report further indicated that 65% of total revenue in 2010 was spent on sales, marketing and administrative expenses, including but not limited to, "compensation, commission and training costs for personnel engaged in sales, marketing and customer support functions; distributor commissions; depreciation expense for loaned instrument sets used in surgeries; shipping costs; surgeon training costs; shareowner (employee) related expenses for our administrative functions; and third-party professional service fees."

255. Defendants' statements concerning purported education and training programs and sales and marketing expenses were false and misleading and omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW1, CW2, CW6, CW8, CW9, and CW13, as well as Kevin J. Ryan, the relator in the *Qui Tam* Action: (1) Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2) Defendants utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; (3) Defendants' sales and marketing practices, such as encouraging neurophysiologists to facilitate sales and billing for medically redundant and unnecessary equipment in operating rooms and promoting off-label uses of NuVasive products, contravened regulatory guidance, violated the False Claims Act, and exposed the Company to increased regulatory risk; (4) improper and illegal expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme in violation of the Anti-Kickback Statute and the PPACA; and (5) Defendants violated the Anti-Kickback

Statute, the Patient Protection and Affordable Care Act, and the False Claims Act, and violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program.

256. In terms of compliance with applicable laws and regulations, the Company stated:

> Our relationship with health care professionals, such as physicians, hospitals and those that may market our products (e.g., distributors, etc.), are subject to scrutiny under various state and federal laws rules, and regulation (e.g., anti-kickback statute, self-referral/Stark laws, false claims, etc.).
>
> * * *
>
> ***We believe that our operations materially comply with the anti-kickback statutes***; however, because these provisions are interpreted broadly by regulatory authorities, we cannot be assured that law enforcement officials or others will not challenge our operations under these statutes.
>
> * * *
>
> For years, ***NuVasive has maintained a compliance program structured to meet the requirements of the federal sentencing guidelines for an effective compliance program and the model compliance programs promulgated by HHS*** over the years and includes, but is not limited to, a Code of Ethical Business Conduct, designation of a compliance officer, a confidential disclosure method (a "hotline"), and conducting periodic audits to ensure compliance.

257. The following statements regarding compliance were false and misleading and/or omitted material information, because they failed to disclose that Defendants knew or recklessly disregarded the fact that the Company's sales

and marketing practices exposed the Company to increased regulatory scrutiny and prosecution for violations of applicable healthcare fraud and abuse laws. In particular, Defendants failed to disclose that, *inter alia*: (1) as confirmed by CW1 and CW6, millions of dollars of gifts, including free travel, dinners, and other entertainment were provided to doctors who used NuVasive products and services in violation of the Anti-Kickback Statute; (2) according to CW1, "doctors [who] were Lukianov's favorites … received more gifts than others"; (3) as confirmed by CW2, certain "high end rollers" received special privileges as part of the "MVP" training program; (4) as confirmed by CW5, doctors were paid hundreds of thousands of dollars in "consulting fees" for authoring peer-reviewed papers promoting NuVasive's products; (5) as confirmed by CW6, improper expenses were categorized under non-descript project names, such as "Wolverine," in order to conceal Defendants' fraudulent gifts and payments in violation of applicable healthcare fraud and abuse laws; (6) as confirmed by CW13, the Company's sales practices included encouraging neurophysiologists to facilitate sales and billing for medically redundant and unnecessary equipment installed in operating rooms in violation of the False Claims Act; and (7) Defendants violated the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act, and violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance

Program. Furthermore, CW1 and CW6 confirmed that expenses for gifts to doctors appeared on Company expense reports, including reports submitted by Defendant Lukianov. In addition to these improper expenses, CW5 confirmed that Defendants were also aware that the Company prepared so-called "reimbursement guides" in order to coach doctors and hospitals on improper coding procedures in violation of the False Claims Act. As a result, there was no reasonable basis to believe that NuVasive maintained an effective compliance program, was in compliance with healthcare fraud and abuse laws, and would not be subject to regulatory scrutiny.

258. With respect to coding and reimbursement for NuVasive procedures, the 2010 Annual Report stated:

> At various times over the past two years, certain insurance providers have adopted policies of not providing reimbursement for the XLIF procedure. We have worked with our surgeon customers and NASS who, in turn, have worked with these insurance providers to supply the information, explanation and clinical data they require to categorize the XLIF procedure as a procedure entitled to reimbursement under their policies. … ***We will continue to provide the appropriate resources to patients, surgeons, hospitals, and insurers in order to ensure optimum patient care and clarity regarding XLIF reimbursement and work to remove any and all non-coverage policies***.

259. Defendants' statements concerning coding and reimbursement were false and misleading and omitted material information, because as confirmed by CW5, CW14, and CW15, as well as *qui tam* relator, Kevin J. Ryan, Defendants

failed to disclose that: (1) Defendants employed improper sales and billing practices to sustain revenues, including, *inter alia*, promotion of NuVasive products for off-label uses, with knowledge that its customers ultimately would submit claims for reimbursement to governmental healthcare programs, including Medicare and Medicaid; and (2) Defendants provided guidance to its customers as to how to improperly code NuVasive products and procedures in violation of the False Claims Act. According to CW14, convincing hospitals and third party payers to use certain billing codes that allowed for increased reimbursement of NuVasive procedures impacted the Company's revenues by tens of millions of dollars each year.

**Quarterly Report for 1Q 2011**

260. On May 4, 2011, the Company issued a press release announcing its financial results for the quarter ended March 31, 2011. For the quarter, the Company reported net income of $2.4 million, or $0.06 diluted EPS and revenue of $124.5 million, compared to net income of $1.1 million, or $0.03 diluted EPS and revenue of $109.1 million for the same period a year ago.

261. On May 6, 2011, the Company filed a quarterly report for the first quarterly period ended March 31, 2011 on Form 10-Q with the SEC ("1Q 2011 10-Q"), which was signed by Defendants Lukianov and Lambert, and reiterated the Company's financial results and financial position, as well as the Company's

expenses related to training and education and issues with third-party payers. In addition, the Form 10-Q contained signed certifications by Defendants Lukianov and Lambert, stating that the information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

262. These reports of financial results were false and misleading and/or omitted material information, because as confirmed by numerous confidential witnesses, including CW1, CW2, CW4, CW5, CW6, CW7, CW8, CW9, CW11, CW13, and CW15, as well as *qui tam* relator, Kevin J. Ryan, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices that contravened regulatory guidance; violated healthcare fraud and abuse laws, for example the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act; violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program; and exposed the Company to increased regulatory risk.

263. With respect to training and education expenses, NuVasive stated: "We dedicate significant resources toward training spine surgeons on our unique technology and products."

264. The Company also disclosed that for the period ending March 31, 2011, 68% of total revenues were spent on sales, marketing and administrative expenses, including, among other things, "compensation, commission and training costs for personnel engaged in sales, marketing and customer support functions; distributor commissions; depreciation expense for surgical instrument sets; shipping costs; surgeon training costs; shareowner (employee) related expenses for our administrative functions; and third-party professional service fees."

265. Defendants' statements concerning purported education and training programs and sales and marketing expenses were false and misleading and omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW1, CW2, CW4, CW6, CW7, CW8, CW9, and CW13, as well as *qui tam* relator, Kevin J. Ryan: (1) Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2) Defendants utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; (3) Defendants' sales and marketing practices, such as encouraging

neurophysiologists to facilitate sales and billing for medically redundant and unnecessary equipment in operating rooms and promoting off-label uses of NuVasive products, contravened regulatory guidance, violated the False Claims Act, and exposed the Company to increased regulatory risk; (4) improper and illegal expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme in violation of the Anti-Kickback Statute and the PPACA; and (5) Defendants violated the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act, and violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program.

266. With respect to coding and reimbursement for the XLIF procedure, the Company stated:

> In the past certain insurance providers have adopted policies of not providing reimbursement for the XLIF procedure. We have worked with our surgeon customers and certain surgical societies who, in turn, have worked with these insurance providers to supply the information required to categorize the XLIF procedure as a procedure entitled to reimbursement under their policies … To date, we have not experienced significant lack of payment for our procedures based on these policies.

267. Defendants' statements concerning coding and reimbursement were false and misleading and omitted material information, because as confirmed by CW5 and CW15, Defendants failed to disclose that: (1) Defendants employed

improper sales and billing practices to sustain revenues, including, *inter alia*, promotion of NuVasive products for off-label uses, with knowledge that its customers ultimately would submit claims for reimbursement to governmental healthcare programs, including Medicare and Medicaid; and (2) Defendants provided guidance to its customers as to how to improperly code NuVasive products and procedures in violation of the False Claims Act. According to CW14, convincing hospitals and third party payers to use certain billing codes that allowed for increased reimbursement of NuVasive procedures impacted the Company's revenues by tens of millions of dollars each year.

**Quarterly Report for 2Q 2011**

268. On July 25, 2011, the Company issued a press release announcing its financial results for the quarter ended June 30, 2011. For the quarter, the Company reported net income of $5.4 million, or $0.13 diluted EPS and revenue of $133 million, compared to net income of $6.7 million, or $0.17 diluted EPS and revenue of $119.6 million for the same period a year ago.

269. August 5, 2011, the Company filed a quarterly report for the second quarterly period ended June 30, 2011 on Form 10-Q with the SEC ("2Q 2011 10-Q"), which was signed by Defendants Lukianov and Lambert, and reiterated the Company's financial results and financial position, as well as the Company's expenses related to training and education and issues with third-party payers. In

addition, the Form 10-Q contained signed certifications by Defendants Lukianov and Lambert, stating that the information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

270. These reports of financial results were false and misleading and/or omitted material information, because as confirmed by numerous confidential witnesses, including CW1, CW2, CW4, CW6, CW7, CW8, CW9, CW11, CW13, and CW15, as well as *qui tam* relator, Kevin J. Ryan, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices that contravened regulatory guidance; violated healthcare fraud and abuse laws, for example the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act; violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program; and exposed the Company to increased regulatory risk.

271. With respect to training and education expenses, NuVasive stated: "We dedicate significant resources toward training spine surgeons on our unique technology and products."

272. The Company also disclosed that for the period ending June 30, 2011, 63% of total revenues were spent on sales, marketing and administrative

expenses, including, among other things, "compensation, commission and training costs for personnel engaged in sales, marketing and customer support functions; distributor commissions; depreciation expense for surgical instrument sets; shipping costs; surgeon training costs; shareowner (employee) related expenses for our administrative functions; and third-party professional service fees."

273. Defendants' statements concerning purported education and training programs and sales and marketing expenses were false and misleading and omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW1, CW2, CW4, CW6, CW7, CW8, CW9, and CW13, as well as *qui tam* relator, Kevin J. Ryan: (1) Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2) Defendants utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; (3) Defendants' sales and marketing practices, such as encouraging neurophysiologists to facilitate sales and billing for medically redundant and unnecessary equipment in operating rooms and promoting off-label uses of

NuVasive products, contravened regulatory guidance, violated the False Claims Act, and exposed the Company to increased regulatory risk; (4) improper and illegal expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme in violation of the Anti-Kickback Statute and the PPACA; and (5) Defendants violated the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act, and violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program and its Global Business Ethics and Compliance Program.

274. With respect to coding and reimbursement for the XLIF procedure, the Company stated:

> In the past certain insurance providers have adopted policies of not providing reimbursement for the XLIF procedure. We have worked with our surgeon customers and certain surgical societies who, in turn, have worked with these insurance providers to supply the information required to categorize the XLIF procedure as a procedure entitled to reimbursement under their policies … To date, we have not experienced significant lack of payment for our procedures based on these policies.

275. Defendants' statements concerning coding and reimbursement were false and misleading and omitted material information, because as confirmed by CW11 and CW15, Defendants failed to disclose that: (1) Defendants employed improper sales and billing practices to sustain revenues, including, *inter alia*, promotion of NuVasive products for off-label uses, with knowledge that its

customers ultimately would submit claims for reimbursement to governmental healthcare programs, including Medicare and Medicaid; and (2) Defendants provided guidance to its customers as to how to improperly code NuVasive products and procedures in violation of the False Claims Act.

**Quarterly Report for 3Q 2011**

276. On October 27, 2011, the Company issued a press release announcing its financial results for the quarter ended September 30, 2011. For the quarter, the Company reported a net loss of $67.6 million, or ($1.69) diluted EPS and revenue of $132.9 million, compared to net income of $8.5 million, or $0.21 diluted EPS and revenue of $120.3 million for the same period a year ago.

277. On November 4, 2011, the Company filed a quarterly report for the third quarterly period ended September 30, 2011 on Form 10-Q with the SEC ("3Q 2011 10-Q"), which was signed by Defendants Lukianov and Lambert, and reiterated the Company's financial results and financial position, as well as the Company's expenses related to training and education and issues with third-party payers. In addition, the Form 10-Q contained signed certifications by Defendants Lukianov and Lambert, stating that the information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

278. These reports of financial results were false and misleading and/or omitted material information, because as confirmed by numerous confidential witnesses, including CW1, CW2, CW4, CW6, CW7, CW8, CW9, CW10, CW11, CW12, CW13, and CW15, as well as *qui tam* relator, Kevin J. Ryan, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales and marketing practices that contravened regulatory guidance; violated healthcare fraud and abuse laws, for example the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act; violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program; and exposed the Company to increased regulatory risk.

279. With respect to training and education expenses, NuVasive stated: "We dedicate significant resources toward training spine surgeons on our unique technology and products."

280. The Company also disclosed that for the period ending September 30, 2011, 64% of total revenues were spent on sales, marketing and administrative expenses, including, among other things, "compensation, commission and training costs for personnel engaged in sales, marketing and customer support functions; distributor commissions; depreciation expense for surgical instrument sets;

shipping costs; surgeon training costs; shareowner (employee) related expenses for our administrative functions; and third-party professional service fees"

281. Defendants' statements concerning purported education and training programs and sales and marketing expenses were false and misleading and omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW1, CW2, CW4, CW6, CW8, CW9, CW10, CW12, and CW13, as well as *qui tam* relator, Kevin J. Ryan: (1) Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2) Defendants utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; (3) Defendants' sales and marketing practices, such as encouraging neurophysiologists to facilitate sales and billing for medically redundant and unnecessary equipment in operating rooms and promoting off-label uses of NuVasive products, contravened regulatory guidance, violated the False Claims Act, and exposed the Company to increased regulatory risk; (4) improper and illegal expenditures were recorded under non-descript "code names" in order to

conceal Defendants' fraudulent kickback scheme in violation of the Anti-Kickback Statute and the PPACA; and (5) Defendants violated the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act, as well as the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program.

282. With respect to coding and reimbursement for the XLIF procedure, the Company stated:

> In the past certain insurance providers have adopted policies of not providing reimbursement for the XLIF procedure. We have worked with our surgeon customers and certain surgical societies who, in turn, have worked with these insurance providers to supply the information required to categorize the XLIF procedure as a procedure entitled to reimbursement under their policies … To date, we have not experienced significant lack of payment for our procedures based on these policies.

283. Defendants' statements concerning coding and reimbursement were false and misleading and omitted material information, because as confirmed by CW11, CW12, and CW15, as well as *qui tam* relator, Kevin J. Ryan, Defendants failed to disclose that: (1) Defendants employed improper sales and billing practices to sustain revenues, including, *inter alia*, promotion of NuVasive products for off-label uses, with knowledge that its customers ultimately would submit claims for reimbursement to governmental healthcare programs, including Medicare and Medicaid; and (2) Defendants provided guidance to its customers as

to how to improperly code NuVasive products and procedures in violation of the False Claims Act.

**2011 Annual Report**

284. On February 22, 2012, the Company issued a press release announcing its financial results for the quarter and year ended December 31, 2011. For the quarter, the Company reported a net loss of $10 million, or ($0.24) diluted EPS and revenue of $150.2 million, compared to net income of $61.9 million, or $1.39 diluted EPS and revenue of $129.3 million for the same period a year ago. For the year, the Company reported a net loss of $69.8 million, or ($1.73) diluted EPS and revenue of $540.5 million, compared to net income of $78.3 million, or $1.85 diluted EPS and revenue of $478.2 million for the same period a year ago.

285. On February 27, 2012, the Company filed an annual report for the period ended December 31, 2011 on Form 10-K with the SEC (the "2011 Annual Report"), which was signed by Defendants Lukianov and Lambert, and reiterated the Company's financial results and financial position, as well as its compliance with regulatory requirements, including, but not limited to, the Anti-Kickback Statute and False Claims Act. In addition, the Form 10-K contained signed certifications by Defendants Lukianov and Lambert, stating that the information contained in the Form 10-K was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

286. These reports of financial results were false and misleading and/or omitted material information, because as confirmed by numerous confidential witnesses, including CW1, CW2, CW4, CW5, CW6, CW7, CW8, CW9, CW10, CW11, CW12, CW13, and CW15, as well as *qui tam* relator, Kevin J. Ryan, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices that contravened regulatory guidance; violated healthcare fraud and abuse laws, for example the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act; violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program; and exposed the Company to increased regulatory risk.

287. With respect to education and training programs and expenses, the 2011 Annual Report stated:

> We devote significant resources to training and educating surgeons regarding the safety and reproducibility of our surgical techniques and our complimentary instruments and implants. We maintain state-of-the-art cadaver operating rooms and training facilities to help promote adoption of our products at our corporate headquarters in San Diego, California and our facility in Paramus, New Jersey. We continue to train surgeons in the XLIF technique and our other MAS platform products including: our proprietary nerve monitoring systems, MaXcess, biologics, and specialized implants. The number of surgeons trained annually includes first-time surgeons new to our MAS product platform as well as surgeons previously trained on our

MAS product platform who are attending advanced training programs.

288. Defendants' statement that the Company "devotes significant resources to training and education," as well as related statements describing purported training programs, were materially false and misleading and omitted material information, because Defendants failed to disclose that Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business. As confirmed by numerous former employees, including CW1, CW2, CW4, and CW6, as well as *qui tam* relator, Kevin J. Ryan, doctors attending training programs received free travel, lodging, and entertainment, including lavish dinners and other perks. These practices contravened regulatory guidance and policies; violated the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act; violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program; and exposed the Company to increased risk of regulatory scrutiny and prosecution for violations of healthcare fraud and abuse laws.

289. The 2011 Annual Report also stated: "As its sole financial supporter, we have also helped to establish SOLAS, a group of spine surgeons dedicated to

the development and expanded application of lateral spine surgery techniques that offer significant patient benefits and improved clinical outcomes through peer-to-peer communication, clinical education efforts, and ongoing research."

290. These statements were false and misleading and omitted material information, because Defendants failed to disclose that the Company used medical societies like SOLAS as a platform to promote its products and services, including to promote off-label and non-approved uses. Specifically, several confidential witnesses, including CW3, identified certain prominent physicians, known internally as "high end rollers," who received consulting fees and other remuneration and gifts in exchange for using NuVasive products and referring patients to clinical trials. These same "high end rollers" were installed in high level positions within certain medical societies financed by NuVasive. These practices contravened regulatory guidance and policies; violated the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act; violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program; and exposed the Company to increased risk of regulatory scrutiny and prosecution for violations of healthcare fraud and abuse laws.

291. The 2011 Annual Report further indicated that 64% of total revenue in 2011 was spent on sales, marketing and administrative expenses, including but

not limited to, "compensation, commission and training costs for personnel engaged in sales, marketing and customer support functions; distributor commissions; depreciation expense for surgical instrument sets; shipping costs; surgeon training costs; shareowner (employee) related expenses for our administrative functions; and third-party professional service fees."

292. Defendants' statements concerning purported education and training programs and sales and marketing expenses were false and misleading and omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW1, CW2, CW4, CW6, CW8, CW9, CW10, CW12, and CW13, as well as *qui tam* relator, Kevin J. Ryan: (1) Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2) Defendants utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; (3) Defendants' sales and marketing practices, such as encouraging neurophysiologists to facilitate sales and billing for medically redundant and unnecessary equipment in operating rooms and promoting off-label uses of

NuVasive products, contravened regulatory guidance, violated the False Claims Act, and exposed the Company to increased regulatory risk; (4) improper and illegal expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme in violation of the Anti-Kickback Statute and the PPACA; and (5) Defendants violated the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act, and violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program.

293. In terms of compliance with applicable laws, the Company stated:

> We are subject to the federal anti-kickback statute, which, among other things, prohibits the knowing and willful solicitation, offer, payment or receipt of any remuneration direct or indirect, in cash or in kind, in return for or to induce the referral of patients for items or services covered by Medicare, Medicaid and certain other governmental health programs. … ***We believe that our operations materially comply with the anti-kickback statutes***; however, because these provisions are interpreted broadly by regulatory authorities, we cannot be assured that law enforcement officials or others will not challenge our operations under these statutes
>
> * * *
>
> ***For years, we have maintained a compliance program structured to meet the requirements of the federal sentencing guidelines for an effective compliance program and the model compliance programs promulgated by HHS*** over the years and includes, but is not limited to, a Code of Ethical Business Conduct, designation of a compliance officer, compliance committee, policies and procedures, a confidential disclosure

method (a hotline), and conducting periodic audits to ensure compliance.

294. The following statements regarding compliance were false and misleading and/or omitted material information, because they failed to disclose that Defendants knew or recklessly disregarded the fact that the Company's sales and marketing practices exposed the Company to increased regulatory scrutiny and prosecution for violations of applicable healthcare fraud and abuse laws. In particular, Defendants failed to disclose that, *inter alia*: (1) as confirmed by CW1 and CW6, millions of dollars of gifts, including free travel, dinners, and other entertainment were provided to doctors who used NuVasive products and services; (2) according to CW1, "doctors [who] were Lukianov's favorites … received more gifts than others"; (3) as confirmed by CW2, certain "high end rollers" received special privileges as part of the "MVP" training program; (4) as confirmed by CW5, doctors were paid hundreds of thousands of dollars in "consulting fees" for authoring peer-reviewed papers promoting NuVasive's products; (5) as confirmed by CW6, improper expenses were categorized under non-descript project names, such as "Wolverine," in order to conceal Defendants' fraudulent gifts and payments in violation of applicable healthcare fraud and abuse laws; (6) as confirmed by CW10, CW12, and CW13, the Company's sales practices included encouraging neurophysiologists to facilitate sales and billing

for medically redundant and unnecessary equipment installed in operating rooms in violation of the False Claims Act; (7) as confirmed by CW14, CW18, and *qui tam* relator, Kevin J. Ryan, the Company promoted off-label uses of NuVasive products in training materials, device training to doctors, and promotional materials, and encouraged sales representatives to increase revenues through off-label sales in violation of the False Claims Act; and (8) Defendants violated the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act, and violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program. Furthermore, CW1 and CW6 confirmed that expenses for gifts to doctors appeared on Company expense reports, including reports submitted by Defendant Lukianov. In 2011, an audit of travel and entertainment expenses requested by the Board of Directors and completed by the Company's compliance team identified numerous inappropriate expenses by senior executives, including Defendant Lukianov, which violated the PPACA, as well as NuVasive's Comprehensive Healthcare Compliance Program policies. According to CW6, this improper and illegal expense reporting continued unabated even after the audit was completed. In addition to these improper expenses, Defendants were also aware that the Company prepared so-called "reimbursement guides" in order to coach doctors and hospitals on improper coding procedures in violation of the

False Claims Act. As a result, there was no reasonable basis to believe that NuVasive maintained an effective compliance program, was in compliance with healthcare fraud and abuse laws, and would not be subject to regulatory scrutiny.

295. With respect to coding and reimbursement, the 2011 Annual Report stated:

> Reimbursement is contingent on established coding for a given procedure, coverage of the codes by the third-party payers, and adequate payment for the resources used.
>
> In July of 2006 NASS established the proper physician coding for the XLIF procedure by declaring it to be encompassed in existing codes that describe an anterolateral approach to the spine. This position was confirmed in a formal statement by NASS in January 2010. Hospital coding is established by the Centers for Medicare and Medicaid Services, or CMS. XLIF is included in the nomenclature for hospital codes as an additional descriptor under existing codes. All physician and hospital coding is subject to change which could impact reimbursement and physician practice behavior.
>
> * * *
>
> At various times over the past two years, certain insurance providers have adopted policies of not providing reimbursement for the XLIF procedure. We have worked with our surgeon customers and NASS who, in turn, have worked with these insurance providers to supply the information, explanation and clinical data they require to categorize the XLIF procedure as a procedure entitled to reimbursement under their policies … We will continue to provide the appropriate resources to patients, surgeons, hospitals, and insurers in order to ensure optimum patient care and clarity regarding XLIF reimbursement and work to remove any and all non-coverage policies.

296. Defendants' statements concerning coding and reimbursement were false and misleading and omitted material information, because as confirmed by CW11 and CW15, as well as *qui tam* relator, Kevin J. Ryan, Defendants failed to disclose that: (1) Defendants employed improper sales and billing practices to sustain revenues, including, *inter alia*, promotion of NuVasive products for off-label uses, with knowledge that its customers ultimately would submit claims for reimbursement to governmental healthcare programs, including Medicare and Medicaid; and (2) Defendants provided guidance to its customers as to how to improperly code NuVasive products and procedures in violation of the False Claims Act.

**Quarterly Report for 1Q 2012**

297. On April 30, 2012, the Company issued a press release announcing its financial results for the quarter ended March 31, 2012. For the quarter, the Company reported net income of $673,000, or $0.02 diluted EPS and revenue of $151.7 million, compared to net income of $2.4 million, or $0.06 diluted EPS and revenue of $124.5 million for the same period a year ago.

298. On May 1, 2012, the Company filed a quarterly report for the first quarterly period ended March 31, 2012 on Form 10-Q with the SEC ("1Q 2012 10-Q"), which was signed by Defendants Lukianov and Lambert, and reiterated the Company's financial results and financial position, as well as the Company's

expenses related to training and education and issues with third-party payers. In addition, the Form 10-Q contained signed certifications by Defendants Lukianov and Lambert, stating that the information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

299. These reports of financial results were false and misleading and/or omitted material information, because as confirmed by numerous confidential witnesses, including CW1, CW2, CW4, CW6, CW7, CW8, CW9, CW10, CW11, CW12, CW13, and CW15, as well as *qui tam* relator, Kevin J. Ryan, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices that contravened regulatory guidance; violated healthcare fraud and abuse laws, for example the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act; violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program; and exposed the Company to increased regulatory risk.

300. With respect to training and education expenses, NuVasive stated: "We devote significant resources to offering surgeons the highest caliber training programs and venues to drive adoption of our unique technology and broad portfolio."

301. The Company also disclosed that for the period ending March 31, 2012, 62% of total revenues were spent on sales, marketing and administrative expenses, including, among other things, "compensation, commission, travel and training costs for personnel engaged in sales, marketing and customer support functions; distributor commissions; depreciation expense for surgical instrument sets; shipping costs; surgeon training costs; shareowner (employee) related expenses for our administrative functions; and third-party professional service fees."

302. Defendants' statements concerning purported education and training programs and sales and marketing expenses were false and misleading and omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW1, CW2, CW4, CW6, CW8, CW9, CW10, CW12, and CW13, as well as *qui tam* relator, Kevin J. Ryan: (1) Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2) Defendants utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do

the same; (3) Defendants' sales and marketing practices, such as encouraging neurophysiologists to facilitate sales and billing for medically redundant and unnecessary equipment in operating rooms and promoting off-label uses of NuVasive products, contravened regulatory guidance, violated the False Claims Act, and exposed the Company to increased regulatory risk; (4) improper and illegal expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme in violation of the PPACA and the Anti-Kickback Statute; and (5) Defendants violated the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act, as well as the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program.

**Quarterly Report for 2Q 2012**

303. On July 25, 2012, the Company issued a press release announcing its financial results for the quarter ended June 30, 2012. For the quarter, the Company reported net income of $2.9 million, or $0.06 diluted EPS and revenue of $154.4 million, compared to net income of $5.4 million, or $0.13 diluted EPS and revenue of $133 million for the same period a year ago.

304. On July 26, 2012, the Company filed a quarterly report for the third quarterly period ended June 30, 2012 on Form 10-Q with the SEC ("2Q 2012 10-Q"), which was signed by Defendants Lukianov and Lambert, and reiterated the

Company's financial results and financial position, as well as the Company's expenses related to training and education and issues with third-party payers. In addition, the Form 10-Q contained signed certifications by Defendants Lukianov and Lambert, stating that the information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

305. These reports of financial results were false and misleading and/or omitted material information, because as confirmed by numerous confidential witnesses, including CW1, CW2, CW4, CW6, CW7, CW9, CW10, CW11, CW12, CW13, and CW15, as well as *qui tam* relator, Kevin J. Ryan, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales and marketing practices that contravened regulatory guidance; violated healthcare fraud and abuse laws, for example the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act; violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program; and exposed the Company to increased regulatory risk.

306. With respect to training and education expenses, NuVasive stated: "We devote significant resources to offering surgeons the highest caliber training

programs and venues to drive adoption of our unique technology and broad portfolio."

307. The Company also disclosed that for the period ending June 30, 2012, 60% of total revenues were spent on sales, marketing and administrative expenses, including, among other things, "compensation, commission, travel and training costs for personnel engaged in sales, marketing and customer support functions; distributor commissions; depreciation expense for surgical instrument sets; shipping costs; surgeon training costs; shareowner (employee) related expenses for our administrative functions; and third-party professional service fees."

308. Defendants' statements concerning purported education and training programs and sales and marketing expenses were false and misleading and omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW1, CW2, CW4, CW6, CW9, CW10, CW12, and CW13, as well as *qui tam* relator, Kevin J. Ryan: (1) Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2) Defendants utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors, including

certain prominent physicians referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; (3) Defendants' sales and marketing practices, such as encouraging neurophysiologists to facilitate sales and billing for medically redundant and unnecessary equipment in operating rooms and promoting off-label uses of NuVasive products, contravened regulatory guidance, violated the False Claims Act, and exposed the Company to increased regulatory risk; (4) improper and illegal expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme in violation of the Anti-Kickback Statute and the PPACA; and (5) Defendants violated the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act, as well as the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program.

**Quarterly Report for 3Q 2012**

309. On October 24, 2012, the Company issued a press release announcing its financial results for the quarter ended September 30, 2012. For the quarter, the Company reported net income of $2.4 million, or $0.05 diluted EPS and revenue of $148.4 million, compared to a net loss of $67.6 million, or ($1.69) diluted EPS and revenue of $132.9 million for the same period a year ago.

310. On October 25, 2012, the Company filed a quarterly report for the third quarterly period ended September 30, 2012 on Form 10-Q with the SEC ("3Q 2012 10-Q"), which was signed by Defendants Lukianov and Lambert, and reiterated the Company's financial results and financial position, as well as the Company's expenses related to training and education and issues with third-party payers. In addition, the Form 10-Q contained signed certifications by Defendants Lukianov and Lambert, stating that the information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

311. These reports of financial results were false and misleading and/or omitted material information, because as confirmed by numerous confidential witnesses, including CW1, CW2, CW3, CW4, CW7, CW9, CW10, CW11, CW12, CW13, and CW15, as well as *qui tam* relator, Kevin J. Ryan, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices that contravened regulatory guidance; violated healthcare fraud and abuse laws, for example the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act; violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program; and exposed the Company to increased regulatory risk.

312. With respect to training and education expenses, NuVasive stated: “We devote significant resources to offering surgeons the highest caliber training programs and venues to drive adoption of our unique technology and broad portfolio.”

313. The Company also disclosed that for the period ending September 30, 2012, 59% of total revenues were spent on sales, marketing and administrative expenses, including, among other things, “compensation, commission, travel and training costs for personnel engaged in sales, marketing and customer support functions; distributor commissions; depreciation expense for surgical instrument sets; shipping costs; surgeon training costs; shareowner (employee) related expenses for our administrative functions; and third-party professional service fees.”

314. Defendants’ statements concerning purported education and training programs and sales and marketing expenses were false and misleading and omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW1, CW2, CW3, CW4, CW9, CW10, CW12, and CW13, as well as *qui tam* relator, Kevin J. Ryan: (1) Defendants’ education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2) Defendants

utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; (3) Defendants' sales and marketing practices, such as encouraging neurophysiologists to facilitate sales and billing for medically redundant and unnecessary equipment in operating rooms and promoting off-label uses of NuVasive products, contravened regulatory guidance, violated the False Claims Act, and exposed the Company to increased regulatory risk; (4) improper and illegal expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme in violation of the Anti-Kickback Statute and the PPACA; and (5) Defendants violated the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act, as well as the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program.

**<u>2012 Annual Report</u>**

315. On February 26, 2013, the Company issued a press release announcing its financial results for the quarter and year ended December 31, 2012. For the quarter, the Company reported a net loss of $2.7 million, or ($0.06) diluted EPS and revenue of $165.8 million, compared to a net loss of $10 million, or

($0.24) diluted EPS and revenue of $150.2 million for the same period a year ago. For the year, the Company reported net income of $3.1 million, or $0.07 diluted EPS and revenue of $620.3 million, compared to a net loss of $69.8 million, or ($1.73) diluted EPS and revenue of $540.5 million for the same period a year ago.

316. On February 27, 2013, the Company filed an annual report for the period ended December 31, 2012 on Form 10-K with the SEC (the "2012 Annual Report"), which was signed by Defendants Lukianov and Lambert, and reiterated the Company's financial results and financial position, as well as its compliance with regulatory requirements, including, but not limited to, the Anti-Kickback Statute and False Claims Act. In addition, the Form 10-K contained signed certifications by Defendants Lukianov and Lambert, stating that the information contained in the Form 10-K was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

317. These reports of financial results were false and misleading and/or omitted material information, because as confirmed by numerous confidential witnesses, including CW1, CW2, CW3, CW4, CW6, CW7, CW8, CW9, CW10, CW11, CW12, CW13, and CW15, as well as *qui tam* relator, Kevin J. Ryan, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices that contravened regulatory guidance; violated healthcare fraud and abuse laws, for example the Anti-

Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act; violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program; and exposed the Company to increased regulatory risk.

318. With respect to education and training programs and expenses, the 2012 Annual Report represented the following:

> We devote significant resources to training and educating surgeons regarding the safety and reproducibility of our MAS surgical techniques and our complementary instruments and implants. We maintain state-of-the-art cadaver operating rooms and training facilities to help educate surgeons regarding our products at our corporate headquarters in San Diego, California and our facility in Paramus, New Jersey. We continue to train surgeons in the XLIF technique and our other MAS platform products including: our proprietary nerve monitoring systems, MaXcess, biologics, and specialized implants. The number of surgeons trained annually includes first-time surgeons new to our MAS product platform as well as surgeons previously trained on our MAS product platform who are attending advanced training programs. The SOLAS Surgeon Education Committee helps direct the continued evolution of our XLIF-related training classes and materials.

319. The 2012 Annual Report also indicated that 60% of total revenue in 2012 was spent on sales, marketing and administrative expenses, including but not limited to, "compensation, commission and training costs for shareowners engaged in sales, marketing and customer support functions; distributor commissions; depreciation expense for surgical instrument sets; shipping costs;

surgeon training costs; shareowner (employee) related expenses for our administrative functions; and third-party professional service fees."

320. Defendants' statement that the Company "devotes significant resources to training and education," as well as related statements describing purported training programs, were materially false and misleading and omitted material information, because Defendants failed to disclose that Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business. As confirmed by numerous former employees, including CW1, CW2, CW3, CW4, and CW6, doctors attending training programs received free travel, lodging, and entertainment, including lavish dinners and other perks. Furthermore, Defendants failed to disclose that the Company used medical societies like SOLAS as a platform to promote its products and services, including to promote off-label and non-approved uses. Specifically, several confidential witnesses, including CW3, identified certain prominent physicians, known internally as "high end rollers," who received consulting fees and other remuneration and gifts in exchange for using NuVasive products and referring patients to clinical trials. These same "high end rollers" were installed in high level positions within certain medical societies financed by NuVasive. These practices contravened regulatory guidance and policies; violated

the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act; violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program; and exposed the Company to increased risk of regulatory scrutiny and prosecution for violations of healthcare fraud and abuse laws.

321. Regarding compliance with applicable laws, the Company stated:

> We are subject to the federal anti-kickback statute which, among other things, prohibits the knowing and willful solicitation, offer, payment or receipt of any remuneration, direct or indirect, in cash or in kind, in return for or to induce the referral of patients for items or services covered by Medicare, Medicaid and certain other governmental health programs. … ***We believe that our operations materially comply with the anti-kickback statutes***; however, because these provisions are interpreted broadly by regulatory authorities, we cannot be assured that law enforcement officials or others will not challenge our operations under these statutes
>
> * * *
>
> ***For years, we have maintained a compliance program structured to meet the requirements of the federal sentencing guidelines for an effective compliance program and the model compliance programs promulgated by HHS*** over the years and includes, but is not limited to, a Code of Ethical Business Conduct, designation of a compliance officer, compliance committee, policies and procedures, a confidential disclosure method (a hotline), and conducting periodic audits to ensure compliance.

322. The following statements regarding compliance were false and misleading and/or omitted material information, because they failed to disclose

that Defendants knew or recklessly disregarded the fact that the Company's sales and marketing practices exposed the Company to increased regulatory scrutiny and prosecution for violations of applicable healthcare fraud and abuse laws. In particular, Defendants failed to disclose that, *inter alia*: (1) as confirmed by CW1 and CW6, millions of dollars of gifts, including free travel, dinners, and other entertainment were provided to doctors who used NuVasive products and services; (2) according to CW1, "doctors [who] were Lukianov's favorites … received more gifts than others"; (3) as confirmed by CW2, certain "high end rollers" received special privileges as part of the "MVP" training program; (4) as confirmed by CW5, doctors were paid hundreds of thousands of dollars in "consulting fees" for authoring peer-reviewed papers promoting NuVasive's products; (5) as confirmed by CW6, improper expenses were categorized under non-descript project names, such as "Wolverine," in order to conceal Defendants' fraudulent gifts and payments in violation of applicable healthcare fraud and abuse laws, including the Anti-Kickback Statute and the PPACA; (6) as confirmed by CW10 and CW13, the Company's sales practices included encouraging neurophysiologists to facilitate sales and billing for medically redundant and unnecessary equipment installed in operating rooms in violation of the False Claims Act; (7) as confirmed by CW14, CW18, and *qui tam* relator, Kevin J. Ryan, the Company promoted off-label uses of NuVasive products in training

materials, device training to doctors, and promotional materials, and encouraged sales representatives to increase revenues through off-label sales in violation of the False Claims Act; and (8) Defendants violated the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act, as well as the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program. Furthermore, CW1 and CW6 confirmed that expenses for gifts to doctors appeared on Company expense reports, including reports submitted by Defendant Lukianov. In 2011, an audit of travel and entertainment expenses requested by the Board of Directors and completed by the Company's compliance team identified numerous inappropriate and illegal expenses by senior executives, including Defendant Lukianov, which violated the PPACA, as well as NuVasive's Comprehensive Healthcare Compliance Program policies. According to CW6, this improper expense report continued unabated even after the audit was completed. In addition to these improper expenses, Defendants were also aware that the Company prepared so-called "reimbursement guides" in order to coach doctors and hospitals on improperly coding procedures in violation of the False Claims Act. As a result, there was no reasonable basis to believe that NuVasive maintained an effective compliance program, was in compliance with healthcare fraud and abuse laws, and would not be subject to regulatory scrutiny.

323. With respect to coding and reimbursement, the 2012 Annual Report stated:

> Reimbursement is contingent on established coding for a given procedure, coverage of the codes by the third-party payers, and adequate payment for the resources used.
>
> In July of 2006, NASS established the proper physician coding for the XLIF procedure by declaring it to be encompassed in existing codes that describe an anterolateral approach to the spine. This position was confirmed in a formal statement by NASS in January 2010. Hospital coding is established by CMS. XLIF is included in the nomenclature for hospital codes as an additional descriptor under long standing codes. All physician and hospital coding is subject to change which could impact reimbursement and physician practice behavior.

324. With respect to the Company's monitoring business, the 2012 Annual Report explained: "In addition, there is a downward pressure on reimbursement for the IOM services provided by Impulse Monitoring. Significant coding changes for IOM services take effect in 2013. New Current Procedural Terminology (CPT) codes were introduced that may lead to reduced reimbursement by private payers for the professional remote oversight component of the service. Medicare patients will be subject to additional coding changes imposed by CMS which may restrict access to care and limit Impulse Monitoring's ability to cover, bill and collect for cases performed."

325. Defendants' statements concerning coding and reimbursement were false and misleading and omitted material information, because Defendants failed

to disclose that Defendants employed improper sales and billing practices to sustain revenues, including, *inter alia*, promotion of NuVasive products for off-label uses, in violation of the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act, as well as the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program. These practices included, but were not limited to: (1) "double-billing" physician's time by allowing the same physician to monitor multiple patients simultaneously (as confirmed by CW7); (2) pressuring neurophysiologists to assist with sales efforts during surgeries (as confirmed by CW10, CW12, and CW13); (3) installing redundant equipment in operating rooms in violation of the False Claims Act (as confirmed by CW12 and CW13; (4) providing guidance to its customers as to how to improperly code NuVasive products and procedures in violation of the False Claims Act (as confirmed by CW5); and (5) promoting off-label uses of NuVasive products, which caused ineligible claims to be submitted and reimbursed by federal health care programs (as confirmed by CW14, CW18, and *qui tam* relator, Kevin J. Ryan).

**Quarterly Report for 1Q 2013**

326. On April 30, 2013, the Company issued a press release announcing its financial results for the quarter ended March 31, 2013. For the quarter, the Company reported net income of $851,000, or $0.02 diluted EPS and revenue of $159.5 million, compared to net income of $673,000, or $0.02 diluted EPS and revenue of $151.7 million for the same period a year ago.

327. On May 1, 2013, the Company filed a quarterly report for the first quarterly period ended March 31, 2013 on Form 10-Q with the SEC ("1Q 2013 10-Q"), which was signed by Defendants Lukianov and Lambert, and reiterated the Company's financial results and financial position, as well as the Company's expenses related to training and education and issues with third-party payers. In addition, the Form 10-Q contained signed certifications by Defendants Lukianov and Lambert, stating that the information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

328. These reports of financial results were false and misleading and/or omitted material information, because as confirmed by numerous confidential witnesses, including CW2, CW3, CW4, CW9, CW10, and CW13, as well as *qui tam* relator, Kevin J. Ryan, they failed to disclose that the Company's earnings and revenues were attributable, in part, to sales, marketing, and billing practices

that contravened regulatory guidance; violated healthcare fraud and abuse laws, for example the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act; violated the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program; and exposed the Company to increased regulatory risk.

329. With respect to training and education expenses, NuVasive stated: "The Company dedicates significant resources toward training spine surgeons on its unique technology and products."

330. The Company also disclosed that for the period ending March 31, 2013, 63% of total revenues were spent on sales, marketing and administrative expenses, including, among other things, "compensation, commission and training costs for shareowners engaged in sales, marketing and customer support functions; distributor commissions; depreciation expense for surgical instrument sets; shipping costs; surgeon training costs; shareowner (employee) related expenses for our administrative functions; and third-party professional service fees."

331. Defendants' statements concerning purported education and training programs and sales and marketing expenses were false and misleading and omitted material information, because Defendants failed to disclose that, as confirmed by numerous former employees, including CW2, CW3, CW4, CW9, CW10, and CW13, as well as *qui tam* relator, Kevin J. Ryan: (1) Defendants' education and training programs and expenses related thereto were a contrivance to disguise improper and illegal gifts, payments, and other remuneration to doctors in exchange for referrals of business; (2) Defendants utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors, including certain prominent physicians referred to by Company insiders as "high end rollers," to utilize its products and services and to encourage other doctors to do the same; (3) Defendants' sales and marketing practices, such as encouraging neurophysiologists to facilitate sales and billing for medically redundant and unnecessary equipment in operating rooms and promoting off-label uses of NuVasive products, contravened regulatory guidance, violated the False Claims Act, and exposed the Company to increased regulatory risk; (4) improper and illegal expenditures were recorded under non-descript "code names" in order to conceal Defendants' fraudulent kickback scheme in violation of the Anti-Kickback Statute and the PPACA; and (5) Defendants violated the Anti-Kickback Statute, the Patient Protection and

Affordable Care Act, and the False Claims Act, as well as the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program.

332. With respect to coding and reimbursement for the XLIF procedure, the Company stated:

> At various times in the past, certain insurance providers have adopted policies of not providing reimbursement for the XLIF procedure or some of its components. We have worked with our surgeon customers and the North American Spine Society (NASS) who, in turn, have worked with these insurance providers to supply the information, explanation and clinical data they require to categorize the XLIF procedure as a procedure entitled to reimbursement under their policies. At present, the majority of insurance companies provide reimbursement for XLIF procedures. However, certain carriers, large and small, may have policies significantly limiting coverage of XLIF, Instrumented Lumbar Interlaminar Fusion (ILIF), Osteocel Plus, the PCM ® Cervical Disc System, or other procedures or products we sell. We cannot offer definitive time frames or final outcomes regarding reversal of the coverage-limiting policies, as the process is dictated by the third-party insurance providers. To date, we have not experienced significant lack of payment for our procedures based on these policies.

333. Furthermore, with respect to coding and reimbursement for IOM services, the Company stated:

> [T]here is a downward pressure on reimbursement for the IOM services such as those provided by Impulse Monitoring. Significant coding changes for IOM services took effect in 2013. New Current Procedural Terminology (CPT) codes were introduced that may lead to reduced reimbursement by private

> payers for the professional remote oversight component of the service. Medicare patients will be subject to additional coding changes imposed by CMS which may restrict access to care and limit Impulse Monitoring's ability to cover, bill and collect for cases performed.

334. Defendants' statements concerning coding and reimbursement were false and misleading and omitted material information, because Defendants failed to disclose that Defendants employed improper sales and billing practices to sustain revenue in violation of the Anti-Kickback Statute, the Patient Protection and Affordable Care Act, and the False Claims Act, as well as the MDMA Code, NuVasive's Comprehensive Healthcare Compliance Program, and its Global Business Ethics and Compliance Program. These practices included, but were not limited to: (1) "double-billing" physician's time by allowing the same physician to monitor multiple patients simultaneously (as confirmed by CW7); (2) pressuring neurophysiologists to assist with sales efforts during surgeries (as confirmed by CW10, CW12, and CW13); (3) installing redundant equipment in operating rooms in violation of the False Claims Act (as confirmed by CW12 and CW13; (4) providing guidance to its customers as to how to improperly code NuVasive products and procedures in violation of the False Claims Act (as confirmed by CW5); and (5) promoting off-label uses of NuVasive products, which caused ineligible claims to be submitted and reimbursed by federal health care programs (as confirmed by CW14, CW18, and *qui tam* relator, Kevin J. Ryan).

## LOSS CAUSATION/MATERIALIZATION OF THE RISK

335. Throughout the Class Period, Defendants concealed the extent to which NuVasive's sales, marketing, and billing practices exposed the Company to increased regulatory scrutiny and lawsuits, including the risk of fines and penalties related to the Company's pervasive regulatory compliance failures and violations of federal and state laws and regulations, including, *inter alia*, the Anti-Kickback Statute and False Claims Act.

336. These risks were known to Defendants, but remained concealed from investors. Among other things, as set forth in detail herein, on September 10, 2012, Kevin J. Ryan, a former NuVasive sales employee filed a *qui tam* lawsuit, alleging that the Company had engaged in an illegal off-label marketing and kickback scheme, causing federal and state health care programs to pay millions of dollars in claims for the use of medical devices that were not approved and were not reasonable and medically necessary, in violation of the False Claims Act and Anti-Kickback Statute (the "*Qui Tam* Action"). While Defendants were well aware of the basis of the relator allegations, the *Qui Tam* Action remained undisclosed to investors.

337. However, the Company's aggressive marketing and billing practices and purported "educational" programs, which served as a thinly-disguised

kickback system to reward doctors for using NuVasive's products, inevitably attracted the attention of regulators and could no longer be concealed by the Defendants. Thus, on July 30, 2013, the Company filed a Form 10-Q with the SEC, where it disclosed the following in relevant part:

> During the three months ended June 30, 2013, the Company received a federal administrative subpoena from the Office of the Inspector General of the U.S. Department of Health and Human Services (OIG) in connection with an investigation into possible false or otherwise improper claims submitted to Medicare and Medicaid. The subpoena seeks discovery of documents for the period January 2007 through April 2013. The Company is working with the OIG to understand the scope of the subpoena and its request for documents, but do not expect to have greater clarity regarding the request for several months. The Company intends to fully cooperate with the OIG's request. At June 30 2013, the Company is unable to determine the potential financial impact, if any, that will result from this investigation.

338. On the same day, during an investor conference call, Defendant Lukianov stated, "The OIG subpoena is a very broad document request. It was very focused on interbody CoRoent and biologics Osteocel and Formagraft, but very, very broad beyond those as well. And again, it's a request for information. It's not litigation. And this will be going on for a few months, I'm sure, as we sort it out with OIG in terms of the specific information that they would like to see." Analysts remarked that the subpoena "ha[s] kind of the earmarks of false claims or whistleblower type action." *See* July 30, 2013 NuVasive Earnings Conference

Call. Drilled by analysts, Defendant Lukianov admitted that the subpoena is not simply part of a broader request of similarly situated companies, but rather "is specific to NuVasive and a very broad request." *Id*.

339. Immediately following these disclosures, analysts advised the market that the OIG subpoena "ha[d] a predictable outcome," resulting in tens of millions of dollars to be paid by NuVasive as a result of illicit sales practices in violation of the federal anti-kickback legislation or the Federal Healthcare Fraud and False Claims statutes:

> [the OIG subpoena] has plenty of precedence on how it plays out: The [OIG] has requested documents for the period January 2007 through April 2013. While the government is mainly focused on Medicare billing claims on inter-body fusions (used for most of NUVA's fusion procedures) and biologics (Osteocel Plus), they are 'casting a very broad net.' As NUVA points out, no charges have been filed against the company, and they are complying with the investigation. However, as these investigations have become commonplace in the device industry (usually relating to sales practices in violating Federal anti-kickback legislation, or the Federal Healthcare Fraud and False Claims statute, which appears to be the case here) there is plenty of precedence on the likely outcome. Specifically, almost all of these inquiries have led to a settlement, in the form of a Corporate Integrity Agreement, which includes a Deferred Prosecution Agreement (where the company agrees to clean up questionable practices over a 1-2 year period to avoid prosecution and disqualification from Medicare participation). Assuming the investigation follows this path, the initial impact will be increased legal cost near term (which the company has assumed in 2013, leaving us to believe NUVA is not peripheral, but the focus of the investigation), and an eventual settlement, leading to a DPA that will require additional cost for hiring a government appointed monitor (WMGI $27.37, Buy was of similar size, and paid $50 million per year over initially a year and a half period), fines (hard to gauge, but historically in the $25-75 million range, for a company of NUVA's size), and the strong

> likelihood of business disruptions over the monitoring period. In addition, there is increased headline risk, and given that NUVA is less likely to be acquired until the investigation is resolved, we think valuation is capped at ~$25 or 2x 2014 EV/Sales, as a near-term acquisition becomes unlikely.

*See* Brean Capital, LLC analyst report dated July 31, 2013.

340. On this news, NuVasive's securities declined $3.28 per share or over 12%, to close at $22.84 per share on July 31, 2013.

**Post-Class Period Confirming Events**

341. Subsequent developments confirmed what investors already recognized upon the announcement of the OIG investigation. First, on April 1, 2015, NuVasive announced the forced resignation of Defendant Lukianov from both his position as CEO and as a member of the Company's Board of Directors based upon violations of the Company's expense reimbursement and personnel policies. On this news, NuVasive's securities declined 5.4% on higher-than-average trading volume, to close at $43.52 after a trading halt put in place prior to the announcement was lifted.

342. Less than one month later, on April 29, 2015, NuVasive announced that it had reached an agreement in principle with the DOJ to resolve potential claims arising from the OIG's investigation of false and/or improper claims submissions to Medicare and Medicaid in exchange for payment of approximately $13.8 million, including fees.

343. Thereafter, on July 30, 2015, the DOJ announced that NuVasive had entered into a definitive agreement to pay the United States $13.5 million, plus fees, to resolve allegations that the Company caused false claims to be submitted to Medicare and other federal health care programs by marketing the CoRoent System for surgical uses not approved by the FDA and by paying kickbacks to induce physicians to use the Company's products, including the CoRoent System.

344. The DOJ announcement explained that the U.S. alleged that between 2008 and 2013, NuVasive promoted the use of the CoRoent System for surgical uses that were not approved or cleared by the FDA, which caused physicians and hospitals to submit false claims to federal health care programs for certain spine surgeries that were not eligible for reimbursement.

345. The U.S. further alleged that NuVasive knowingly offered and paid illegal remuneration to certain physicians, including, *inter alia*, promotional speaker fees, honoraria, and expenses related to attending Company events, to induce them to use the Company's products. U.S. Attorney Rod J. Rosenstein commented: "Health care providers need to be free to make medical decisions without improper influence by material or incentives from manufacturers. A medical device manufacturer violates the law if it knowingly causes physicians to use its products for purposes that are not medically reasonable and necessary and to bill federal health insurance programs."

346. Special Agent in Charge Nick DiGiulio of the OIG further stated: "Defrauding Medicare and Medicaid by paying kickbacks to physicians and promoting uses not covered by Federal health care programs will not be tolerated. Settlements such as the one entered into today by NuVasive send a message to the medical device industry that such practices will be closely monitored."

347. The DOJ Settlement also resolved the *Qui Tam* Action, which similarly alleged that "NuVasive's illegal scheme to promote the use of CoRoent XL implants for indications that were not FDA approved greatly increased CoRoent XL implants' sales to the great financial benefit of NuVasive, but caused federal and state health care programs to pay millions of dollars for the use of medical devices that were not approved, were not reasonable and medically necessary and were medically unsafe for non-approved uses."

**ADDITIONAL SCIENTER ALLEGATIONS**

348. The Company repeatedly stated that its business was "largely dependent on the availability of reimbursement from third-party payers, such as governmental programs, for example Medicare and Medicaid…" The Company further acknowledged that "[o]ur relationship with health care professionals … are subject to scrutiny under various state and federal laws, rules and regulation," and "violations of these laws may be punishable by criminal or civil sanctions, including substantial fines, imprisonment, and exclusion from participation in

governmental healthcare programs." The Company also acknowledged: "Pursuant to FDA regulations, we can only market our products for cleared or approved uses…"

349. Because compliance with healthcare fraud and abuse laws was critical to the Company's business, Defendants cannot credibly claim that they were unaware of the illegal and improper payment of kickbacks in violation of the Anti-Kickback Statute. Likewise, Defendants cannot claim that they were unaware of off-label marketing and aggressive coding and billing practices, which produced a significant financial benefit for NuVasive, generating millions of dollars of additional revenue and year-over-year growth in sales, and resulted in submission of improper claims to Medicare and Medicaid in violation of the False Claims Act and other applicable laws and regulations.

350. In addition, the Company spent billions of dollars in sales, marketing, and administrative expenses throughout the Class Period, which included amounts expended for, among other things, surgeon training, commissions, and third party professional fees. In every year since 2008, sales, marketing, and administrative expenses consumed in excess of 60% of the Company's total revenues, a disproportionate percentage as compared to any of the Company's competitors. The amounts were so great and impacted profits to such an extent that the Defendants knew or should have known that these expenses encompassed

inappropriate and improper expenses that contravened regulatory guidance, violated healthcare fraud and abuse laws, and substantially increased regulatory risk.

351. Moreover, the payment of kickbacks and off-label promotion of NuVasive products permeated every aspect of NuVasive's business and involved high-level executives throughout the Company, including the Individual Defendants herein.

352. The Individual Defendants, as directors and/or officers of NuVasive during the Class Period, are liable as direct participants in all of the wrongs complained of herein. Through their positions of control and authority, these Defendants were in a position to, and did, control all of the Company's false and misleading statements and omissions, including the contents of SEC filings and press releases, as set forth herein.

353. With respect to Defendant O'Boyle, in addition to his experience, high level position and access to information, Defendant O'Boyle signed the Company's SEC filings and accompanying SOX certifications through November 6, 2009, certifying that the information contained therein was accurate.

354. During Defendant O'Boyle's tenure, several confidential witnesses confirm that the Company engaged in improper sales, marketing, and billing practices. For example, CW2 described the training program, known as MVP,

which provided all expense-paid travel to physicians invited to attend. Similarly, CW14 and CW15 confirmed that NuVasive took a very aggressive posture with third-party payers regarding coding and reimbursement for the XLIF procedure. According to CW14, the manner in which the Company coded the XLIF procedure impacted the Company's revenues by millions of dollars each year. Likewise, as confirmed by both the DOJ Settlement and the *Qui Tam* Action, during Defendant O'Boyle's tenure, NuVasive's sales and resulting growth in revenues were attributable to an extensive off-label marketing scheme, which involved dissemination of improper and illegal promotional materials and Company-sponsored training of both employees and physicians by high-ranking executives throughout the Company. As CFO, Defendant O'Boyle would have been aware of the extent to which NuVasive's sales, marketing, and billing practices affected the Company's revenues.

355. With respect to Defendant Lukianov, in addition to his experience, high level position, access to information, and the fact that he signed all of the Company's SEC filings throughout the Class Period, numerous confidential witnesses confirm that he directly participated in the fraud alleged herein.

356. CW1 worked directly for Defendant Lukianov from December 2009 to September 2012. During her tenure, CW1 became aware of millions of dollars in gifts and perks given to physicians in exchange for using NuVasive products.

CW1 discovered that "some of the doctors were Lukianov's favorites," and "those doctors received more gifts than the others."

357. Similarly, CW6 had access to and regularly audited Company expense reports for senior executives, including Defendant Lukianov, from June 2010 to April 2012. According to CW6, Defendant Lukianov's expense reports indicated that, among other things, he traveled with doctors on the Company's private jet, commissioned special gifts for prominent physicians, entertained physicians with tickets to Broadway shows and professional sporting events, and attended all-expense, Company-paid luxury vacations with physicians to such places as Puerto Rico and ski-resort destinations. CW6 said that these excessive expenses, as well as others, were flagged during a special audit requested by the Board of Directors in 2011. However, CW6 indicated that even after the audit was complete, Defendant Lukianov continued his practice of billing the Company for physician gifts and entertainment.

358. CW3, who worked for the Company from June 2012 to February 2013, confirmed that Lukianov attended events at the Company's headquarters with certain "high end rollers," who received special privileges for referring patients to clinical trials. These events included catered affairs with large quantities of champagne and wine. CW3 noted, "The CEO did not skimp on champagne and wine." CW3 also recalled that Drs. Goodrich and Volcan

received specially-ordered wine bottles as gifts after publishing a text book on XLIF.

359. According to CW14 and *qui tam* relator, Kevin J. Ryan, these Company events attended by Defendant Lukianov also involved promotions, demonstrations, and training of physicians in off-label uses of NuVasive products.

360. Likewise, CW4 and CW8 explained the practice of recruiting doctors to attend training programs based upon the doctors' ability to refer business to the Company.

361. CW5, who worked for NuVasive from June 2010 to February 2011, confirmed that Defendant Lukianov was involved in the development of reimbursement guides distributed to sales representatives, which instructed doctors and hospitals on coding expenses for monitoring services in order to maximize reimbursement. CW5 said that her direct supervisor worked with Defendant Lukianov, who "was aware of what we were doing in that space" to promote and market the Company's monitoring services.

362. CW14 similarly confirmed that Defendant Lukianov was aware of and encouraged the use of off-label sales to grow revenues during sales meetings.

363. With respect to Defendant Lambert, in addition to his experience, certification of the Company's SEC filings, high level position and access to information, numerous confidential witnesses confirm that he was told by several

employees about excessive expenses and gifts paid to doctors, as well as Defendant Lukianov's personal expenses billed to the Company. CW1 indicated that she told Defendant Lambert that Defendant Lukianov was running inappropriate expenses through the Company. CW1 said, "[Defendant Lambert] approved the expenses anyway. Always."

364. After raising concerns with the Company's Controller, Compliance Manger, and General Counsel, but seeing no changes in the reporting of travel and entertainment expenses, CW6 also spoke directly with Defendant Lambert. In or about 2011, CW6 went to Defendant Lambert's office to discuss the inappropriate items reported in the audit requested by the Board of Directors. Defendant Lambert said, "Thank you for letting me know … I'll take care of it."

365. CW6 said that after the Board's audit, Defendant Lukianov's were submitted to and continued to be approved by Defendant Lambert. CW6 also said that following the Board's audit, she was instructed by the Controller and the Company's General Counsel to file questionable expenses under code names like "Wolverine." Based upon their positions in the Company and direct involvement, Defendants Lukianov and Lambert knew or should have known of this accounting change to conceal the Company's improper and illegal sales and marketing scheme.

366. Furthermore, the Board's audit of expenses in 2011 provided notice to Defendants Lukianov and Lambert that the Company lacked sufficient internal controls to detect and prevent wrongful and illegal sales and marketing and billing practices in violation of healthcare fraud and abuse laws. As CW6 explained, rather than correcting any compliance issues, Defendants Lukianov and Lambert developed a system whereby a small group of senior executives, including Defendants Lukianov and Lambert, as well as the Company's General Counsel, Jason Hannon and senior executive Peter Valentine, approved each other's expenses. No further steps were taken to ensure the Company's compliance with healthcare fraud and abuse laws.

367. Defendants Lukianov and Lambert were also aware of and/or recklessly disregarded compliance issues related to its monitoring business. CW9 and CW10 confirmed that following changes to coding rules, there was increased pressure from management to sustain profitability. CW10, CW12, and CW13 all describe instances where neurophysiologists were encouraged to facilitate sales and install medically redundant or unnecessary equipment. Similarly, CW11 explained defects in the Company's billing system, which allowed employees to manually override billing codes. CW11 noted that several employees complained that invoices were improperly coded and submitted for reimbursement to Medicare and Medicaid.

368. Furthermore, *Qui Tam* Action filed by relator Kevin J. Ryan details pervasive, illegal, off-label marketing and kickback schemes implemented by Defendants as early as 2008. This illegal conduct included, *inter alia*: (1) training NuVasive's national sales force to promote off-label uses of NuVasive products in order to increase sales; (2) disseminating promotional materials to physicians recommending NuVasive products for surgical uses and treatments not approved by the FDA; (3) providing device training to physicians on off-label uses and treatments for Nuvasive products; and (4) using Company-financed medical societies and training sessions, as well as paid consultants, to train and make recommendations physicians on off-label uses of NuVasive products.

369. The DOJ Settlement also substantiates Defendants' scienter. Specifically, the DOJ Settlement provides:

> The United States contends that it and the Medicaid Participating States have certain civil claims against NuVasive for engaging in the following conduct (hereinafter referred to as the "Covered Conduct"):
>
> 1. During the period January 1, 2008, through December 31, 2013, NuVasive knowingly marketed the CoRoent for uses that were not approved or cleared by FDA, most notably spine fusion procedures involving more than two contiguous levels of the spine, use in the thoracic region of the spine, and use in treating severe scoliosis and severe spondylolisthesis. Some of these uses were not reasonable and necessary for the diagnosis or treatment of an illness or injury under 42 U.S.C. § 1395y(a)(1(A),

> and thus were not covered by Medicare, Medicaid, TRICARE, or FEHBP.
>
> 2. During the period January 1, 2008, through December 31, 2013, NuVasive knowingly offered and paid illegal remuneration to certain physicians to induce them to use CoRoent in spinal fusion surgeries, in violation of the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b). The illegal remuneration consisted of promotional speaker fees, honoraria and expenses for attending events sponsored by the Society of Lateral Access Surgery ("SOLAS"). Despite its outward appearance of independence, SOLAS was created, funded, and operated solely by NuVasive.
>
> As a result of the foregoing conduct, the Government alleges that NuVasive knowingly caused false or fraudulent claims for CoRoent to be submitted to, or caused purchases by, Medicare, Medicaid, TRICARE, and FEHBP.

370. NuVasive agreed to pay $13.8 million in fines and penalties to the United States to resolve the OIG Investigation and the *Qui Tam* Action.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

371. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired NuVasive securities during the Class Period (the "Class"); and were damaged thereby. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

372. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, NuVasive securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by NuVasive or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

373. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

374. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

375. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;
- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of NuVasive;
- whether the Individual Defendants caused NuVasive to issue false and misleading financial statements during the Class Period;
- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of NuVasive securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

376. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs

done to them. There will be no difficulty in the management of this action as a class action.

377. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- NuVasive securities are traded in efficient markets;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ, and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and members of the Class purchased and/or sold NuVasive securities between the time the defendants failed to disclose or misrepresented material facts and the time the true

facts were disclosed, without knowledge of the omitted or misrepresented facts.

378. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

### (Against All Defendants For Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder)

379. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

380. This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

381. During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such

scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of NuVasive securities; and (iii) cause Plaintiff and other members of the Class to purchase NuVasive securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

382. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for NuVasive securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about NuVasive's finances and business prospects. By virtue of their positions at NuVasive, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and

disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

383. Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of NuVasive, the Individual Defendants had knowledge of the details of NuVasive internal affairs. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of NuVasive. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to NuVasive's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of NuVasive securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning NuVasive's business and financial condition which were concealed by defendants,

Plaintiff and the other members of the Class purchased NuVasive securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

384. During the Class Period, NuVasive securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of NuVasive securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiff and the Class, the true value of NuVasive securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of NuVasive securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members. By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

385. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the materialization of previously undisclosed risks regarding the Company's compliance with health care fraud and abuse laws, including, *inter alia*, the Anti-Kickback Statute and the False Claims Act, as well as the Company's stated compliance policies.

**COUNT II**

**(Violations Of Section 20(a) Of The Exchange Act Against The Individual Defendants)**

386. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

387. During the Class Period, the Individual Defendants participated in the operation and management of NuVasive, and conducted and participated, directly and indirectly, in the conduct of NuVasive's business affairs. Because of their senior positions, they knew the adverse non-public information about NuVasive's misstatement of income and expenses and false financial statements.

388. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to NuVasive's financial condition and results of operations, and to

correct promptly any public statements issued by NuVasive which had become materially false or misleading.

389. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which NuVasive disseminated in the marketplace during the Class Period concerning NuVasive's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause NuVasive to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of NuVasive within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of NuVasive securities.

390. Each of the Individual Defendants, therefore, acted as a controlling person of NuVasive. By reason of their senior management positions and/or being directors of NuVasive, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, NuVasive to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of NuVasive and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

391. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by NuVasive.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: October 7, 2016

**POMERANTZ LLP**

By: *<u>/s/ Jeremy A. Lieberman</u>*

Jeremy A. Lieberman (admitted *pro hac vice)*
Michele S. Carino
Emma Gilmore
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: 212-661-1100
Facsimile: 212-661-8665
Email: jalieberman@pomlaw.com

mcarino@pomlaw.com
egilmore@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: 312-377-1181
Facsimile: 312-377-1184
Email: pdahlstrom@pomlaw.com

**GLANCY BINKOW & GOLDBERG LLP**
Lionel Z. Glancy
Michael Goldberg
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: 310-201-9150
Facsimile: 310-201-9160
Email: info@glancylaw.com
lglancy@glancylaw.com
mmgoldberg@glancylaw.com

***Counsel for Lead Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2016, I electronically filed the foregoing Sixth Amended Class Action Complaint For Violations Of The Federal Securities Laws with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the attorneys of record registered with the CM/ECF system, and will electronically send the foregoing to those indicated as non-registered participants on October 7, 2016.

This 7th day of October, 2016.

*/s/Jeremy A. Lieberman*
**POMERANTZ LLP**
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665